UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .   CR No. 25-0244 (SLS)
                                   .
     v.                            .
                                   .   Washington, D.C.
SYDNEY LORI REID,                  .   Wednesday, October 15, 2025
                                   .   9:12 a.m.
          Defendant.               .
. . . . . . . . . . . . . . . ..   Pages 256 through 453



TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:            TRAVIS WOLF, AUSA
                              JASON FACCI, AUSA
                              U.S. Attorney's Office
                              601 D Street NW
                              Washington, DC 20530


For Defendant:                TEZIRA ABE, AFPD
                              EUGENE OHM, AFPD
                              Federal Public Defender Office
                              625 Indiana Avenue NW
                              Suite 550
                              Washington, DC 20004

Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

TESTIMONY

EUGENIA BATES:         Cross-Examination (Cont') .......... 267
                       Redirect Examination ............... 343

JESSICA MASON:         Direct Examination ................. 406
                       Cross-Examination .................. 414

CATHERINE CAMPBELL-    Direct Examination................. 415
MORRISON:              Cross-Examination .................. 418

*   *   *

EXHIBITS RECEIVED

Defendant Exhibit No. 5b ............................... 272
Defendant Exhibit No. 5d ............................... 283
Defendant Exhibit No. 8 ................................ 320
Government Exhibit No. 6 ............................... 333
Defendant Exhibit Nos.9-12 ............................. 409

*   *   *

P R O C E E D I N G S

DEPUTY CLERK:  We're back on the record in criminal
action 25-244, United States of America versus Sydney Lori
Reid.  Counsel, please state your appearances for the record.

MR. WOLF:  Good morning, Your Honor.  Travis Wolf for
the United States.  Mr. Facci will be joining me shortly, and
I'll be joined also by my paralegal, who will also be joining
me shortly.

THE COURT:  Okay.  Good morning.

MS. ABE:  Good morning, Your Honor.  Tezira Abe and
Eugene Ohm on behalf of Ms. Sydney Reid, who is present in the
courtroom, and we are joined at counsel table by Rhiannon
Little.

THE COURT:  Okay.  Team, when I say we're starting at
9:00, we're starting at 9:00.  Mr. Wolf was the only one here
at 9:00.  I was here well before 9:00 so we could start at
9:00 and start trial at 9:30 so I'm not keeping the jury
waiting.

Okay.  Let's start with your discussions yesterday evening
on the late videos.  Can someone update me on where we are?

MR. WOLF:  Yes, Your Honor.  The government conferred
with the defense and informed them that we're not going to
call Ms. Beverly based on everything that happened yesterday.
I think that puts the issue to bed, but I'll let the defense
confirm on that one.

1          MR. OHM:  That's correct, Your Honor.  The government

2     proposed sort of a missing evidence instruction that advised

3     the jury that there were these videos but they're not going to

4     see them.  We prefer that not be injected at all.  And I know

5     that the court didn't want to give the standard missing

6     evidence instruction or any version of that, so given that

7     they're not calling Ms. Beverly, we're not asking for another

8     instruction.

9          THE COURT:  Okay.  That sounds good.  And after Agent

10    Bates's testimony, I'm not sure that she's necessary in any

11    event.

12      So I then have from the defense the additional exhibits.

13    Mr. Wolf, do you have any objections or thoughts on any of

14    those?

15          MR. WOLF:  So start with kind of the easiest one first,

16    Defense Exhibit 7 and 7a, I believe?  It's an email disclosure

17    that I sent along with an attached image.  I had concerns

18    about whether the email in its form could raise 403 issues, so

19    I proposed a stipulation instead that would track the language

20    of the disclosure, and I don't think the defense has an

21    objection.  I do have the stipulation here that I've provided

22    to the defense.  So I think we would just revise the exhibit

23    numbers, but I think that issue is resolved.

24          THE COURT:  Okay.  So in lieu of 7 and 7a, you're going

25    to work out a stipulation?

1              MR. WOLF:  Yes.

2              THE COURT:  Is that right, Mr. Ohm?

3              MR. OHM:  It is, Your Honor.  I think we're already

4       there.

5              THE COURT:  Okay.  All right.

6              MR. OHM:  Look at us.

7              THE COURT:  All right.  That was the easy one.

8          What's next, Mr. Wolf?

9              MR. WOLF:  I forget the exact number, but there's an

10      exhibit, I think it's at either 5 or 6, that's Officer Liang's

11      prior grand jury testimony.

12             THE COURT:  It's 5 and 6.  Yeah.

13             MR. WOLF:  The government -- I guess we don't know

14      exactly the foundation by which the defense would be

15      attempting to elicit this if they're not calling Officer

16      Liang.  So I don't think it ought to be elicited as a prior

17      inconsistent statement in that Officer Liang is not

18      testifying, and if it's not being offered for the truth, I

19      don't understand the relevance of it if it's not going to be

20      offered as a prior inconsistent statement.

21             THE COURT:  Okay.  Mr. Ohm, are you planning to call

22      Officer Liang and Officer Residovic?

23             MR. OHM:  I don't think so.

24             THE COURT:  No?

25             MR. OHM:  I think the court's ruling might have us

1    revisit that.

2         THE COURT:  Okay.  So tell me, what do you propose

3    doing with the grand jury transcript --

4         MR. OHM:  We just want it in, Your Honor.  Ideally,

5    from our perspective, we'd be able to move it really whenever

6    we wanted to.  But I think, in contrast to what is shown on

7    the video, his sworn statement is not true because his sworn

8    statement is that Ms. Reid initiated the contact.  And in our

9    view, this is kind of one ongoing assault that Officer Liang

10   initiated.  He grabs her hand, he never basically lets go

11   until Agent Bates comes, or actually until they arrest her.

12      This is highly relevant.  It's not being offered for the

13   truth.  It's reliable and under oath.  We are -- so if the --

14   however the court wants us to put it in, we'll put it in.  But

15   in the end, in closing argument we want to be able to argue,

16   here's this video, here's the sworn statement.

17      This case and the opening, mind you, really started with

18   Officer Liang's perspective and the perimeter that he created,

19   and the government's not proving any of that up.  So we have

20   the video left and we have his false testimony, which we would

21   like the jury to be able to consider.

22        THE COURT:  So you want to use it to show that he did

23   not have his official badge with him?

24        MR. OHM:  That's correct.

25        THE COURT:  That's based on the photos that are also

1    some of your exhibits?  Is that -- that's the point of 5?

2         MR. OHM:  Yes.  I think we could do that through Agent

3    Bates also, and if she needs to be refreshed or she needs to

4    be impeached, then we have the photos to remind her what

5    Officer Liang looked like on the scene.

6         THE COURT:  Okay.  And 6, you want to show that he --

7         MR. OHM:  Falsely testified that Ms. Reid was the one

8    who initiated the physical part of this incident.  I mean, the

9    government also opened on, you know, the tone changed when

10   Ms. Reid lifted her knee, but that's just not true.

11   Everything changed when Officer Liang grabbed Ms. Reid.  Then

12   when it got to the grand jury stage, Officer Liang told the

13   grand jury, she grabbed me, that's this whole incident, that's

14   how this whole thing started.

15        And then Officer Liang, once he realized there was video,

16   he was -- his testimony was false.  As far as we know, he

17   didn't know that he had video.  So we have a false statement

18   under oath that we would like to put in that is certainly

19   relevant to how this whole thing was initiated.  I don't see

20   how it wouldn't come in, frankly.

21        THE COURT:  Okay.  Mr. Wolf, what are your thoughts on

22   Mr. Ohm's response?  Is it your position that if they want

23   this in they need to put Officer Liang on the stand and ask

24   him about it and confront him with the prior inconsistent

25   statement at grand jury?

1          MR. WOLF:  I believe that would be the foundation.

2     Otherwise, if it's not being offered for the truth, I just

3     don't see the relevance.  It's going to Officer Liang's

4     credibility.  I fully understand that, but if he's not

5     testifying, it's kind of neither here nor there, especially

6     if -- it obviously is the fact that Officer Liang did not have

7     his badge.

8          THE COURT:  Okay.  I will think about this one a little

9     more and let you know after we finish up with Agent Bates.

10        Mr. Ohm, I assume, if I'm not going to let you put this in,

11    I guess through Agent Bates or some other way, you're going to

12    reconsider calling Officer Liang?

13         MR. OHM:  We would have to give it some thought,

14    frankly.

15         THE COURT:  Okay.

16         MR. OHM:  I guess when the court is considering it, I

17    would ask the court consider or perhaps review the court's

18    notes on the government's opening, because it can't not be

19    relevant.  The government opened, actually, on this.

20         THE COURT:  I don't know if the question is whether

21    it's relevant.  How do you put this in through Bates, though?

22    You're going to ask her whether she remembers that he had his

23    ID on and whether she knows what he testified in grand jury?

24    How do you plan to put this in through Bates?

25         MR. OHM:  We don't necessarily need to put it in

1    through Bates.  We could just move it in now or in our own

2    case.  We were hoping, though, we could publish it at the time

3    that Agent Bates was testifying so that the jury would

4    understand the relevance of it a little bit better, but I

5    don't think that's the sticking point.

6        But the fact that the government opened in the way it

7    did -- and frankly, we have some complaints about the

8    government opening promising evidence and not delivering upon

9    that promise and the impact that would have on a jury, but we

10   don't want to move for a mistrial, for obvious reasons.

11       So the government sets forth a theory, the fact that the

12   government decided -- I don't know if the government decided

13   to or knew in the beginning in their opening that they weren't

14   going to call Officer Liang.  I think that was a surprise to

15   most of us.  And so it would be significantly prejudicial to

16   Ms. Reid if this false testimony is excluded by the court.

17       I don't think I'm required -- because we're not offering it

18   for the truth.  It's not hearsay.  It doesn't need to fall

19   under the prior inconsistent statement exception.  It's just

20   really a relevance question, unless the government has another

21   objection, which I think they're trying to go for foundation,

22   but it's grand jury testimony that can just be admitted.  I

23   don't think any more foundation is needed.

24       So the court -- I don't think that we are required to call

25   Officer Liang just to impeach him.  That's not what -- it

1    might be different if this was a sworn statement and we didn't

2    have another basis for admissibility, but in this situation,

3    we could just move it in.

4         THE COURT:  Okay.  I will go back and look at the

5    government's opening and let you know.  Okay.

6      Where does that leave us?  So I have the stipulation, and I

7    have a bunch of photographs showing Ms. Reid's injuries.  Are

8    there any issues with those exhibits?

9         MR. WOLF:  No, Your Honor.

10        THE COURT:  Okay.  So after we get through the cross of

11   Agent Bates, are you planning to rest at that point, Mr. Wolf?

12        MR. WOLF:  Yes, Your Honor.  I guess I would defer to

13   the court about -- I think we should read the stipulations in

14   and then we would rest, but yes.

15        THE COURT:  Okay.  So, Mr. Ohm, do you anticipate

16   calling witnesses?  And I'll put to the side Officer Liang.

17   Or after we finish up with Agent Bates, are we going to head

18   to charging conference?  I just want to get a sense of where

19   we're heading today.

20        MS. ABE:  Yes, Your Honor.  We anticipate calling just

21   two witnesses, Ms. Katie Campbell-Morrison and Ms. Jessica

22   Mason.  We anticipate them both being very quick witnesses.

23        THE COURT:  Sorry, say that again?

24        MS. ABE:  We anticipate them both being quick

25   witnesses.

1          THE COURT:  Okay.  So after we are finished with Agent

2     Bates, we'll take a break and I will come back from that break

3     and tell you my ruling on the Liang transcripts so that you

4     can consider how that affects your case.  And then we'll come

5     back, we'll do your witnesses, and then we'll do our charging

6     conference.  Okay?

7          MS. ABE:  Yes.  Thank you.

8          THE COURT:  All right.  Let's take five minutes and

9     I'll come back at 9:30, and we'll have the jury come in for

10    Agent Bates.

11       (Recess from 9:26 a.m. to 9:37 a.m.)

12         THE COURT:  All right.  Mr. Ohm, I've looked at the

13    government's opening, and I don't disagree that this is

14    relevant, but I don't understand which hearsay exception you

15    are relying on.  And it's clearly being admitted for the

16    truth.  And so if you want to call Officer Liang, you can do

17    that, but otherwise you can't just move this in.

18         MR. OHM:  I'm sorry, Your Honor.  In terms of the

19    substance of the statement --

20         THE COURT:  Why are you admitting it if not for the

21    truth?

22         MR. OHM:  Because it shows that he's lying.  So it's

23    being admitted for its falseness, the opposite.

24         THE COURT:  Mr. Ohm, I disagree.  Your objection is

25    noted.  If you want to use this, you can call Officer Liang,

1     but I think it is being admitted for the truth, and there's no

2     hearsay exception that I think applies.

3          MR. OHM:  Well, just so the record is clear, the

4     argument, for example, by closing is not going to be Officer

5     Liang testified that Ms. Reid came up to him and smacked his

6     arm away.  It's going to be that Officer Liang said that but

7     it's not true.  So that's why we are asserting that it's not

8     being admitted or offered for the truth of the matter being

9     asserted, Ms. Reid slapped my hand away.  We're not offering

10    it for that truth that he asserted.  We are offering it just

11    to show that he was not telling the truth.

12         THE COURT:  Okay.  Your objection is noted.  We're

13    going to bring the jury in.

14       (Jury in at 9:39 a.m. )

15         THE COURT:  Good morning, ladies and gentlemen.  We are

16    going to get started and resume with the defense's cross-

17    examination of Agent Bates.  Can you grab her?

18         MR. WOLF:  Yes, Your Honor.  The government is

19    recalling Agent Bates.

20    EUGENIA BATES, WITNESS FOR THE GOVERNMENT, PREVIOUSLY SWORN

21                    CROSS-EXAMINATION (Continued)

22    BY MS. ABE:

23    Q.   Good morning, Agent Bates.

24    A.   Good morning.

25    Q.   So I would like to start with where we left off.  Before

 1      we took our break yesterday afternoon, we were talking about

 2      text messages that you exchanged with former colleagues.

 3      A.   Yes.

 4      Q.   And if we could pull up Defense Exhibit 5.  And just for

 5      the record for clarity -- so just to be clear, the

 6      conversation in this group of text messages was sarcastic.

 7      A.   Yes.

 8      Q.   You called the incident with Ms. Reid your claim to fame?

 9      A.   Yes.  That's the first statement I made.

10      Q.   And you said that the booboos caused you PTSD?

11      A.   Again, it was sarcasm, but that is what I stated.

12      Q.   And PTSD is a mental health condition that people get

13      after, for example, serving in combat?

14      A.   There's a variety of PTSD that could be diagnosed.

15      Q.   Okay.  And in response to that, your friend responded

16      that you were, quote, brave for being a victim, unquote, with

17      two laughing-crying emojis?

18      A.   Yes.  That is what he said.

19      Q.   And that was also sarcastic?

20      A.   The whole tone of this message was sarcastic and to be

21      light-hearted, yes.

22      Q.   And you responded: "I sacrificed life and limb for the

23      mission.  I think it's worth a Trump coin."

24      A.   Yes.

25      Q.   And that was a joke.

1    A.    Yeah.  There's some context to that as well.  One of my

2    friends in this chat had previously received a White House

3    coin, so that is why I stated that specifically.

4    Q.    And then your friend responded, "Thank you for your

5    service" with an emoji?

6    A.    Yes.

7    Q.    And you said, "You are welcome," quote, "finally someone

8    recognizes."

9    A.    Yes.

10    Q.    And that again was sarcasm.

11    A.    Yes.

12    Q.    Because you were making light of the situation.

13    A.    Correct.

14    Q.    And yesterday you testified you used the word "booboos"

15    because you're a mother to a two- and a three-year-old?

16    A.    Correct.

17    Q.    But that's not really the reason, right, you used the

18    word "booboos"?  It's because you were making light of what

19    happened.

20    A.    I had made that reference to my kids multiple times.

21    When my children asked about the injuries to my hand, I did

22    refer to them as "booboos" on multiple occasions, as I did here.

23    Q.    But you're not talking to your kids in this chat.

24    A.    That's something I say very frequently, and I have

25    previously used those words to other colleagues that also

1    received injuries, and I refer to those as booboos.

2    Q.    Okay.  We don't have those here, so we'll move on.

3    Yesterday you were trying to present yourself as the

4    disciplined agent in this situation.  Was that correct?

5              MR. WOLF:  Objection.

6              THE COURT:  Sustained.

7    BY MS. ABE:

8    Q.    Okay.  Well, let's just talk about what you believe.  So

9    you testified on direct that you wouldn't speak to an arrestee

10   the way that Agent Residovic spoke to Ms. Reid.

11   A.    Correct.

12   Q.    On July 23, you had a text message with Agent Residovic.

13   Do you remember that conversation?

14   A.    I remember I had a conversation.  I don't remember what

15   date we had a sustained conversation about this incident.  I

16   don't remember what day that was.

17   Q.    If we could stop publishing to the jury, and if we could

18   publish...

19        So I'm showing you what has previously been marked as

20   Defense Exhibit 5b.

21              MS. ABE:  If I may, Your Honor, one moment.

22        (Defense conferring.)

23   BY MS. ABE:

24   Q.    Do you recognize these text messages?

25   A.    Vaguely, yes.

1    Q.   It says "Dinko" at the top?

2    A.   Yes.

3    Q.   And it -- I apologize.

4    A.   That's the officer.

5    Q.   Agent Residovic.

6    A.   Correct.  Yes.

7    Q.   And in the middle it states -- it says Wednesday, July 23,

8    1:49 p.m.?

9    A.   Yes.  I see that.

10   Q.   And these text messages are from your phone.

11   A.   It's possible, yes.  I don't know if this specifically

12   was from my phone, but yes.  This is what I sent -- the yellow

13   is what I sent.  I would assume these are what I sent.

14   Q.   These are an accurate representation of text messages

15   from you?

16   A.   Yes.

17   Q.   Between you and Agent Residovic?

18   A.   Yes.

19   Q.   And we can scroll down further if that would be helpful.

20   A.   Yes.  Yes, that is what we discussed.

21        MS. ABE:  I would like to publish Defense Exhibit 5b,

22   text messages between Agent Residovic and Agent Bates.

23        MR. WOLF:  Can defense scroll down to the bottom?  I

24   just haven't seen the full exhibit.

25      No objection to admission and publishing.

1                 THE COURT:  Admitted.

2                           (Defendant Exhibit No. 5b

3                            received into evidence.)

4    BY MS. ABE:

5    Q.   So if we could go to the second page of this exhibit.

6    And you just testified that you are in the yellow.  You're the

7    text in the yellow?

8    A.   Yes.  That's me.

9    Q.   In this conversation with Agent Residovic, you say that

10   he was, quote, your favorite on the BWC.

11   A.   Yes.  That is what I said.

12   Q.   And "BWC" stands for body-worn camera?

13   A.   Yeah.

14   Q.   So that would be the camera you were wearing on your

15   chest on July 22.

16   A.   Yes.

17   Q.   And Agent Residovic responds, "Hahaha.  What did I do?"

18   A.   Yes.

19   Q.   And your response was, quote, "You came in hot, ready for

20   action.  No playing around.  Your cop side was showing!  Haha.

21   Made me feel like I was back on RT1," with a crying-laughing

22   emoji.

23   A.   Yep.

24   Q.   And RT1 is an abbreviation for Route 1?

25   A.   Route 1, yes.

1    Q.   And that was your beat when you did local police work for

2    Fairfax County?

3    A.   Yes, Mt. Vernon district.

4    Q.   And Agent Residovic responded, "Haha awesome.  Love it.

5    Yeah, it kicks in occasionally.  That's awesome, thank you.

6    It made my day."  And then he says, "It's too calm at the fed

7    level!"

8    A.   Yes.

9    Q.   And if you could -- you then respond a side note about

10   other work-related information.  Is that correct?

11   A.   Correct.

12        MS. ABE:  If I may have a moment, Your Honor?

13        THE COURT:  Sure.  Do you want us to stop publishing?

14        MS. ABE:  If I may, Your Honor, if we could actually

15   just get on the phones for a brief moment?

16      (Bench conference.)

17        MS. ABE:  Can everyone hear me?

18        THE COURT:  Go ahead, Ms. Abe.

19        MS. ABE:  Your Honor, I noticed that there is a

20   discrepancy between -- just as context, Ms. Bates sent these

21   text messages to defense this morning just before court, and I

22   notice a discrepancy between what we have that the government

23   already disclosed and what was sent from Ms. Bates, and I just

24   want to make sure we have all of the correct messages.

25      So I just wanted to check that briefly.  The difference

1    between the messages is the ones that the government disclosed

2    were from Agent Residovic's side, and the ones we got this

3    morning are from Agent Bates.

4        THE COURT:  And those don't match up?

5        MS. ABE:  I would like to confirm briefly, Your Honor.

6    I thought that they did when I checked this morning, but I'm

7    now seeing -- I'm not sure if it's a discrepancy.  I would

8    just like to confirm that briefly.

9        THE COURT:  Okay.  How much time do you need?

10       MS. ABE:  Less than, I think, 30 seconds.

11       THE COURT:  Okay.  Go ahead and do that.

12       (Pause)

13       MS. ABE:  Your Honor, I noticed that Agent Bates sent

14   messages this morning that do not match up.  Those are missing

15   messages from the text messages she disclosed this morning and

16   the messages that Agent Residovic has that the government

17   disclosed to us from Agent Residovic.

18       THE COURT:  So the Bates messages that you got this

19   morning are missing messages that are on the Residovic side?

20       MS. ABE:  Yes, Your Honor.

21       THE COURT:  Okay.  I'm going to have the jury step out

22   for a little so we can figure out what's going on.

23       MS. ABE:  Okay.

24      (End of bench conference.)

25       THE COURT:  Okay.  Ladies and gentlemen of the jury, I

1    apologize.  I'm going to ask you to take a quick break, use

2    the bathroom, stretch your legs while I discuss something with

3    the attorneys.

4         (Jury out at 9:55 a.m.)

5         THE COURT:  Agent Bates, you may step outside.  You're

6    still under oath.  Please do not discuss your testimony with

7    anyone.

8         THE WITNESS:  Yes, Your Honor.

9       (Witness steps down and exits.)

10        THE COURT:  Okay.  Mr. Wolf, what's going on?

11        MR. WOLF:  I am not sure.  I am pulling up Agent

12   Residovic's text messages now.

13        THE COURT:  Okay.

14        MR. WOLF:  So, Your Honor, the government turned over

15   text messages from Agent Residovic with Agent Bates.  That

16   conversation is reflected largely in the text messages from

17   Agent Bates that she turned over with Agent Residovic.  At the

18   bottom of one text message, it appears that perhaps one

19   message was cut off.

20        THE COURT:  Was it cut off or deleted?  Is it the last

21   one on the end and you didn't get the last one, or is it in

22   between two other text messages, thus it's removed somehow?

23        MS. ABE:  Your Honor --

24        THE COURT:  One at a time.  One at a time.

25        MR. WOLF:  So it may help just for the court to see,

 1    so let me connect if I can.

 2              THE COURT:  Ms. Abe.

 3              MS. ABE:  Yes, Your Honor.  We have already pulled them

 4    up.  We could show them to the court.  Ms. Little has...

 5              THE COURT:  Okay.

 6         (Exhibit displayed.)

 7              MS. ABE:  So, Your Honor, I will also preface this by

 8    stating, we requested from the government these text messages

 9    before trial over the weekend, and then we requested again

10    yesterday these text messages.  I requested them in court, and

11    I was told by the government that they didn't have them.  We

12    requested again in the evening.

13         This morning we received an email from -- and I will -- to

14    Mr. Wolf's credit, I suppose called Agent Bates with Mr. Wolf

15    last night.  She did not pick up.  He put me in a group text

16    with Agent Bates and himself and AUSA Facci, and then this

17    morning we received an email disclosure from AUSA Wolf with an

18    email response from Agent Bates stating, "I received your

19    message from defense counsel.  I don't think these text

20    messages are relevant.  Here."  And then we have screenshots.

21         And now we have a screenshot of missing or deleted, I'm not

22    sure, messages.  But as the court can see, we have on the left

23    text messages that the government disclosed between Agent

24    Residovic and Agent Bates.  Agent Residovic is in the green on

25    the left side, and you see --

 1          THE COURT:  I see it.  The one on the right with the

 2    black and yellow, is that what Agent Bates sent to you?

 3          MS. ABE:  This morning.  Yes, Your Honor.  And it says,

 4    as you can see, there's a --

 5          THE COURT:  I see that on the thing, yes.  How do you

 6    want to proceed?  Do you want to ask her why she cut that off

 7    or whether she did?  I assume her response may well be it was

 8    inadvertent, but what do you want to do?  You've got both of

 9    them.

10          MS. ABE:  Yes, Your Honor.  I mean, I will seek to

11    impeach her with that, and I would also like to admit the

12    email she sent stating she does not believe that it's relevant,

13    because I believe that goes to credibility.

14          THE COURT:  Mr. Wolf, what's your position on that?

15          MR. WOLF:  The government doesn't object to using

16    Residovic's and Agent Bates's text messages in defense's

17    inquiry into what happened with this one text message.

18      Regarding Agent Bates's discussion of whether it's

19    relevant, it sort of goes back to my point earlier in this

20    case, is that often agents have a different perspective on

21    what's relevant from what the attorneys do.  And so I think it

22    might be just confusing the issue.

23      The fact is -- I think the fact is is that the defense can

24    cross on whether they think this evidence is bias or not.  I

25    think that's fair game.  My concern is that if we start to

1    talk about relevance, it sort of confuses the issues and risks

2    misleading the jury.

3            THE COURT:  Can I see the email?

4            MR. WOLF:  Which email?

5            THE COURT:  The email that the defense wants to

6    introduce.

7            MR. WOLF:  Yes.  Actually, I think it was a text

8    message.  One moment.

9            MS. ABE:  Your Honor, I apologize.  It was a text

10   message, not an email.

11           THE COURT:  Mr. Wolf, did you ask Agent Bates ahead of

12   this morning?

13           MR. WOLF:  We asked multiple times for all

14   communications relating to this case, yes.

15           THE COURT:  When did you ask her?

16           MR. WOLF:  So -- sorry, the days are blending together.

17           THE COURT:  Did you ask her yesterday or last week or

18   before that?

19           MR. WOLF:  Last week during trial prep we asked her,

20   and also I made a phone call to her asking her to double check

21   for any text messages relating to this case.  I believe that

22   was -- today is Wednesday?  I don't remember exactly what day

23   it was, but it was I think before the start of this trial, so

24   might have been even over the weekend.

25           THE COURT:  And she just didn't provide anything until

1    she sent this message that Ms. Abe is referring to?

2            MR. WOLF:  No, Your Honor.

3            THE COURT:  Okay.  I'm going to allow this line of

4    questioning by the defense.

5       Okay.  Are you ready to proceed, Ms. Abe, or do you need to

6    kind of get sorted, figuring this out in real time?

7            MS. ABE:  Well, Your Honor, if we could just have a

8    brief moment just to make sure that -- or unless the

9    government is willing to pre-admit the Agent Residovic

10   messages.

11           MR. WOLF:  I have no issue with the defense using those

12   exhibits.  I mean, it's part of the same conversation.

13           MS. ABE:  Okay.  Then I think we're ready to proceed.

14           THE COURT:  Okay, great.  Go get the jury.

15       (Jury in at 10:05 a.m.)

16           THE COURT:  Thank you.  Are you grabbing Agent Bates?

17   Thank you.

18       (Witness enters, resumes the stand.)

19           MS. ABE:  May I proceed, Your Honor?

20           THE COURT:  Please.

21   BY MS. ABE:

22   Q.   Thank you, Agent Bates.  So I am going to publish now

23   what was previously admitted as Defense Exhibit 5b, which are

24   your text messages in yellow, and then by it what during the

25   break the parties admitted as Defense Exhibit 5c, which are

1    text messages in white and green from Agent Residovic's side

2    of the same conversation.

3    A.   Okay.

4    Q.   So we were going through the text messages and you -- we

5    were talking about the message where -- in the yellow on

6    Defense Exhibit 5b, you say: "You came in hot, ready for

7    action, no playing around.  Your cop side was showing.  Haha.

8    Made me feel like I was back on Route 1."

9    A.   Yes.

10    Q.   And then Agent Residovic sends three messages in

11    response.  Correct?

12    A.   Yes.

13    Q.   And you mention a side note:  "Do you have FOWs for the

14    two subjects?"

15    A.   Yes.

16    Q.   And then on the messages that come from your phone,

17    there's no second text message, but on the messages that come

18    from Agent Residovic's phone, you have two text messages.

19    Correct?

20    A.   I'm trying to look.  Can you point out specifically --

21    Q.   Sure.  Let's look from Agent Residovic's side, Exhibit

22    5c.

23    A.   Okay.

24    Q.   Agent Residovic says "Haha" -- I apologize.  Yes.  Agent

25    Residovic says, "Haha, awesome.  Love it.  Yeah, it kicks in

1    occasionally."

2    A.    Okay.  Yep.

3    Q.    And that's in reference to his cop side showing, correct?

4    A.    Yes.

5    Q.    And he says, "That's awesome, thank you, it made my day,"

6    and then he responds, "It's too calm at the fed level!"

7    exclamation point.

8    A.    Okay.

9    Q.    And then you respond with the text message that begins

10    "side note."

11    A.    Yes.

12    Q.    And then you say, "I agree.  Everyone is scared to react.

13    So much respect!"

14    A.    Okay.

15    Q.    Is that true?

16    A.    It's shown in this message, so I would assume so, yes.

17    Q.    Okay.  Now let's go back to Defense Exhibit 5b, your text

18    messages from your phone.  Just to take a step back, you sent

19    these text messages to the government this morning.  Is that

20    correct?

21    A.    I did.

22    Q.    And the government had been asking you for a while for

23    these text messages.

24    A.    They asked for anything relevant, so I sent this this

25    morning when I was asked last night, and I didn't get the

1    message until this morning.

2    Q.   They never asked you before this morning or last night?

3    A.   What I was asked was for anything exculpatory that

4    potentially downplays the assault, which is what I provided to

5    the defense counsel previously.

6    Q.   Well, you didn't provide anything to the defense.  I'm

7    the defense attorney.

8    A.   I'm sorry.  To the prosecutor, as I was asked.

9    Q.   So you -- I mean you thought that these text messages

10   should have been sent, correct?  That's why you sent them?

11   A.   Well, because I was asked last night for all text

12   messages between me and Dinko, which I provided every single

13   message that I had between me and Officer Dinko.

14   Q.   So you deleted a text message.  That's what you're saying?

15   A.   Not last night, I did not.  I sent him exactly what I had

16   at the moment.

17   Q.   So "I agree.  Everyone is scared to react.  So much

18   respect."

19   A.   Yeah, I see that.  I don't recall saying that, but if

20   it's in his messages, I must have.  I did not delete any

21   messages last night.  If I did, it may have been at the time

22   that I sent this message, but I did not delete anything last

23   night when I was asked to provide it.

24   Q.   Okay.  So I would like to turn to Defense Exhibit 5c,

25   which is a text message that you sent this morning.  And if we

```
 1        could stop publishing to the jury.

 2             So do you see what's been published to your screen?

 3        A.    Yes.

 4        Q.    And "Eugenia," that's you?

 5        A.    Yes.

 6        Q.    And there's a message in white.  Does that look like --

 7        or actually, there's a message in white from yesterday at 5:18

 8        p.m. saying, "Hello.  This is Bates."

 9        A.    Yes.

10        Q.    Does this look like a fair and accurate representation of

11        text messages that you sent to the government attorney?

12        A.    Yes.  Yep.

13             MS. ABE:  I would like to admit what previously has

14        been marked as Defense Exhibit 5c.

15             MR. WOLF:  I think we already have 5c.  I think it will

16        be 5d.

17             MS. ABE:  5d.

18             MR. WOLF:  No objection.

19             THE COURT:  Okay.  Admitted.

20                          (Defendant Exhibit No. 5d

21                           received into evidence.)

22        BY MS. ABE:

23        Q.    So this message was sent today at 5:32 a.m.

24        A.    Yes.

25        Q.    Says, "I received the message from you with defense
```

1    counsel.  None of our messages, I believe, are relevant to the

2    case, so I will send them to you and you can send them as you

3    see fit.  See attached screenshots."

4    A.   Yes.

5    Q.   So you keep mentioning you didn't delete any text message

6    last night.  Did you delete them this morning?

7    A.   No.  I did not delete them this morning.  I sent exactly

8    what I had at the time.

9    Q.   Okay.  So -- we'll move on.  And I just want to be very

10   clear.  The government asked you for these messages.  Correct?

11   A.   Yes.

12   Q.   And you're testifying in court today.  You knew you were

13   going to testify in court today.

14   A.   Yes.

15   Q.   And so you knew they were relevant?

16   A.   I provided them as requested.

17   Q.   But you knew they were relevant.  That's why they were

18   requested?

19   A.   I advised them that I did not believe they were relevant,

20   which is why I previously never sent them, and I sent them

21   this morning because they specifically asked to provide every

22   piece of messages between me and Officer Dinko, which is what

23   I did as requested.

24   Q.   Okay.  So let's talk about safety concerns you mentioned

25   yesterday.  You kept talking about directives to wear masks

1    that came from the top.  Was that from Kash Patel?

2    A.    No.  My supervisor directed our team to wear masks, my

3    direct-line supervisor.  I don't know where it came from past

4    that.

5    Q.    So yesterday you testified that you were worried that

6    Ms. Reid was going to release the noncitizen that you had just

7    arrested.

8    A.    I said that that was a concern, that it was possible that

9    she would intervene in our arrest to potentially release the

10   individual we were arresting, yes.

11   Q.    I would like to show you Government Exhibit 5, which has

12   previously been admitted.  If we could go to the 8:35 mark.

13   And play.

14        (Video played.)

15        Stop, please.  So we're at 8:41.

16        So you just started walking over from the car.  Correct?

17   A.    Yes.

18   Q.    And when you were there, you had just finished putting a

19   noncitizen in the car?

20   A.    Yes.

21   Q.    So for ease of conversation, we'll call the gentleman you

22   put in the car the gentleman in the blue shirt.  So you

23   testified that a concern you had was that Ms. Reid was going

24   to get from this position where Officer Liang is and help that

25   gentleman out of the car.

1    A.    That's not what I testified to.  I said that, as she was

2    walking before Officer Liang put his hands on her, I believed

3    that she could divert towards us before this happened.

4    Q.    That's not what you said.

5    A.    Then it was perceived incorrectly.

6    Q.    Okay.  We'll look at the 302 that you drafted in this

7    case.  A 302 is the FBI report of investigation.  Is that

8    correct?

9    A.    That's correct.

10   Q.    And I am showing what has previously been marked as

11   Defense Exhibit 13, which is a redacted version of the 302

12   that Ms. Bates -- that we would like to introduce as Defense

13   Exhibit 13.

14         The 302 is an important document.  Correct?

15   A.    It is.

16   Q.    It is an incident report?

17   A.    Yes.

18   Q.    It has to be accurate?

19   A.    Yes.

20   Q.    You're supposed to draft it close in time to the

21   incident?

22   A.    Yes, as we are able to.

23   Q.    I would -- does this look like a fair and accurate

24   representation of the 302 that you drafted in this case?

25   A.    Yes.

1              MS. ABE:  We would like to admit Defense Exhibit 13.

2              MR. WOLF:  Objection, Your Honor.  May I be heard?

3         (Bench conference.)

4              THE COURT:  Mr. Wolf?

5              MR. WOLF:  Your Honor, the government would object as

6    to hearsay.  I think defense is attempting to impeach the

7    witness, but I don't think that sufficient foundation has been

8    laid for a prior inconsistent statement or impeachment by

9    omission as to what she testified to.

10             THE COURT:  Ms. Abe?

11             MS. ABE:  I'm happy to further lay a foundation, Your

12   Honor.

13             THE COURT:  Okay.  Go for it.

14             MS. ABE:  Your Honor, just also one more issue that we

15   would like to take up.  We would just like to clarify, earlier

16   the government represented to the court that they asked for

17   all text messages relevant to this case between Agents

18   Residovic and Bates, but of course now Agent Bates is

19   testifying that they only asked for exculpatory information.

20   So we would just like to get confirmation from the government

21   as to what was actually requested.

22             THE COURT:  Mr. Wolf?

23             MR. WOLF:  Yes, Your Honor.  The previous requests were

24   for any communications related to the substance of this

25   incident.  The secondary request --

1          THE COURT:  I'm sorry, Mr. Wolf.  When was that request

2    made?

3          MR. WOLF:  That request was made during a trial

4    preparation conference and in a subsequent phone call for

5    Agent Bates to just double check.

6          THE COURT:  Okay.  And when did that happen?  Was that

7    last week?  When did that happen?  Because you just heard the

8    witness testify you only asked for exculpatory information.

9          MR. WOLF:  So Your Honor, I have actually -- I'm

10   looking at an email that we sent on October 1st to Agent Bates

11   in which we stated, "I believe you provided all Jencks to us

12   but can you [indiscernible] to anything else that you

13   generated for this case and if so send those materials to me

14   or us, AUSA Facci.  We need to provide all materials to the

15   defense today."

16         THE COURT:  Okay.  Can you repeat what you asked for

17   after you said "I believe you provided all Jencks"?

18         MR. WOLF:  "But can you confirm there was anything else

19   you generated for this case, and if so, send those materials

20   to me before COB."

21         THE COURT:  Okay.  And that was on October 1.

22         MR. WOLF:  Yes.

23         THE COURT:  Okay.  And you just heard the witness say

24   something different.  Do you agree?

25         MR. WOLF:  Yes.

1          MS. ABE:  Your Honor, we would, of course, request that

2     email communication.

3          THE COURT:  Any objection, Mr. Wolf?

4          MR. WOLF:  No.

5          THE COURT:  Okay.

6          MR. OHM:  Your Honor, we'd like to ask the government

7     if they're continuing to sponsor this witness.  She just

8     clearly lied up on the stand about a material fact about

9     discovery that has been the central focus of this trial and

10    caused a circus, essentially.  And I want to know what the

11    government's position is going to be about whether they are

12    going to continue to put this witness on and sponsor this

13    witness and if they think it's consistent with their ethical

14    obligations.

15         THE COURT:  Mr. Wolf, do you want a break?

16         MR. WOLF:  Sure.

17         THE COURT:  All right.  I'm going to ask the jury to

18    step out for five minutes.

19      (End of bench conference.)

20         THE COURT:  Okay.  Ladies and gentlemen, I am going to

21    give you another five-minute break while we discuss something.

22    You can use the bathroom, stretch your legs, don't talk about

23    the case as I previously instructed you, and we'll have you

24    back shortly.

25      (Jury out at 10:23 a.m.)

1          THE COURT:  Agent Bates, you can please step outside.

2     You are still under oath.  Please do not discuss your

3     testimony with anyone.

4          THE WITNESS:  Yes, Your Honor.

5        (Witness steps down and exits.)

6          THE COURT:  All right.  Mr. Wolf, just so you have it,

7     what your witness said is, "What I was asked was for anything

8     exculpatory that potentially downplays the assault, which is

9     what I provided."

10          MR. WOLF:  Yes, Your Honor.  That was an inquiry that

11     was made by AUSA Dernbach during the early stages of the case,

12     which led to Agent Bates providing the text messages involving

13     the friend group and other text messages.  Subsequent to that,

14     as we approached trial, the government made additional

15     inquiries as to Jencks materials.  And so that's where we're

16     at right now.

17          THE COURT:  Okay.  And so she is saying that she was

18     only asked last night for all text messages between her and

19     Officer Residovic, which is what prompted her to send these

20     text messages.

21          MR. WOLF:  Yes, Your Honor.

22          THE COURT:  Where one appears to be missing.

23          MR. WOLF:  Your Honor, I mean, I intend to ask this on

24     redirect, but I mean, she has her phone here.  I'm going to

25     ask her to open her phone and do a re-review.  It appears,

1 based on the way the screenshots are, it may have been

2 inadvertently cut off, just when you're screenshotting on

3 iPhones it sometimes happens if you're moving quickly.  So I

4 mean, the solution is just to have her look at her phone.

5    THE COURT:  But why is she saying that she was not

6 asked for this information before last night if you asked her

7 for it on October 1st?  I mean, last week I had an officer

8 here on the stand telling me he didn't remember meeting with

9 you three days earlier.  What is going on with your witnesses?

10    MR. WOLF:  As I said before, the testimony is what it

11 is.  If I may have an opportunity to confer with a supervisor

12 about how to proceed next?

13    THE COURT:  Sure.  Go ahead.

14    MR. WOLF:  Thank you, Your Honor.

15    THE COURT:  All right.  We're going to break for --

16 I'm sorry, Ms. Abe.  Do you have something?

17    MS. ABE:  Well, Your Honor, if the government is

18 allowed to redirect to allow her to open her phone, we would

19 ask for re-cross.

20    THE COURT:  I agree.  We're going to break for five

21 minutes.

22   (Recess from 10:26 a.m. to 10:35 a.m.)

23    THE COURT:  Okay, Mr. Wolf.

24    MR. WOLF:  Your Honor, may I have just one moment?  My

25 colleague is in the restroom, and he's going to have

1      representations on the issue.  He'll be right in.

2              THE COURT:  Okay.  That's Mr. Facci?

3              MR. WOLF:  Yes.

4              THE COURT:  Okay.

5          (Mr. Facci enters.)

6              THE COURT:  All right, Mr. Facci.  I hear you have all

7      the answers.

8              MR. FACCI:  I hope so, Your Honor.  So I went back

9      through my emails, and we did as my co-counsel stated.  We did

10     send Agent Bates an email.  This was coming up on the Jencks

11     deadline that was in the court's pretrial order, so it was

12     October 1 at about 9:12 in the morning, I sent an email to

13     Agent Bates saying, I believe -- well, the subject of the

14     email was "Jencks Materials."

15         I said, "Good morning, Agent Bates.  I believe you already

16     provided all Jencks to us, but can you confirm there is

17     anything else you generated for this case, and if so, send

18     those materials to me before COB today.  Need to provide all

19     materials to the defense today."

20         And she responded that same day and said, "I believe I

21     provided the 302 of Reid's arrests, plus all relevant messages

22     and BWC.  I'm not sure if the 302 for the ICE arrest that

23     occurred simultaneously is needed, but that's the only other

24     thing I can think of.  Not sure if that was provided."

25         That was the substance of the message.  So she confirmed

1    that -- she told us she sent all relevant messages, that she

2    could not think of anything else.

3        THE COURT:  Okay.  And you heard her testimony today

4    saying that you did not ask for that until last night.

5        MR. FACCI:  Perhaps the witness is mistaken and she

6    could be crossed on this, or we can impeach her with this

7    message and refresh her recollection.

8        THE COURT:  So the government is continuing to...

9        MR. FACCI:  Your Honor, memories can fade.  People can

10   make mistakes.  It doesn't necessarily mean she's lying here,

11   and I think it's fair cross, it's fair redirect on this point,

12   and I think we can clear this up.

13       THE COURT:  Okay.  I am -- if that's the position of

14   the United States.  Where we are with this witness and what

15   I've seen last week with your witnesses, I am surprised that

16   that is the position of the United States, but here we are.

17     Have you provided all of those emails -- all of the

18   requests that you made to Agent Bates to the defense?

19       MR. FACCI:  Yes.

20       THE COURT:  Ms. Abe, Mr. Ohm, do you have every request

21   that the government made of Agent Bates?

22       MR. OHM:  We have that one email that Mr. Facci just

23   read.  I thought I heard Mr. Wolf say there was also a phone

24   call.  We don't have any of the initial requests that

25   presumably Mr. Dernbach made at the beginning of the case.

1    Mr. Facci's email also seems to be referring to some other

2    communication that made him think they had all the Jencks

3    materials.  We don't have that either.

4        Your Honor, I just want to say this.  There are times when

5    witnesses make innocent mistakes and they forget things.  It's

6    usually not at the apex of a cross-examination for what -- I

7    mean, Agent Bates, let's be real.  I mean either she deleted

8    this message because she didn't like it or the way she sounded, or

9    she intentionally took these screenshots to make sure this

10   message was cut off.  It's very difficult for the court to

11   conclude otherwise.

12       I'd also like to point out, the government has an

13   obligation under *Napue* to correct false testimony.  They

14   shouldn't have to wait for us to object and call it to the

15   court's attention.  The government didn't do that.  This isn't

16   just what the government gets to decide to do at this point.

17   I mean, this is preposterous.

18       And we're now at -- the gamesmanship that's been happening.

19   I mean, we told this jury that they're going to be here till

20   Friday.  It's now a one-witness case all of a sudden because

21   they didn't want to put on their ICE agents because they don't

22   want to put on -- you know, because they thought they would

23   have a more favorable witness, and then the more favorable

24   witness that presents better is the one that actually is

25   destroying evidence and putting false testimony on the stand?

1    I mean, there's probable cause for that, Your Honor, and they

2    want to just keep on putting them on?

3        THE COURT:  Mr. Ohm, you can cross this witness.  The

4    government -- I am now asking them, to the extent it has not

5    happened, to provide you with any communications that you made

6    to Agent Bates so that you can impeach her on cross.  I'm not

7    sure what else you want me to do.  I mean, I can't make the

8    government put on witnesses.  They can call the witnesses they

9    want to call in their case.  They told me their case would

10   take a day or two.  I mean, obviously, they're not held to

11   that in the same way I'm not going to hold you to that.

12       So they've decided not to put on those witnesses.  And

13   after what we all saw last week, I'm not terribly surprised,

14   but that's their choice.  You can call them if you want.

15       MR. OHM:  Sure.  I just want to say, though, that when

16   we are talking about a week where the court admonished the

17   government repeatedly about failing to act in its supervisory

18   role to collect Jencks material, when the government insisted

19   to the court over and over again that that's not their

20   obligation, that as prosecutors they're not supposed to go

21   into texts and make sure, when the court essentially found

22   that there was relevant and exculpatory material, potentially

23   exculpatory material within the texts and within the email

24   messages, and then this morning they're still relying upon the

25   testimony of the witness or the discretion of the witness to

1    provide these messages, that is -- that's our record right

2    now.

3        And Your Honor couldn't trust them.  We can't trust them.

4    I mean, I'm actually like -- we've been talking about a

5    standing motion for all of our cases, where the court is

6    ordering the government to make sure that they're reviewing

7    all of the text messages separately because we thought that

8    that's what they did.  We thought that that's what they knew

9    that their job was, but apparently that's not what they're

10   doing.  And even after they get caught and get yelled at about

11   it, they're still not doing it.

12       We have a witness on the stand right now, and Ms. Abe,

13   fortunately, was diligent enough and recognizes on the spot,

14   but that's not how these cases are supposed to be tried,

15   especially in federal court where discovery obligations are

16   taken seriously, where every time we come to court the

17   government is asked, have you provided all the discovery.

18       THE COURT:  I agree, Mr. Ohm.  And particularly where

19   the government is saying to me that they are aware that their

20   witness's view of what may or may not be relevant may not

21   always match up with what is actually relevant, there is an

22   obligation to make sure that they are in fact collecting the

23   messages and reviewing them to determine whether they need to

24   be turned over and not leaving that at the discretion of their

25   own witnesses.

1          MR. OHM:  And so we're learning throughout this trial

2      that even though they recognize that, and even though they've

3      been admonished about that, that's what they're continuing to

4      do, and we are being prejudiced by it on a day-to-day basis.

5      And it's unfathomable that it's the exact same issue that the

6      government is -- they're outsourcing their supervisory role

7      about turning over discovery and *Brady* information to law

8      enforcement officers who have zero interest in actually

9      exposing the potentially exculpatory information.

10        We see on the stand here that they have actually the

11     opposite interest.  So what system or principle are we

12     actually prosecuting under here?

13         THE COURT:  Mr. Wolf, do you have anything to say for

14     the United States?  You told me, and you told me before, that

15     your agents sometimes can't determine what is relevant or not

16     because they have a different view.  In fact, what we've seen

17     on display is they actually have an interest in not interpreting

18     relevance broadly, and yet you're relying on these agents to

19     give you what they think is relevant for you to meet your

20     disclosure obligations.

21         MR. WOLF:  Your Honor, regarding our obligations to

22     obtain communications relating to the substance of their

23     testimony, in this district we generally do defer to law

24     enforcement --

25         THE COURT:  Why?

1        MR. WOLF:  -- who are trained --

2        THE COURT:  Why?  You just told me they have a

3    different view of relevance than you do, so why are you

4    relying on them?

5        MR. WOLF:  Law enforcement are trained on what Jencks

6    materials are, and it is not the government's belief that it

7    is our obligation to physically take possession of agents'

8    phones and physically start scrolling through their phones,

9    personal or otherwise.  It is an intrusion on their privacy.

10        THE COURT:  It's an intrusion on their privacy when

11    they're here testifying and this agent had information on her

12    phone that was clearly relevant to this case that she only

13    turned over this morning?  And you sat there while she

14    testified that she wasn't asked for it until last night, and

15    you knew that that was false, Mr. Wolf.

16        MR. WOLF:  So the request last night was specifically

17    for all communications with Agent Residovic.

18        THE COURT:  Do you disagree that the request from

19    October 1 that Mr. Facci just read to us covered the messages

20    and they should have been given to you in response to that

21    request?

22        MR. WOLF:  I do not disagree.

23        THE COURT:  Okay.  So then you sat here and listened to

24    your witness give false testimony.  Whether you say it's

25    because she didn't remember or not, you knew that it was false.

1    Correct?

2              MR. WOLF:  I don't agree that it was false testimony,

3    Your Honor.

4              THE COURT:  Wait.  Hang on.  You just told me that you

5    do not disagree that the messages that she got this morning

6    should have been provided in response to the October 1st

7    request.  That's what you just told me two seconds ago, right?

8    And she sat here and said she was only asked for exculpatory

9    information, and it wasn't until last night that she was asked

10   for all these text messages, which is why she turned them over

11   this morning.

12      Mr. Wolf, throughout this case we have had issue after

13   issue with what you know about what happened in the past, and

14   you've stood up here and made representations to me that

15   turned out to be false.  And I don't think you're lying to me,

16   but you're -- either you're not doing your job and doing due

17   diligence, or whatever is happening at the U.S. Attorney's

18   Office right now.  With cases being handed over, things are

19   being missed, and we are in a criminal trial.

20      You are choosing -- the government is choosing to prosecute

21   this defendant criminally saying, I didn't know, or this one

22   didn't tell me, or I filed it in a box and I don't know if we

23   forgot to download it or it wasn't downloaded in the first

24   place.  It's not the first time this has happened in this

25   case.  It is not acceptable, and it's not what's expected of

1      the United States when you choose to prosecute a defendant

2      criminally in court.

3          And you yourself have stood up there and made

4      misrepresentations to me.  Last week you came -- after you

5      talked to your agents, you came and told me a totally

6      different story about this missing video based on your

7      conversations with the agent; and then they got here and said

8      something totally opposite on the stand, and your only answer

9      to me is, well, the testimony is what the testimony is.

10         This is not acceptable in any way.  And yet, for all of

11     these issues that keep coming up, the remedy that I have

12     available to me isn't really one that anyone wants, and the

13     defense is left flat-footed all along the way.  Videos popping

14     up the night before, text messages the morning of.  Turns out

15     one's deleted from them, that Ms. Abe stood there figuring out

16     while she stood in front of the jury and the jury's wondering

17     what's going on.

18         Maybe she needs a break.  Maybe she doesn't know what she's

19     doing.  Maybe it's because she's there for the first time

20     scrolling through the messages and one is missing, turns out

21     one that doesn't look that good for your witness.  I mean, the

22     jury has been waiting long enough.  I just do not understand

23     how this is the conduct of the United States government.  I do

24     not.

25         And the next time you have a witness sitting here giving

1    testimony that you know is wrong, you sit there and you wait

2    for me to come ask you, hey, didn't you just tell me that you

3    talked to that witness on Tuesday?  I mean, come on, Mr. Wolf.

4    You listen to your witness giving incorrect testimony; you do

5    have an obligation to do something.  You're waiting for the

6    defense to ask for me to get on the phone, and then I have to

7    call you up.

8         MR. WOLF:  Sorry, Your Honor.

9         THE COURT:  Do they have all of the communications and

10   requests that you made of this agent to turn over information

11   so that they can use it on cross?

12        MR. WOLF:  I believe so, yes.

13        THE COURT:  Ms. Abe, do you agree?  Because we've now

14   kept the jury waiting a very long time, which is something I

15   made very clear to all of you I did not want to do, once

16   again, because of an issue with the government.  What do you

17   think you're missing?

18        MS. ABE:  Your Honor, I don't believe we have whatever

19   communication from AUSA Dernbach was made to Agent Bates about

20   the potential exculpatory material, any other -- I mean, the

21   only thing that I believe we have is this email from October

22   1.  We don't have the dates of any phone calls that were

23   made --

24        THE COURT:  When did you have phone calls with this

25   witness?  When did you or Mr. Facci have phone calls in

 1      relation to trial preparation?

 2              MR. WOLF:  So we had an in-person conversation, I

 3      believe, on October 6th or so.  I could check my phone.

 4              THE COURT:  Please do.  And if Ms. Abe asks her and she

 5      says she didn't have that conversation with you, what's your

 6      proposal for the remedy there?  Do you want me to put you on

 7      the stand?  I mean, if this witness keeps lying or not

 8      remembering that requests were made of her, and they don't

 9      have a way to put that in front of the jury, how do you

10      propose it be handled?

11              MR. WOLF:  Your Honor, just to answer the first

12      question, we had a in-person trial prep meeting on October 7th

13      and then a videoconference on October 9th and --

14              THE COURT:  Okay.  And so you requested the information

15      on October 1.  They have that email.

16              MR. WOLF:  Yes.

17              THE COURT:  And then on October 6th and 7th --

18              MR. WOLF:  Not on -- sorry.  I apologize, Your Honor,

19      for interrupting.  Go ahead.

20              THE COURT:  On -- which dates did you meet with her?

21              MR. WOLF:  Met with her on October 7th, Your Honor.

22              THE COURT:  Okay.  So October 7th, and you met with her

23      in person, and once again you asked her for all relevant

24      information?

25              MR. WOLF:  Relating to the substance of the case, yes.

1          THE COURT:  And then you met with her on video on when?

2          MR. WOLF:  October 9th.

3          THE COURT:  Okay.  And once again you asked her for all

4    relevant information related to the substance of the case?

5          MR. WOLF:  Not in that conversation, no.

6          THE COURT:  So we have the October 1st email and

7    October 7th in person, you asked her for all relevant

8    information related to the substance of the case.

9          MR. WOLF:  Yes, and then I had a phone call on Friday,

10   October 10th.  And I will just note, Your Honor --

11         THE COURT:  I know.  I just want to make sure they have

12   this information.  October 10th, you had a phone call with

13   her.

14         MR. WOLF:  Yes.

15         THE COURT:  And you also asked her for all relevant

16   information related to the substance of the case?

17         MR. WOLF:  I asked her to double check and make sure

18   for any information related to the substance of the case.

19         THE COURT:  So October 1 there's an email, October 7th

20   you meet with her in person, ask her for all relevant

21   information related to substance of the case, October 9th you

22   have a video call where this does not come up, and October 10th you

23   have a phone call where you again ask her to double check that

24   she's given you all relevant information related to the

25   substance of the case.

 1          MR. WOLF:  Yes.

 2          THE COURT:  Okay.  And when did AUSA Dernbach request

 3     information from her and in what form?

 4          MR. WOLF:  One moment, Your Honor.

 5          MS. ABE:  Your Honor, if I may get a clarification, the

 6     October 10th, was that an email or a phone call?

 7          THE COURT:  A phone call.

 8        Go ahead, Mr. Wolf.

 9          MR. WOLF:  So, Your Honor, the written communications I

10     have regarding requests are relating to BWC and reports from

11     AUSA Dernbach from August 6.

12          THE COURT:  So August 6 --

13          MR. WOLF:  I apologize.  August 5th through August 6th.

14          THE COURT:  August 5th through 6th, it's body-worn

15     camera and reports?

16          MR. WOLF:  Yes.

17          THE COURT:  Okay.  So when she says what was requested

18     of her was exculpatory information, what is she talking about

19     to your knowledge?

20          MR. WOLF:  To my knowledge, it was regarding the text

21     messages and that group chat that's already in evidence, as

22     well as other text messages in which Ms. Bates refers to the

23     assault in quotation marks.  Those were all previously turned

24     over.

25          THE COURT:  No, I'm asking you, she says that the

1    government requested exculpatory information.  That doesn't

2    sound like this August 5th to 6th communication.  So which

3    communication is she talking about, to your knowledge, or do

4    you not know?

5        MR. WOLF:  So I don't know the specific day, and I do

6    not have any written communications in the file to that

7    effect.  I did confer with AUSA Dernbach, and he did say that

8    he made this request earlier on in the case at about the same

9    time --

10        THE COURT:  Orally?

11        MR. WOLF:  Orally, I believe.

12        THE COURT:  Ms. Macey, are you aware of -- I know you

13    worked on this case with AUSA Dernbach.  Can you come to the

14    table?  I believe you've entered an appearance.  Do you have

15    any knowledge of these earlier requests?

16        MS. MACEY:  I don't believe I do, Your Honor.  I'm

17    happy to check my email to see if I may have been cc'd on

18    them.  I can't stand here and say definitively that I was not,

19    but I don't recall having any personal knowledge about those

20    inquiries.

21      I should add one thing.  I do have knowledge about the fact

22    that the government became aware that there were -- there was

23    at least one text message by Agent Bates that had relevant

24    language that may be derogatory towards Ms. Reid.  I believe

25    that was the basis for Mr. Dernbach's request to Agent Bates,

1    because we did learn that through the office in a way where it

2    led us to make the inquiry.  So I do have personal knowledge

3    about that, but I don't believe I have anything more about the

4    specifics.  But I will check my email.

5            THE COURT:  So when you learned about that text

6    message, you don't recall what was requested of Ms. Reid, and

7    that was -- was it exculpatory messages and left to her to

8    figure out what that means, or was it all of your text

9    messages relevant to the substance of the case?

10           MS. MACEY:  I don't believe I have any knowledge about

11   that.  I don't want to speculate.

12           THE COURT:  Please, please, please don't.

13           MS. MACEY:  I do believe -- I will say, I do believe

14   the aim was to try to obtain the message that we had reason to

15   believe was out there, but I don't believe that I was privy to

16   the specific wording of the inquiry.

17           THE COURT:  Okay.  Thank you very much.  I appreciate it.

18      Okay.  Can you provide the August 5-6 communications from

19   AUSA Dernbach to the defense, Mr. Wolf or Mr. Facci?

20           MR. OHM:  And, Your Honor, Mr. Facci has been able to

21   do that since we've been up here.

22           THE COURT:  You can probe on this if you want and ask

23   her where this exculpatory request came from, whether it was a

24   phone call or something and who it was with, and you can ask

25   her about this email.  You can impeach her with this email.

I'm not sure what you can do about the October 7th and October

10th meetings where, according to the government, she was

asked and she did not talk about it.  You can ask her if she

met with the government, you can ask her if she had a phone

call, and we'll see if she remembers or if she says no.

MR. OHM:  So the other part of the representation to us

is that there's no -- or I guess I'm unsure of what other

verbal conversations that SAUSA Dernbach had with Agent Bates.

I mean, we're about to hit what we've been talking about.  I

mean, if she says this is what Dernbach told me in a verbal

conversation, we don't -- there's no notes of memorialization

of these meetings with the agent.  There's nothing that we can

actually rely upon.  So we're just stuck with her answer

because of the government's either sloppiness or bad faith, or

whatever it is.

THE COURT:  Okay.  You've got -- I hear you.  I have

said my piece.  I think everyone here knows how I feel about

what has happened.  I'm trying to move forward now.  We've got

a jury waiting.  You can use the October 1st email where this

information was very clearly requested, and that contradicts

her testimony before.

You can raise the October 7th and October 10th meetings

that we now know happened, and maybe that will refresh her

memory as Mr. Wolf suggested, or maybe it won't.  And we don't

really have anything memorializing those meetings to impeach

1    her on.  And if that happens, we can regroup at lunch and I'll

2    hear from the government on how they propose putting that

3    before the jury.  It won't be with this witness, but.

4        MR. OHM:  Okay.  I just want to preview, Your Honor.

5    We are going -- I might as well just say it now.  We're moving

6    for a mistrial.  The government's forced a mistrial here, and

7    so we're moving for a mistrial.  In the alternative, we're

8    moving to dismiss for prosecutorial misconduct.

9        THE COURT:  Okay.  All right.  I'm going to take that

10   under advisement.  I will hear from the government on it the

11   next time we break, and let's finish up with this witness,

12   please.

13       (Witness resumes the stand.)

14       (Jury in at 11:01 a.m.)

15       THE COURT:  All right.  Sorry for the delay.  We will

16   pick up with the defense's cross-examination of Agent Bates.

17   BY MS. ABE:

18   Q.   So Agent Bates, before we broke, you testified that the

19   government only asked you for exculpatory messages.

20   A.   The first time that I was asked about providing any

21   information, it was specifically exculpatory evidence that

22   potentially downplayed the assault.

23   Q.   So now it was the first time.

24   A.   When they asked me, and then anything that I assessed to

25   be relevant, which was when Mr. Wolf asked me.  But, yes, when

1    the grand jury was going, that's what I was asked, which was

2    the text messages that I provided with the operation chat, and

3    then you have additional messages regarding that.

4    Q.    Okay.  So that's a yes.  So you were then asked to

5    provide relevant messages.  Correct?

6    A.    That I believed to be relevant, yes.

7    Q.    A message talking about the incident is relevant.  Correct?

8    A.    Yes.  Relevant.  What I believed at the time was relevant

9    to the assault.  That's what I perceived that question to be,

10    which is what was asked of me from the prosecution initially.

11    Q.    Okay, but we're not talking about initially.  We're

12    talking about the requests that they made.  So I'm going to

13    show you what will now be marked as Defense Exhibit 5d.

14         So this an email that is dated October 1, 2025.  And do

15    you recognize this email?

16    A.    Yes.  I do.

17    Q.    It's from one of the prosecutors on this case.

18    A.    Yes.

19    Q.    It begins, "Good morning, SA Bates."

20    A.    Yes.

21    Q.    Can you --

22         MS. ABE:  Actually, the defense, we would request to

23    admit and publish this exhibit to the jury.

24         MR. WOLF:  We would object to admission and publishing,

25    Your Honor.

1          (Bench conference.)

2              THE COURT:  Why, Mr. Wolf?

3              MR. WOLF:  This is potentially impeachment, and so it

4     shouldn't be admitted as substantive evidence and published.

5              THE COURT:  Ms. Abe?

6              MS. ABE:  I mean, Your Honor -- I mean, we would

7     argue -- the witness is gratuitously lying at this point.  I

8     think we're kind of at a loss.  If the jury is not able to

9     see, I think this goes, I would say, into -- yeah.  That would

10    be our argument.

11             THE COURT:  Mr. Wolf, we just spent an hour talking

12    about this.  How do you propose putting this before the jury?

13             MR. WOLF:  I think Ms. Abe can ask, basically, were you

14    sent this email on this day and requested X, you responded X,

15    and that closes the impeachment.  This is not a prior sworn

16    statement, so it wouldn't be offered for the truth.  It would

17    just be offered for impeachment.

18             MS. ABE:  Your Honor, the next email is Agent Bates

19    stating that she did in fact provide the relevant materials.

20    So I would also note that for the government.

21             MR. OHM:  Your Honor, I think Mr. Wolf is conflating

22    publication and going back to the jury, which frankly I think

23    this goes back to the jury anyway, but there's no rule against

24    publication of an exhibit that's being offered as an

25    inconsistent statement.

1      The government often argues that it shouldn't go back

2      because it's not substantive evidence, but I've never heard

3      any authority where a party gets suspended from publishing it

4      to the jury even if the court ultimately says it's not

5      substantive evidence.  Demonstrative evidence is published to

6      the jury all the time.  There's no definitive rule that I

7      think the government can point to.

8           THE COURT:  What's your authority that they can't show

9      it to the jury, putting aside whether it can go back at the end?

10          MR. WOLF:  I guess they could show it to the jury.  My

11     concern is that it would be marked for identification

12     purposes, but I don't think it would be admitted as

13     substantive evidence.

14          THE COURT:  We can resolve that after when we confer

15     about what goes back.  You can show it to the jury.

16        (End of bench conference.)

17          MS. ABE:  If we could publish Defense Exhibit 5e, it is

18     the email that I believe is on the screen.  We are publishing

19     it for the jury for purposes of impeachment.

20          THE COURT:  It can be published.

21     BY MS. ABE:

22     Q.   So Agent Bates, this email reads, "Good morning, SA

23     Bates.  I believe you already provided all Jencks to us, but

24     can you confirm if there is anything else you generated for

25     this case, and if so, send those materials to me before COB

1    today?  We need to provide all materials to the defense today.

2    Thank you very much."

3         First, "COB" means close of business.  Correct?

4    A.    Yes.

5    Q.    So this email does not request "all relevant materials."

6    It requests "all materials."

7    A.    It requested materials that I generated for this case

8    which I perceived to be official documents, which is what I

9    ended up providing, which was the two arrested individuals.

10    So I responded to this email, and I said there's another 302

11    of the two arrested individuals --

12    Q.    Well, let me stop you right there.

13    A.    Okay.

14    Q.    So it says, "send those materials."  It doesn't qualify

15    it with "relevant."  Correct?

16    A.    Can you say that again?

17    Q.    The email says, "If so, send those materials."  It does

18    not qualify "materials" with the word "relevant."  Correct?

19    A.    I'm just explaining how I took this email to be, which

20    was --

21    Q.    Agent Bates, please.  We're on cross-examination.  Please

22    just answer my question yes or no.

23    A.    I did not perceive it to be that way.

24    Q.    Is the word "relevant" in this email?

25    A.    No.  It is not in this email.

1    Q.    Okay.  Thank you.

2          If we may scroll up, please.  Okay.

3          This is your response on October 1 at 9:30 a.m.  That is

4    your email next to your name "Eugenia Bates"?

5    A.    Yes.

6    Q.    And it says, "I believe I provided the 302 of Reid's

7    arrest, plus all relevant messages, and BWC."  Correct?

8    A.    Yes.

9    Q.    And it's your position that conversations about the

10   incident are not relevant.

11   A.    I was going off of what the prosecution asked me the

12   first time, which was relevant of the downplaying of the

13   assault.  That is what I was going off of at the time when I

14   sent this.  The relevance to me was of the assault, which is

15   what was initially asked of me by the initial prosecution.

16   That is how I perceived that to be.

17   Q.    Agent Bates, what does the email say?  Not what was in

18   your head.  What it says.

19   A.    It says "all relevant messages."

20   Q.    Okay.  And to be clear, sitting here today, you say that

21   if a message talks about the incident, it is not relevant?

22   A.    At the time I did not believe --

23   Q.    Agent Bates, please.

24   A.    At the time I did not believe it to be relevant.

25          MS. ABE:  Your Honor, we would ask --

```
 1              THE COURT:  You need to answer her question.
 2              THE WITNESS:  At the time -- no.
 3              THE COURT:  Can you restate the question?
 4     BY MS. ABE:
 5     Q.   Would a message that discusses the incident be relevant?
 6     A.   I did not believe that --
 7              THE COURT:  Yes or no?
 8              THE WITNESS:  Yes, but my relevance was based on the --
 9     BY MS. ABE:
10     Q.   Okay.  Thank you.  Yes.
11     A.   My relevance was based on the assault.
12     Q.   After October 1st, on October 7th you had a conversation
13     with the government, and they asked you again to provide
14     relevant messages.  Correct?
15     A.   We had a conversation, yes, providing messages.  I'm not
16     sure what date that may have been.  We had another
17     conversation asking for relevant messages, yes.
18              MS. ABE:  Your Honor, if we may get on the phones?
19          (Bench conference.)
20              MS. ABE:  Your Honor, I know this is something -- I
21     just want to cut this off at the knees.  I would like to just
22     enter into this cross-examination that the government has
23     represented to us that this is a conversation that was had,
24     given that this witness is becoming combative, is refusing to
25     answer any questions.
```

1          THE COURT:  Mr. Wolf, do you have any objection to

2     Ms. Abe -- or do you have another proposal for how we advise

3     the jury that the government did have a meeting with Agent

4     Bates on October 7th and a phone call on October 10th, where

5     both times you asked for all relevant information about the

6     substance of this case?

7          MR. WOLF:  Your Honor, I think the witness's memory

8     could be refreshed --

9          THE COURT:  Mr. Wolf, with what?  She's been asked the

10    question, and she's not answering.  What do you propose doing

11    to refresh her recollection?

12         MR. WOLF:  I don't agree that she's not answering.  She

13    testified that she was asked again but she just can't remember

14    the day.  I don't think that's necessarily inconsistent.  I

15    think it's just -- I mean, as you saw, I had difficulty

16    remembering the day as well, and so --

17         THE COURT:  Ms. Abe, why don't you ask her specifically

18    what Mr. Wolf represented to us, that they had a meeting and

19    whether or not she remembers the date, whether it was last

20    week, whether she was asked to provide all relevant

21    information related to the substance of this case, and whether

22    she was again asked for that during a phone call and whether

23    or not she remembers the date.  Let's see what she says.

24         MS. ABE:  Okay.  And, Your Honor, we would just ask,

25    given that AUSA Wolf argued that he had trouble remembering

1        the date, we would ask to use his calendar so we could use

2        that to impeach Agent Bates.

3                THE COURT:  Mr. Wolf, is the meeting on your calendar?

4                MR. WOLF:  Yes.

5                MR. OHM:  Your Honor, if we end up in the same place,

6        though, I would ask the court to invite us back to the phones

7        so it doesn't seem like Ms. Abe is the one who keeps on

8        causing all these delays.

9                THE COURT:  Okay.

10            (End of bench conference.)

11       BY MS. ABE:

12       Q.   Agent Bates, do you remember having a conversation with

13       the prosecutors in this case in the last week?

14       A.   Yes.

15       Q.   Do you remember having an in-person meeting with them in

16       the last week?

17       A.   Yes.

18       Q.   Do you remember whether it was October 6th or 7th?

19       A.   I don't remember specifically what day.

20       Q.   Okay.  Can we, at least for right now, agree that it was

21       either October 6th or 7th?

22       A.   Yes.

23       Q.   In that conversation, the prosecutors asked you to

24       provide the relevant messages and all other materials for this

25       case.

1    A.   Yes.

2    Q.   And then on or around October 9th, you had a video call

3    with these prosecutors.

4    A.   Yes.  I don't know exactly what day, but yes.

5    Q.   And then around October 10th you had a phone call with

6    them.  Correct?

7    A.   I'll take your word for it.

8    Q.   Do you remember having a phone call with them in the last

9    few days?

10   A.   Yes.

11   Q.   And during that phone call, they again asked you for

12   relevant materials.  Correct?

13   A.   Correct.

14   Q.   And they asked you specifically for materials because you

15   knew you were coming to testify.

16   A.   Yes.

17   Q.   And then again last night, AUSA Wolf reached out to you

18   and asked you for the text messages between you and Agent

19   Residovic.

20   A.   Yes.

21   Q.   I am going to go back to -- if we could go to Exhibit 5c

22   and d.  I'm going to show you Defense Exhibit 5c and d again.

23   So this morning you respond to AUSA Wolf and you say, "Here

24   are the messages."  Correct?

25   A.   Yes, because he specifically asked for Dinko's messages.

1    Yes.

2    Q.   And actually, I'm going to show you Defense Exhibit 5d.

3    And it may be published.

4        So you just stated that messages that discussed the

5    incident are relevant.  Correct?

6    A.   I said that I do not believe these specifically were

7    relevant.

8    Q.   And if we may show Defense Exhibit 5b and 5c side by side.

9        In these messages, you and Agent Residovic are discussing

10   Ms. Reid's arrest.  Correct?

11   A.   Yes.

12   Q.   Okay.  Agent Residovic is discussing that he thinks it's

13   too calm on the federal level.  Correct?

14   A.   That is what he said.

15   Q.   Okay.  And in response, you say, "I agree."

16   A.   That is what I said.

17   Q.   But you left that message out when you sent it this

18   morning.

19   A.   Again, I don't know what happened with that message, but

20   I did not delete that message yesterday or this morning.

21   Q.   Okay.  So when did you delete it?

22   A.   I do not recall when that message was deleted.

23   Obviously, it was sent.  I did not delete that message last

24   night or this morning or anytime that these messages were

25   asked for, which was last night, and then I saw it this morning.

1    Q.    To be clear, this is in the middle of a conversation.

2    Correct?

3    A.    As far as I recall, yes.

4    Q.    I would like to discuss this alleged kneeing incident.

5    A.    The alleged what?

6    Q.    The alleged kneeing incident.

7    A.    Okay.

8    Q.    So yesterday you said that Officer Liang set up a perimeter?

9    A.    Yes.

10    Q.    Okay.  You two were near each other, correct, around the

11    time that Ms. Reid approached the jail?

12    A.    I mean we were all around each other.  Don't specifically

13    know where Officer Liang was.  I would assume he was all

14    around where we all were, but I can't specifically state.

15    Q.    Okay.  You saw Officer Liang.

16    A.    Yes.  He was there, yes.

17    Q.    So you know he was wearing a blue plaid shirt and khakis?

18    A.    Yes.

19    Q.    No tactical gear?

20    A.    No.

21    Q.    He didn't have a visible -- his ICE badge?

22    A.    I don't know.

23    Q.    If I may show Defense Exhibit 8.  Can you see that photo?

24    A.    Yes, I can.

25    Q.    Is that a fair and accurate representation of Officer

1    Liang?

2    A.   Yes.

3    Q.   Is that a fair and accurate representation of Officer

4    Liang on July 22, 2025?

5    A.   To the best of my knowledge, yes.

6         MS. ABE:  I am moving to enter Defense Exhibit 8 into

7    evidence and have it be published to the jury.

8         MR. WOLF:  No objection.

9         THE COURT:  Admitted.

10                        (Defendant Exhibit No. 8

11                         received into evidence.)

12   BY MS. ABE:

13   Q.   Officer Liang is not wearing an ICE badge.  Correct?

14   A.   I don't see his waist.  So he may have been wearing an

15   ICE badge on his waist, but in that picture I do not see one.

16   Q.   Okay.  Officer Liang didn't tell Ms. Reid that he was law

17   enforcement.  Correct?

18   A.   That's not something that I would know.

19   Q.   You did announce to the public that no one was allowed on

20   the platform.  Correct?

21   A.   I personally never said anything, no, to that accord.

22   Q.   Okay.

23   A.   I did not, no.

24   Q.   Nobody in your group did, though?

25   A.   I don't know.  I did not.

1    Q.   Well, let's watch some of this surveillance video.   I

2    would like to show Government's Exhibit 1, and if we could

3    show camera 137 at about 7 minutes and 26 seconds -- or 7:26.

4    Seven o'clock.  And for the record, we're beginning at 7:25:59

5    p.m.

6         (Video played.)

7         And we can pause at 7:27:13.

8         So this we just watched about a minute, and that showed

9    the initial -- or Officer Liang and Ms. Reid's initial

10   interaction.  Correct?

11   A.   The initial physical interaction, yes.

12   Q.   Okay.  If we could continue playing at 7:27:13.

13        (Video played.)

14        And if we could pause at 7:27:33.

15        So this gentleman in the black in the middle of the

16   screen, he's not with you and the other ICE agents.

17   A.   No.

18   Q.   He's a civilian.

19   A.   I believe so.

20   Q.   Walking right through the platform.  Correct?

21   A.   I don't recall him, but it appears so.  He may have been

22   leaving from work or...

23   Q.   But he was walking through the platform.

24   A.   Yes.

25   Q.   If we could go back to 7:26:02 and play here.

```
 1              (Video played.)

 2              If we could pause.  7:26:56.

 3              And in the bottom right corner near the stairs, that's

 4       Ms. Reid.  Correct?

 5       A.     Yes.

 6       Q.     She's got what looks like a cell phone in her right hand?

 7       A.     Yes.

 8       Q.     Would it be fair to say she's recording?

 9       A.     Very likely, yes.

10       Q.     If we could play from 7:26:56.

11              (Video played.)

12              Pause, please.  We just stopped at 7:27:01.

13              Officer Liang just grabbed Ms. Reid's arm.  Correct?

14       A.     Yes.

15       Q.     He made first contact with her.

16       A.     Yes.  First physical contact.

17       Q.     And to be clear, it's not illegal to film ICE agents.

18       Correct?

19       A.     That's correct.

20       Q.     It's not illegal to film the FBI.

21       A.     No.

22       Q.     Play, please.

23              (Video played.)

24              Pause, please.

25              So I just played from 7:27:01 to 7:27:06, and Officer
```

1     Liang and Ms. Reid are no longer in view.  Correct?

2     A.   Correct.

3     Q.   Do you see -- I'm going to try to draw this.  I'm going

4     to circle something.

5          Okay.  Agent Bates, do you see what looks like a white

6     passenger van on the far right of the screen?

7     A.   Yes.

8     Q.   It's parked over the diagonal --

9     A.   I can probably circle it if you want.

10    Q.   Oh, if you can, that would be great.  Thank you.

11         And now do you see, just below what you circled, what

12    looks like a -- that looks like a camera, correct, you would

13    say?

14    A.   Yes.

15    Q.   A surveillance camera?

16    A.   It looks like it.

17    Q.   Okay.  Thank you.  I am now going to show you what is

18    Government's Exhibit -- what has previously been marked and

19    admitted as Government's Exhibit 5, and I will direct you to

20    8:41.  And if we can publish this to the jury.  Please play.

21         (Video played.)

22         Pause, please.

23         So Ms. Reid says, "I was just as far away as I was over

24    there."  Correct?

25    A.   Yes.  That's what she said.

1     Q.   And you at this time have no idea how much force Officer

2     Liang is exerting on Ms. Reid.

3     A.   I mean, I could see that he's struggling with her because

4     she's actively pushing back on his hands.

5     Q.   She hasn't moved.  Correct?

6     A.   From where?  She's moving her arms.

7     Q.   Okay, but her position has not moved.

8     A.   She's on the wall.

9     Q.   She's on the wall.

10    A.   Yes.

11    Q.   She hasn't moved towards either of the noncitizens.

12    Correct?

13    A.   After being stopped by Officer Liang she did not move

14    further.

15    Q.   Okay.  He has her pinned against the wall.  Correct?

16    A.   Yes.

17    Q.   She doesn't get closer to them, though.  Correct?

18    A.   She's not capable of getting closer to him because

19    Officer Liang stopped her.

20    Q.   If we could keep playing, please.

21        (Video played.)

22        Pause, please.

23        So we're at 8:52.  Here's a gap between Officer Liang and

24    Ms. Reid.  Correct?  He's standing -- scratch that, please.

25    If we can continue playing, please.

```
 1              (Video played.)
 2              Pause.  So we're at 8:56, and you have now grabbed both
 3         of Ms. Reid's -- both of your hands are on Ms. Reid.  Correct?
 4         A.    Yes.  In the process, but yes.
 5         Q.    And now Officer Liang has moved closer in to Ms. Reid.
 6         Correct?
 7         A.    Yes.
 8         Q.    Keep playing, please.
 9              (Video played.)
10              Pause.
11              So we just played until 9:10, and Officer Liang's left
12         leg moves into Ms. Reid.  Correct?
13         A.    If you can replay it, I don't recall that.
14         Q.    Could we go back 10 seconds, please?  Play, please.
15              (Video played.)
16              Pause.  Officer Liang moves in to Ms. Reid?
17         A.    It looks like he took a step closer towards her, yes.
18         But I could not see his legs, so that's just my assumption.
19         Q.    Could we keep playing, please.
20              (Video played.)
21              Pause, please.
22              Officer Liang just forced his legs -- his leg in between
23         Ms. Reid's legs.  Correct?
24         A.    He was trying to gain control of her because she was
25         actively resisting.
```

```
1    Q.   Officer Liang forced a leg in between Ms. Reid's legs.

2    Correct?

3    A.   He stepped in closer towards her body, yes.

4    Q.   He leaned his whole body into her crotch.  Correct?

5    A.   I don't know.  I can't see exactly where his legs are,

6    but he took one step towards her in an attempt to restrain her.

7    Q.   Okay.  So yes.

8    A.   He took one step towards her, yes.

9    Q.   You don't know what Officer Liang is thinking in this

10   moment.

11   A.   Say that again?

12   Q.   You don't know what Liang is thinking in this moment.

13   A.   No.

14   Q.   Again, you don't know what force he's exerting on her.

15   A.   No.  That was just my assessment.

16   Q.   You don't know how much force he's exerting with his

17   hands?

18   A.   I mean, I can see that he is physically pushing her up

19   against the wall, but I don't know what his intentions were

20   with his actions at the time.

21   Q.   You don't know how the force that he was exerting felt on

22   Ms. Reid.

23   A.   No.  I do not.  Thank you for rephrasing that question.

24   Q.   Yesterday you talked about the type of motion that you

25   felt.  Correct?
```

1    A.    Yes.

2    Q.    Okay.  It's from this, correct?

3    A.    From what?

4    Q.    From Officer Liang's action, correct?  Yesterday you

5    testified that Ms. Reid's leg went up into your groin area.

6    Correct?

7    A.    She didn't make contact, but yes.

8    Q.    That motion, correct, was in response to Officer Liang's

9    actions?

10   A.    I don't know if that was in response to his actions.

11   Q.    Okay.  If we could start playing, please.

12         (Video played.)

13         Pause.

14         If we could go back to 9:10 and then play through 9:15,

15   please.  Go back just a little bit more.  Thank you.

16         (Video played.)

17         Pause, please.

18         So Officer Liang just pushed his hand into Ms. Reid's

19   boob.  Correct?

20   A.    I don't think that was his intent.  I think he was trying

21   to restrain her hand.

22   Q.    I didn't ask his intent.  I asked what he did.

23   A.    He was -- he had control of her hand and was pushing her

24   arm against her body.

25   Q.    Okay.  She wasn't talking about trying to get closer,

1    Ms. Reid.

2    A.   I didn't hear her say anything about getting closer.

3    Q.   In fact, she said that she was just as far as she had

4    been before.   Correct?

5    A.   That's what she said, yes.

6    Q.   Yesterday you said at this point, when you approached,

7    that you were just trying to deescalate the situation.

8    Correct?

9    A.   Not at this point.   When I initially approached, yes.

10    Q.   Okay.   Can we go back to 8:50, please.   I apologize,

11    8:40.   Thank you.

12        (Video played.)

13        Pause, please.

14        We're at 8:55, and at this point Ms. Reid has made no

15    movement closer towards the noncitizens, correct?

16    A.   Because she was being held by Officer Liang from

17    preventing her to move forward.

18    Q.   Officer Liang had her under control.

19    A.   Yes.

20    Q.   You grabbed her hard.

21    A.   I grabbed her arm to gain control, as we are taught at

22    all law enforcement academies.

23    Q.   You grabbed her hard enough to leave bruises.

24    A.   I -- I'm not sure about that.   We are required to gain

25    control of individuals, so I wasn't going to grab her softly

 1    either.

 2    Q.   That's not what I asked.  You didn't deescalate the

 3    situation.  Correct?

 4    A.   I attempted to.  I walked up, I called her "ma'am," I

 5    said "once they're done, you'll be free to go."

 6    Q.   Thank you.  Please just answer my questions yes or no.

 7            MR. WOLF:  Your Honor, I object.

 8            THE COURT:  Overruled.

 9    BY MS. ABE:

10    Q.   So let's talk about how this case started.  At the

11    beginning of this case, after you-all arrested Ms. Reid, a

12    criminal complaint was filed.  A criminal charge was filed.

13    Correct?

14    A.   Yes.

15    Q.   And a criminal complaint is the document that starts a

16    criminal case.  Correct?

17    A.   Correct.

18    Q.   Okay.  It's how you get an arrest warrant.  Correct?

19    A.   Yeah.

20    Q.   And you were sent that complaint early on.  Correct?

21    A.   I was.

22    Q.   Before you drafted your 302 form.  Correct?

23    A.   Correct.

24    Q.   And you discussed or you used that complaint in

25    discussions to draft your 302 form.  Correct?

```
1    A.    No.

2    Q.    Okay.  There's nothing about the kneeing in the

3    complaint.  Correct?

4    A.    No.

5    Q.    Because after this arrest, you didn't mention any kneeing

6    to the prosecutor.

7    A.    Yes, I did.

8    Q.    Oh.  Yesterday you testified that the reason why you and

9    your colleagues were sitting outside and waiting for these

10   noncitizens was because you were not allowed in D.C. jail.

11   Correct?

12   A.    That's what I was told at the time.  Yes.

13   Q.    And that's because D.C. has a law that does not allow the

14   D.C. government employees to cooperate with federal

15   immigration enforcement.  Correct?

16   A.    I believe so.  I've never read the law.

17   Q.    Okay.  Would it help you to view the law now?

18   A.    If you would like me to read it.

19        MS. ABE:  Your Honor, may I approach?

20        THE COURT:  Yeah.  Go ahead.

21   BY MS. ABE:

22   Q.    So I just handed you a document titled Prohibition on

23   Cooperation with Federal Immigration Agencies.  Correct?

24   A.    Yes.

25   Q.    And above that it says Code of the District of Columbia.
```

1    Correct?

2    A.    Yes.

3    Q.    And the section of this code is 24-211.07.  Correct?

4    A.    Yes.

5    Q.    And then subsection --

6          MR. WOLF:  Your Honor, the government has an objection.

7    May we be heard?

8        (Bench conference.)

9          THE COURT:  What's your objection, Mr. Wolf?

10         MR. WOLF:  Your Honor, so the witness testified that

11   she believes there is a law but she hasn't read it.  I think

12   what would be proper here based on the foundation would be to

13   refresh recollection, and that would not entail reading the

14   statute into the record, thus first allowing the witness to

15   review it to herself and asking her whether that refreshes her

16   recollection and asking her essentially whether D.C. law

17   prohibits X.  I don't think there's a foundation for admitting

18   this.

19         MS. ABE:  Well, Your Honor, I was not seeking to admit

20   this law into evidence.  I was actually going to point Agent

21   Bates to the provision that I was discussing so then I could

22   use -- instead of having her read the entire document.  I

23   think it's four pages long.

24         THE COURT:  I suspected you weren't going to move it

25   into evidence.  Mr. Wolf, does that clarify things for you?

1          MR. WOLF:  Yes, it does.  If she's just directing the

2     witness, that's fine.  Where to read, that's fine.

3          THE COURT:  Okay.

4       (End of bench conference.)

5     BY MS. ABE:

6     Q.   So subsection (a) begins "Absent judicial warrant."

7     Could you just read to yourself subsection (a) and then the

8     first two subsections within subsection (a).

9     A.   I wish I had my glasses today.

10          (Witness reviewing document.)

11     Q.   So after looking at this law, you would agree that it

12     prohibits D.C. government employees from cooperating with

13     federal immigration enforcement.

14     A.   Yes.

15     Q.   But you and your colleagues were conspiring with an

16     employee at the Department of Corrections to violate the law.

17     A.   I had no part in any of those conversations.

18     Q.   Okay.  But you knew.

19     A.   I knew there was somebody that was giving us information,

20     yes.

21     Q.   And if I could just point -- or if I could show

22     Government's Exhibit 6.  I don't know if it's been admitted.

23          THE COURT:  Did you say Government's Exhibit 6?

24          MS. ABE:  Yes, Your Honor.

25

```
 1       BY MS. ABE:
 2       Q.   And if we could just play without sound -- I don't
 3       believe this portion has been published -- of the first few
 4       seconds so Agent Bates can get a look.
 5            (Video played.)
 6            Can we pause, please.
 7            So I just played the first 11 seconds of Government
 8       Exhibit 6.  There are four people on the screen.  Correct?
 9       A.   Yes.
10       Q.   And the second person from the right is you.  Correct?
11       A.   Yes.
12       Q.   Okay.  Is this a fair and accurate representation of you
13       and your colleagues on July 22, 2025?
14       A.   Yes.
15            MR. WOLF:  Your Honor, just for clarity of the record,
16       I admitted Government 6a, which is a portion of this body-worn
17       camera.  I don't have any objection, though, to admitting
18       Government Exhibit 6.
19            THE COURT:  Okay.  Admitted.
20                              (Government Exhibit No. 6
21                               received into evidence.)
22            MS. ABE:  We were actually going to -- well, we can
23       admit the whole thing.  That's okay.
24       BY MS. ABE:
25       Q.   If we could --
```

 1            MS. ABE:   To be clear, this is now admitted and it may

 2       be published to the jury, Your Honor?

 3            THE COURT:   Correct.

 4       BY MS. ABE:

 5       Q.   If we could go to 2:23, please.   And now with sound and

 6       play.

 7            (Video played.)

 8            Pause, please.

 9            So we just played until 2:44.   Were you able to hear

10       that -- any of that?

11       A.   I was not.

12            (Video replayed.)

13       Q.   Who is the gentleman with the gray beard who was talking

14       first?

15       A.   That's Officer Craddock.

16       Q.   Officer Craddock is an ICE agent?

17       A.   Yes.

18       Q.   And at the beginning he said, "You wanna grab Dinko, it's

19       your correction."   Correct?

20       A.   I think he said "connection," but yes.

21       Q.   Thank you.   Okay.   And can we keep playing?

22            (Video played.)

23            MR. WOLF:   Your Honor, we have an objection at this

24       point.

25            (Bench conference.)

1          THE COURT:  Mr. Wolf.

2          MR. WOLF:  Your Honor, while we don't have an objection

3     to the admission of the exhibit, I'm not sure this witness has

4     personal knowledge of what's happening at this point.

5          THE COURT:  Then she can say that.

6          MR. WOLF:  She's not being asked that, though, I guess

7     is the question.

8          THE COURT:  Go ahead, Ms. Abe.

9          MS. ABE:  Your Honor, just to be clear, she did testify

10    that she knew they were all colluding with someone at DOC, and

11    I'm just showing --

12         THE COURT:  Mr. Wolf, she did say she was aware of it.

13         MR. WOLF:  Yes, but regarding these particular

14    statements, there's no evidence that she was actually there to

15    have personal knowledge of this.  So as to her, it's hearsay.

16    What her knowledge is of what's going on is obviously fair

17    game for cross, but what's going on here obviously at the

18    beginning of the clip which shows her; but at this point she's

19    not visible anywhere on the screen, and so what's going on

20    here is hearsay as to Agent Bates.

21         MS. ABE:  Your Honor, I also would just note that the

22    government turned over these text messages from Agent

23    Residovic where he's talking about this, and now they are ,

24    you know -- well --

25         THE COURT:  Ms. Abe?

1          MS. ABE:  I apologize, Your Honor.  The government

2     is --

3          (Defense conferring.)

4       I mean, Your Honor, I mean I just -- Agent Bates -- I

5     candidly, Agent Bates answered that she understood that they

6     were colluding with this DOC agent.  I have a good-faith basis

7     for asking the question.  This line of questioning I think

8     goes to again Agent Bates's credibility.  She's been lying all

9     morning, and now we have her agreeing to, or her admitting

10    that she -- I mean she's encouraging someone to break the law,

11    or she's at least, I mean, if this --

12         THE COURT:  I don't think she testified that she's

13    encouraging them.

14         MS. ABE:  She knows there is this violation going on.

15    Yes, Your Honor.  Thank you for that correction.

16         THE COURT:  How much more of this video do you want to

17    show, Ms. Abe?

18         MS. ABE:  Less than 20 seconds.

19         THE COURT:  Okay.  You can finish and -- you can ask

20    her what she knows, how she knows it.  You can press on that.

21    You asked her and she answered one question, and you stopped.

22    I understand that it's frustrating because they're now not

23    calling Officer Residovic for the text messages.  You can call

24    him yourself and put the text messages in, and in the meantime

25    you can ask her with more specificity about what it is that

 1    she knows about this.

 2            MS. ABE:  Okay.  Thank you, Your Honor.

 3        (End of bench conference.)

 4    BY MS. ABE:

 5    Q.   If we could go back to 2:50 and then play through 3:20,

 6    please.

 7            (Video played.)

 8            Pause, please.

 9            So the gentleman in the purple -- in the red plaid,

10    that's Agent Residovic.  Correct?

11    A.   Correct.

12    Q.   And at the end of this clip, he just said, "Okay, next

13    one up."  Correct?

14    A.   I believe so, yes.

15    Q.   And at the beginning of this video, we saw you and other

16    agents standing around.  Correct?

17    A.   If this was the second arrest, I was not present.

18    Q.   That's not what I asked.  What I asked was at the

19    beginning of this video --

20    A.   Could you please back up so I can recall?

21    Q.   Sure.

22    A.   Thank you.

23    Q.   For the record, we are at 30 seconds on the same video.

24    A.   Yes.

25    Q.   And so -- if we could play.

1            (Video played.)

2            Pause, please.

3            So we started this at 30 seconds, and we are now at 56

4     seconds.  In the last 26 seconds, you and your colleagues

5     started inching closer and closer to the door.  Correct?

6     A.    Correct.

7     Q.    Why was that?

8     A.    Because we got notified that they were bringing out the

9     individual.

10    Q.    Someone inside the D.C. jail told you that this person

11    was being released.

12    A.    Not me specifically, no.

13    Q.    Someone inside told one of you or your colleagues.  One

14    of you.

15    A.    Yes.

16    Q.    And how do you know this?

17    A.    Because I was notified by one of the officers on scene

18    that -- he notified us, saying they are coming out.

19    Q.    Okay.  And when we watched at the 3:20 mark, you just

20    said you weren't there.  Correct?

21    A.    I think I'm getting confused with these two videos.  I

22    was present here, but the second video that you just played

23    may have been two different activations of a body-worn camera.

24    That's how I'm perceiving it.  And if we were able to play it

25    through, that would help me answer.

1    Q.   Okay, yeah.  It's the same video.  So we'll start at 56

2    seconds and play through.

3    A.   Thank you.

4         (Video played.)

5    Q.   Did you have a comment?

6    A.   Yes.  When you asked me if I was there at the 8 minute

7    mark, I was not.  I was with the first subject.  I had just

8    taken him away, so I wasn't present for this second

9    individual.

10   Q.   Just for clarity of the record, it was 3:20, but my

11   question was not whether you were there.  Actually, my

12   question is -- well, if we could go to the 3:10 mark and just

13   play through 3:20, please.

14        MR. WOLF:  Your Honor, objection at this point.

15      (Bench conference.)

16        THE COURT:  Mr. Wolf.

17        MR. WOLF:  Your Honor, the witness has testified that

18   once she made the arrest, she was not present at this point.

19   So we would object as to the portion of this body-worn camera

20   as to the witness.  She doesn't have personal knowledge of

21   what's happening at this point.  She is not in this area.

22   She's down in the parking lot.

23        THE COURT:  Ms. Abe.

24        MS. ABE:  Your Honor, so part of the issue is that we

25   have BWC in this case missing, and I'm trying to get out that

1    she -- I would just like her to confirm that the message that

2    they received that someone is coming out is like the one that

3    Agent Residovic says at the 3:17 mark.  That's all I'm trying

4    to get at.  And if I didn't have to keep refreshing this

5    witness's recollection, we wouldn't be having to keep watching

6    this video constantly, but she's impossible to pin down, Your

7    Honor.

8         THE COURT:  So she's not there at 3:17.  Is that right?

9         MS. ABE:  No, Your Honor.

10        THE COURT:  So then -- she's not there.  She doesn't

11   know what he says.

12        MS. ABE:  Okay.  Well, Your Honor, what I'm trying to

13   get out is that she knows that the text message -- the

14   statement to the effect of, okay, he's coming now, is what is

15   said at the time.  But we don't have that statement from any

16   other vantage point.

17        THE COURT:  But that's because she's not there.  It's

18   not on her body-worn camera because she's not on the scene.

19   You could put Residovic on the stand, and he's obviously there

20   and you can ask him about that.  You can ask her what she

21   knows about the communications.  But she's not there.  That's

22   the real problem here, is you expected Residovic to be on and

23   they're not putting him on.  And you could call him.

24        MS. ABE:  Yes, Your Honor.  Understood.

25        (End of bench conference.)

1     BY MS. ABE:

2     Q.   Okay.  So the one thing that you're clear about here is

3     someone on your team received a communication from a D.C. jail

4     employee who informed you when these noncitizens were leaving.

5     Correct?

6     A.   I did not know if they were an employee, but I knew that

7     one of the officers had contact with someone that had

8     information on when they were being released.  Yes.

9     Q.   Someone who was inside and told them they were coming out.

10    A.   Someone that had information.  I was not privy to any of

11    that information.  All I knew is that someone knew when they

12    were being released.  Yes.

13    Q.   Okay.

14    A.   I do not recall what the circumstances of that

15    relationship was or what --

16    Q.   Understood, understood.  Thank you.

17         MS. ABE:  If I may have just one moment, Your Honor?

18         THE COURT:  Of course.  Go ahead.

19       (Defense conferring.)

20         MS. ABE:  Okay.  Thank you, Your Honor.

21    BY MS. ABE:

22    Q.   I would like to show you what I will mark as Defense

23    Exhibit 5f.  Earlier you testified that you did not use the

24    complaint in this case to draft your 302.  Correct?

25    A.   Correct.

1    Q.    Okay.  Do you recognize this text message?

2    A.    Yes.

3    Q.    And who's this message with?

4    A.    My supervisor.

5    Q.    And there is an attachment of something in this text

6    message.  Do you know what it is?

7    A.    Yes.  That's the complaint.

8    Q.    And in this text message, are you in the -- or is the

9    message that is in brown what you wrote?

10    A.    Yes.

11    Q.    And in that message you say, "But do you want the arrest

12    EC separate from the 'assault' or am I good to put it in

13    together in one 302?"

14    A.    Yes.

15    Q.    And at this point, you had not drafted your 302.

16    A.    No.

17         MS. ABE:  If I may just have one moment, Your Honor.

18         THE COURT:  Go ahead.

19         MS. ABE:  For the record, I believe I have this as 5f,

20    correct?  Okay.  Yes.

21         THE COURT:  Yes.  I have it as 5f.

22       (Defense conferring.)

23         MS. ABE:  Just a few more questions.

24    BY MS. ABE:

25    Q.    Going back to -- you testified yesterday that Officer

1    Liang established a perimeter.  Correct?

2    A.   Yes.

3    Q.   But you didn't hear him say anything about establishing a

4    perimeter.

5    A.   No.

6    Q.   You didn't hear him tell anyone to stay back.

7    A.   Not that I recall.  Not that I recall, no.

8    Q.   There was no tape up, for example, marking --

9    A.   No.

10    Q.   -- a perimeter.

11    A.   No.

12         MS. ABE:  No further questions for this witness, Your

13    Honor.  Thank you.

14         THE COURT:  Thank you.  Mr. Wolf, do you have any

15    redirect?

16         MR. WOLF:  Yes, Your Honor.

17                REDIRECT EXAMINATION

18    BY MR. WOLF:

19    Q.   Good afternoon.

20    A.   Is it afternoon already?

21    Q.   So I'd like to kind of take things in order.  So first

22    regarding the text messages you were asked about, the Trump

23    coin thing, you said there was context.

24    A.   Yes.

25    Q.   What was going on with that?

1   A.   Yeah.  The Trump coin, one of the individuals on that

2   thread is in protection.  That's his job.  He does protection,

3   and he had recently received either a Trump coin or a White

4   House coin; I don't specifically remember.  So that was kind

5   of my way of saying that back to him like, hey, maybe I would

6   get a Trump coin.  So that's the only reason I said that, was

7   because he had just received a coin from the White House.

8   Q.   And the people on this text message thread, how long have

9   you known them?

10  A.   It goes back to my first units in the military, so I'd

11  say close to eight years, give or take.  Close to ten years,

12  give or take.

13  Q.   How often do you see them?

14  A.   In person, not that often.

15  Q.   How often do you talk to them?

16  A.   Messages here and there, but not that often.

17  Q.   How would you describe your relationship with them?

18  A.   Very close.  We maintain sustained contact though, you

19  know, as you get older your relationships kind of fade, but we

20  maintain very good relationships since back when we were in

21  the military together.

22  Q.   All right.  I'd like to address this issue with the text

23  messages with Agent Residovic.  And Madam Clerk, can you share

24  Defense Exhibit 5b, which is on my screen now?

25       All right.  So Agent Bates, how did you go about sending

1    copies of the text messages to the government this morning?

2    A.   I screenshotted them.

3    Q.   And what kind of phone do you have?

4    A.   It's a government-issued phone.

5    Q.   Is it like an iPhone, Android?

6    A.   Android or Google phone, whatever the FBI issues.  I

7    think it's a Google phone, like a Android-type phone.

8    Q.   And when you screenshot it, can you describe the process

9    of how you screenshotted this?

10    A.   There's like a square on the bottom right.  I click the

11    square, and then it kind of makes the screen smaller, and then

12    there's like a screenshot portion.  So I press "screenshot."

13    Q.   All right.

14    A.   And then I did that for the whole string.

15    Q.   And so when you do the screenshot, you take one

16    screenshot, how do you do the next portion of the message?

17    What do you do with your phone?

18    A.   So I just scrolled up, screenshot, scrolled up, screenshot.

19    Q.   You testified that you did not delete any text messages

20    last night or today.

21    A.   No.  I did not.

22    Q.   Do you have that phone with you?

23    A.   Yes.

24    Q.   Are you able to bring out your phone and take a look at

25    this text message thread?

1    A.    Yes.  My phone's over there.  I don't have it on me
2    physically right now.
3          THE COURT:  Any objection?
4          MS. ABE:  We don't have an objection, but we would, of
5    course, request to watch.
6          MR. WOLF:  Of course.  Permission for the witness to
7    step down or for the government to obtain the phone from
8    wherever to --
9          THE COURT:  The agent should go get her own phone.
10          MR. WOLF:  Thank you, Your Honor.
11      (Witness retrieving cell phone.)
12          THE WITNESS:  Do you want me to turn it on?
13          THE COURT:  Yes.  You may turn it on.  Please come back
14    to the witness stand.
15      (Witness resumes the stand.)
16    BY MR. WOLF:
17    Q.    All right.  While that's starting up, we'll get started.
18    You let me know when the phone is back on.
19          You testified regarding about being asked about -- being
20    asked to provide any exculpatory evidence downplaying the
21    incident.  Do you recall testifying about that?
22    A.    Yes.
23    Q.    And you testified that it was during the grand jury
24    process?  Does that sound right?
25    A.    Yes.  It was the first prosecutor that was on the case

1    during the grand jury that asked for relevant text messages,

2    and I asked him specifically what he believed was relevant,

3    and he said exculpatory evidence downplaying the assault.

4    Q.    What was the time frame of this request?  Not an exact

5    date, but approximately month.

6    A.    Sometime in August, when I sent the initial email to him

7    that I'm sure you got.

8    Q.    Okay.  And has your phone started up at this point?

9    A.    Yes.

10    Q.    Okay.  Can you take a look for the text messages with

11    Agent Residovic?

12         MR. WOLF:  And, Your Honor, what the government would

13    propose is for the parties to be able to approach the witness

14    and be able to observe this phone and document what's on the

15    phone.  Either the parties could both take a picture, and the

16    government would like to provide this as evidence.

17         THE COURT:  We're going to take a break right now for

18    five minutes.

19      (Jury out at 12:20 p.m.)

20         THE COURT:  Agent Bates, you can step out of the

21    courtroom.  You are not to speak to anyone.  You're still

22    under oath.  Do you understand me?

23         THE WITNESS:  Yes, Your Honor.

24      (Witness exits.)

25         THE COURT:  You can have a seat.

1      Mr. Wolf, this that's about to happen, these games of let's

2      bring up a phone and turn it on and take pictures of it

3      because your witness turned over text messages the morning of

4      her testimony that you asked for last week, that was asked for

5      previously, and either deleted a text message or didn't

6      screenshot it is really not what I tolerate in my courtroom.

7              MR. WOLF:  May I respond, Your Honor?

8              THE COURT:  Sure.  Go ahead.

9              MR. WOLF:  Your Honor, I am not playing games with this

10     witness.  I suspect, and what I -- and I think it's -- since

11     the court believes and defense is asserting that Ms. Bates

12     committed -- essentially committed a crime by deleting a text

13     message in response to a government request, I think it's

14     important --

15             THE COURT:  Their theory is either that she -- just to

16     correct you, Mr. Wolf, their theory is either that she deleted

17     the text message now or before, or when she was screenshotting

18     the messages she intentionally left this one out because it

19     made her look bad.

20      And by the way, the reason we're resolving this now in the

21     middle of trial and people are going to get phones from the

22     gallery and we're all going to gather around and take pictures

23     of text messages is because they're getting it this morning,

24     because you tell me you asked for it on the 1st and your agent

25     did not give it to you, that you asked for it on the 7th and

1    your agent didn't give it to you, that you asked for it on the

2    10th and your agent didn't give it to you.  Why are we here

3    with your witnesses again?

4         MR. WOLF:  I acknowledge that these text messages could

5    have been provided earlier --

6         THE COURT:  Do you agree that these text messages were

7    responsive to what you asked your witness for several times

8    before last night?

9         MR. WOLF:  No, Your Honor.

10        THE COURT:  Are you contradicting what you told me

11   earlier, once again, like you contradicted yourself last week?

12        MR. WOLF:  Sorry.  I'm sorry, Your Honor --

13        THE COURT:  You told me that you asked this witness for

14   all relevant information relevant to the substance of this

15   case.  That's, in essence, what you asked for.  Correct?

16        MR. WOLF:  Yes, Your Honor.

17        THE COURT:  Do you think that these messages are

18   relevant to the substance of the case?

19        MR. WOLF:  Yes, Your Honor.

20        THE COURT:  Okay.  So what was the disagreement with

21   what I said previously that these messages were responsive to

22   what you asked for and not given to you?

23        MR. WOLF:  I'm sorry.  Kind of lost me on the question.

24   I apologize.

25        THE COURT:  Okay.  I asked you whether you agree that

1    these messages were responsive to your request to this agent.

2    You said you didn't agree.  Then you told me that you agree

3    that these messages were relevant and that you did ask for

4    text messages that were relevant to the substance of the case.

5    Where is there a disconnect?

6            MR. WOLF:  I don't think that's my position I'd take.

7    I think I've said I requested all communications relating to

8    the substance of the case.

9            THE COURT:  You told me earlier -- I can go back -- if

10   you're disagreeing now with what you told me earlier -- did

11   you tell me that what you asked for -- and by the way, you

12   asked for it in person, on the phone, and a way we can't

13   verify, right?  You told me earlier that you asked for all

14   information that was relevant to the substance of this case.

15   Is that not what you asked for?

16           MR. WOLF:  Yes.  That's what we asked for.

17           THE COURT:  Okay.  And do you agree that these text

18   messages are relevant to the substance of the case?

19           MR. WOLF:  Yes, Your Honor.

20           THE COURT:  Okay.  I didn't think this was difficult.

21   So putting those two things together, do you agree with me

22   that these text messages were responsive to your prior

23   requests to this witness?

24           MR. WOLF:  I believe that --

25           THE COURT:  How is the answer to that not just yes?

1              MR. WOLF:  It's actually -- it's not a yes-or-no

2      question.  I think that what happened here --

3              THE COURT:  Mr. Wolf, are you being serious right now?

4      Let me go over this again --

5              MR. WOLF:  Your Honor, I'm trying --

6              THE COURT:  No, no, no.  No.  Because you're not

7      answering my question.  I just asked you, did you ask this

8      witness for information relevant to the substance of the case?

9      Your answer was yes.  Then I asked you, do you agree that

10     these text messages are relevant to the substance of the case?

11     Your answer:  Yes.  Necessarily, that means that these text

12     messages were responsive to your request.  Yes or no?

13             MR. WOLF:  Yes.  These text messages are responsive to

14     my requests.

15             THE COURT:  So what we have here are text messages that

16     you asked your agent for multiple times, well before trial,

17     that she did not give to you, that the night before trial or

18     the morning of trial she decided to turn over, that the

19     defense has to realize during her cross-examination is missing

20     a text message either because she screenshotted it and left

21     that one out, or your version would be she made a mistake in

22     screenshotting and they have to be flat-footed during

23     cross-examination figuring this out.

24         And now we're all going to figure it out on redirect while

25     we gather around this witness and review her phone for the

1    first time?  These are games.  We have all been together

2    preparing for this trial for weeks, and it's unbelievable to

3    me that we are here in the middle of trial dealing with this.

4          MR. WOLF:  Your Honor, the objective is to find the

5    truth, and Your Honor has a belief, defense have a belief.

6          THE COURT:  I don't have a belief.  I don't know what

7    the answer is, Mr. Wolf.  I've laid out everyone's belief, and

8    it's stunning that no one knows what's happened and we're in

9    the middle of trial because you and your witness waited until

10   the morning of the trial to give this to the defense.

11         MR. WOLF:  So, two things.  The witness can testify as

12   to her version of events.  I think that's what she should be

13   allowed to do, and what she's not been allowed to do, and

14   that's why we'd like to sort this out.  And for what it's

15   worth, Your Honor, the text messages at issue here were

16   provided in Agent Residovic's messages.  It's the same text

17   message thread.

18         THE COURT:  She's the one who's testifying, and her

19   text messages, which were not turned over until the morning of

20   trial, don't match the ones that your other witness who, after

21   last week and their testimony you've decided not to call

22   today, they don't match up.  And they have to realize that on

23   the morning of trial because this witness withheld her text

24   messages for whatever reason -- I don't know what that reason

25   is -- despite you asking her for it multiple times.

1          MR. WOLF:  And, Your Honor, if you look at the actual

2     text message string -- this is why I published it -- you can

3     see there's a very small sliver of yellow on the bottom of one

4     screen, there's a sliver of yellow on the other screen.  There

5     is a reasonable argument -- and the witness can answer.  She

6     has to answer truthfully.  She's under oath.  There's

7     reasonable argument that she --

8          THE COURT:  Of course.  What I am saying to you is this

9     should not be happening in trial.

10          MR. WOLF:  I agree, Your Honor.

11          THE COURT:  These text messages should have been given

12    to the defense well before this morning, and this could have

13    been sorted out so the jury isn't sitting there while we all

14    crowd around and look at someone's phone.  That is what I am

15    discussing with you today.  And this is a repeated pattern in

16    this case, of things not being turned over -- I have videos

17    being turned over the night before trial.  I have text

18    messages coming in the morning of trial.  It's over and over

19    in this case, and it's not acceptable.

20          MR. WOLF:  Respectfully, Your Honor, the government

21    went beyond what is required under Jencks for these text

22    messages -- many of them provided through Agent Residovic.

23    Those text messages are the back and forth between -- text

24    messages between Agent Residovic and Agent Bates.

25          THE COURT:  Residovic is not testifying.  Agent Bates

1     is the one testifying.  So why is it that you did not get her

2     text messages?  You didn't even have them before this morning.

3     Everyone got them at the same time.

4           MR. WOLF:  They are the text messages, though, Your

5     Honor.  So it doesn't matter, essentially, the source of

6     whether it came from phone A, phone B.  It is the same

7     conversation.

8           THE COURT:  Well, Mr. Wolf, it wasn't, in fact.  The

9     defense had to realize that in the middle of their cross.  I

10    mean -- and that would not have happened had you gotten

11    messages from your witness who you intended to call and

12    realized that one was missing and then had a conversation with

13    her to figure out whether that was an error on her part, and

14    you had gotten the complete text messages, and they would have

15    had that well in advance of trial.

16          And again, this is not the first time that I have the

17    government turning over things at the last minute and seeming

18    to not know what's going on in their own case.  Again,

19    transferring a case from AUSA Dernbach to you is not an excuse

20    for the sloppiness that I have seen.  At points you don't even

21    know what the prior AUSA did.  At points you told me that he

22    did things that turned out to be untrue when you finally put a

23    witness on the stand at a *Brady* hearing.  This is not

24    acceptable.

25          And, sure, our only choice now is to crowd around a witness

1    and look at her phone and all figure this out in real time

2    while the jury wonders what's going on.  I mean, that is not

3    supposed to happen, and it's only happening because the

4    government is not meeting its obligations.

5        Okay.  Does the defense have anything to add to what's

6    about to happen?  I'm not sure there's another choice here.

7        MR. OHM:  So the problem with what the government just

8    presented here is that, as the court just noted, it's not

9    really responsive to our concern, right, because it doesn't

10   prove anything.  She could just very well have intentionally

11   screenshotted and deleted or kept out that message when she

12   provided it, but when you have this dramatic television moment

13   where the witness scrolls down and everybody gathers around

14   and gives this aura of importance that I think the government

15   is trying to elicit like it matters -- it actually doesn't

16   matter.

17       It doesn't mean that she didn't -- the truth?  It doesn't

18   illuminate the truth.  It just puts on a show to make it seem

19   like this is an important thing that is responsive to our

20   point, but it doesn't because whether it's on there or not

21   doesn't make a difference.

22       THE COURT:  Okay.  We're going to break for lunch now.

23   You are going to provide the defense with the complete text

24   messages.  To the extent one's missing and what you turned

25   over to them this morning was inadequate, you can now make a

1     proper disclosure to them of the text messages, and we can

2     reconvene after lunch and figure out how, if at all, all of

3     that gets presented to the jury.

4         I'm not going to figure that out for the first time in

5     front of the jury like this is a show.  What you gave to them

6     this morning is either incomplete because she made a mistake

7     when she screenshotted her phone, or she intentionally did not

8     screenshot that message, or the message isn't there because

9     it's been deleted.

10        Your responsibility is to provide them with what you

11    believe to be an accurate text message string, and you can do

12    that over lunch and then we can reconvene.

13        MR. OHM:  And Your Honor, I do want to add a couple

14    things for the record just because I know the transcript is

15    not going to be clear on the demeanor of this witness when she

16    was confronted.  I mean, she was very evasive when she was

17    talking about her texts.  She used the word "deleted" and

18    qualified it every single time.  She said, I didn't delete

19    them yesterday, I didn't delete them this morning, every

20    single time she actually said deleted, because she doesn't

21    know if she actually deleted them in the past.

22        THE COURT:  I don't think she knows.  I don't think

23    this witness -- I mean, based on my read of her testimony, she

24    does not even know if that text is on her phone.  And she does

25    not know if she deleted it in the past.  At one point she

1    said, "If I deleted it, it wasn't last night or this morning."  I

2    don't think she knows.  I think she's about to find out, along

3    with the rest of us in this production here, whether that text

4    is on her phone or not.

5         MR. OHM:  And the government also had every opportunity

6    to request the court to do this outside the presence of the

7    jury, and the government decided to do this in the way it

8    decided to do this.

9         THE COURT:  Okay.  Mr. Ohm, before you leave, I saw

10   that you sent cases on Officer Liang's testimony, which I will

11   look at.  Let me ask you, what's your theory about why it is

12   relevant that Officer Liang lied to the grand jury?

13     So if he's here and he's testifying, you want to attack his

14   credibility, and that's all fine.  But if he's not before the

15   jury and his credibility is not an issue for the jury, why is

16   it relevant to put before the jury that he lied before the

17   grand jury?

18        MR. OHM:  Your Honor, because the government did open

19   on Officer Liang's presence, that he established this

20   perimeter and that he was essentially the person communicating

21   to Ms. Reid that she couldn't go any further, and that that

22   was the basis for the government's theory about the initial

23   interaction.

24        THE COURT:  Now, when you say the original interaction,

25   you're not talking about who used force first, because we can

1    tell that from the video.  You can see that he put his hands

2    on her first.  Agent Bates testified that that is true, and he

3    obviously said something that appears to be different before

4    the grand jury.  But are you saying that his credibility is

5    generally in question because there's no physical perimeter

6    and he established a perimeter that he made Ms. Reid aware of?

7        MR. OHM:  Well, Your Honor, we have a general bias

8    theory about this entire prosecution.  We plan on arguing, and

9    this is a case that would be -- I mean, you got a one-witness

10   case where the agent is already caught in multiple

11   inconsistent statements that --

12       THE COURT:  Right.  But are you saying -- sorry.  Are

13   you saying that Officer Liang lied and that's why they brought

14   the case?  Like why is his lie relevant?

15       MR. OHM:  Yes, I am.  If Officer Liang had told the

16   truth in the beginning and said he initially caused the

17   contact, then there would be no case to begin with.  Now

18   they're stuck with this case.  They have this media frenzy of

19   ICE, and they have to stick to their guns.

20     And we know that the executive here, in prosecutions, they

21   stick to their guns.  And I think that the United States

22   Attorney said let the chips fall where they may.  So they're

23   stuck with this prosecution, they don't want the embarrassment

24   of dismissing it, and so they're bringing this inordinately

25   weak case against Ms. Reid.

1          And it all starts because of Officer Liang's lie.  If he

2     had realized that there was surveillance video, we wouldn't

3     even be here.  But the surveillance video caught him in the

4     lie.  They're still plodding forward because that's what they

5     do, and that's why we're here with a case that has just a

6     scintilla of essential evidence that Ms. Reid is culpable of

7     anything.  We want to be able to argue that to the jury.  This

8     is relevant to that argument.

9          THE COURT:  You want to argue to the jury that they

10     initiated this prosecution because Officer Liang lied to the

11     grand jury about putting his hands on Ms. Reid first?

12          MR. OHM:  Yes.

13          THE COURT:  Okay.  I will take that under consideration

14     during lunch.  Mr. Wolf, do you want to be heard on that?

15          MR. WOLF:  Your Honor, I haven't had a chance to review

16     Mr. Ohm's case law.  If I could have a chance to review it and

17     formulate our response in regards to the case law, I would

18     greatly appreciate it.

19          THE COURT:  No, I guess in response to his question,

20     you did open by talking about Officer Liang, by talking about

21     him establishing the perimeter.  Why do you think Officer

22     Liang's credibility is not relevant?  Because I've looked at

23     the cases a little bit, and I think Mr. Ohm is right on the

24     hearsay point.  I don't think they are admitting this for the

25     truth.

1          So now I have gone back to whether this is relevant, and

2      I'm a little stuck because usually we have impeachment and

3      then -- about a witness who's testifying because his

4      credibility is at issue.  And the cases Mr. Ohm cites, not all

5      of them involve that witness testifying, but I think in those

6      cases there's some theory about why the grand jury testimony

7      is relevant to the trial.

8          And he is saying it's relevant because Mr. Liang told the

9      grand jury that Ms. Reid made contact with him first, and that

10     the government brought this case because of that initial lie

11     to the grand jury, which, now that we have the video, turns

12     out to be false.

13         And so by you relying on him establishing the perimeter,

14     you're relying on his credibility, and that's why you brought

15     this case in the first place, because at the very first

16     moment, he lied to the grand jury about who made contact

17     first.  Putting aside the case law, what's your response to

18     that?

19         MR. WOLF:  Your Honor, the government is not relying on

20     the credibility of Officer Liang.  Officer Liang is not

21     testifying for the government.  What's established here is

22     that Agent Bates saw Officer Liang doing X, Y, and Z.  And so

23     regarding Officer Liang's testimony about what he did and did

24     not do is therefore irrelevant because we're not proceeding on

25     a theory that you have to believe Officer Liang to establish

1    this case.  The evidence is about what Agent Bates observed.

2       And so regarding whether Officer Liang had a badge or not,

3    whether his testimony at one point was that he did wear a

4    badge and then he realized he did not wear a badge, one, it's

5    irrelevant --

6       THE COURT:  Or that he told the grand jury Ms. Reid

7    made contact with him first, even though the video now shows

8    that that was false.

9       MR. WOLF:  But that isn't the basis of the government's

10   theory, and I never opened on that he -- that he or -- or that

11   she made contact first or he made --

12      THE COURT:  Obviously, you couldn't do that because the

13   video shows otherwise.  If you had done that, Mr. Wolf, we

14   wouldn't be here.

15      MR. WOLF:  Correct, Your Honor, and --

16      THE COURT:  Because you heard his argument, which is,

17   at the very beginning of this case, Officer Liang lied to the

18   grand jury, told the grand jury that she made contact with him

19   first.  The video shows otherwise, and the whole basis, the

20   genesis of this prosecution is that initial lie.  What's your

21   response to that?

22      MR. WOLF:  So, Your Honor, regarding who made contact

23   first, it's irrelevant because, under Section 111(a), when a

24   person knows -- when a person knows that the agent is federal

25   law enforcement, there is no real self-defense right.

1          THE COURT:  Right.  So your argument is that an agent,

2     an officer, could assault a citizen all he or she wants, but

3     if that citizen in your view assaults back, whatever they did

4     first is fine.  Got it.  But.

5          MR. WOLF:  What the case law says is the redress for

6     that would be a lawsuit.  The jury instructions that we

7     reviewed is that --

8          THE COURT:  I'm aware of what the elements are, and I'm

9     not -- you've read my jury instructions.  That's not at issue.

10     I'm asking you if you would like to -- if you don't, that's

11     fine.  We can go for lunch.  His argument is that this is

12     relevant because that lie, that first lie to the grand jury is

13     what led the government to bring this case.  What is your

14     response to that?

15          MR. WOLF:  That is not accurate.  That the theory --

16     and this is going back to the different posture of a felony

17     assault case.  The theory was always that the defendant

18     forcibly assaulted, resisted, interfered --

19          THE COURT:  The theory was not assaulted, by the way.

20     When you first filed this information, you did not include

21     assault, and you in fact argued to me that you were not

22     required to show assault and that you were not alleging that

23     she assaulted anyone.  Your theory was that she interfered,

24     resisted, the other verbs, and only after I ruled that simple

25     assault is required did you supersede, and now you're arguing

1    assault.

2        So your theory was never that she assaulted anyone.  In

3    fact, you were pretty clear that you didn't need to show

4    assault and that your theory was not that she assaulted.

5            MR. WOLF:  No, that's not accurate, Your Honor.  So

6    back in the beginning of the case, when she was charged with

7    felony 111, which requires physical contact --

8            THE COURT:  I see.

9            MR. WOLF:  The theory of that was that the defendant

10   used force to assault Agent Bates, causing the scrape on her

11   hand, which Judge Harvey at a preliminary hearing found

12   probable cause for.  It was not based on --

13           THE COURT:  And three grand juries refused to indict.

14   So then you filed an information.  You no longer had an

15   assault theory, because every time you were before me you

16   argued that you were not alleging assault, and then you later

17   went to assault.

18       To go back to your initial point, you're saying that the

19   initial lie from Officer Liang to the grand jury is not what

20   led the government to bring this case, and so his lie, his

21   credibility, is not relevant?  Is that your argument?

22           MR. WOLF:  Yes.  Just for the record, I would dispute

23   that it was a lie versus a mistake, but --

24           THE COURT:  Got it.  That seems to be a common theme

25   with all of your witnesses:  Are they lying, or are they

1    continually making mistakes?

2          MR. WOLF:  That's fair, Your Honor.

3          THE COURT:  This is not the first time.  We lived

4    through that all through Thursday and Friday, and in fact you

5    stood up there and made representations to me based on your

6    conversations with your witnesses that I took to be true

7    because I have the government and the AUSA standing before me

8    making representations, and then once your witness gets on the

9    stand, they tell me a different story.

10         So the question is are they lying, are they mistaken, are

11    you lying?  I mean, this is a misdemeanor 111(a) prosecution,

12    to be clear, as we learned at the beginning, a charge that has

13    never been tried before, a 111 misdemeanor, that is supposed

14    to be a simple case, has been drawn out and at every step,

15    issues with the government, issues with the government's

16    witnesses, issues with the government's disclosures.

17         And here we are in the middle of trial and about to, you

18    know, crowd around a witness to learn what her texts actually

19    say because she, on the morning of her testimony, finally sent

20    information that you admit to me was relevant, that you

21    requested, and that she maybe made a mistake when she

22    screenshotted or maybe intentionally didn't screenshot, or

23    maybe they aren't there, and that we're all supposed to figure

24    that out in the middle of trial.

25         I am just -- I am stunned that we are here.  And when I got

1    this case and charted out a course for us to get this case

2    tried, I did not at all expect everything that would happen

3    between now and then.

4        So we are on a break for lunch.  We will come back at 1:15

5    so we can deal with this text message issue before the jury

6    comes back at 1:30.

7        (Recess from 12:45 p.m. to 1:31 p.m.)

8        THE COURT:  Okay, counsel.  Tell me where we are before

9    we bring the jury in.

10        MR. WOLF:  Good afternoon, Your Honor.  So after the

11    court recessed for lunch, the parties went outside, and in the

12    presence of defense counsel and in the presence of another

13    investigator, Agent Bates opened her phone, showed the text

14    message string, allowed everyone to photograph and record the

15    text message string, and based on our review, the text message

16    is in fact in that conversation.

17        And so what the government would like to do is just inquire

18    with Agent Bates about, like, what happened over the lunch

19    break, essentially this procedure, and that was the text

20    message in fact there, what happened, why was it not in the

21    screenshots that were sent to the government this morning.

22        THE COURT:  Okay.  Ms. Abe?

23        MS. ABE:  Your Honor, we of course object to that.  I

24    mean, this is, as the court noted before lunch, yet another

25    disclosure and discovery obligation -- or violation that the

government has committed.  The government had Agent

Residovic's text messages before Agent Bates sent messages

this morning.  She sent them this morning -- or the government

sent them to us this morning at 7:37 a.m., and -- I mean, part

of the reason why I at least was late to court today was

because I was trying to compile these messages to be able to

cross Agent Bates on them.

And so I mean, we didn't object in the presence of the

jury, because of course I've had to spend a lot of time going

back and forth, but at this point, given where we are and the

fact that it is the government's fault -- it's not just Agent

Bates's fault, but it's also the prosecution's fault that they

didn't double check this before turning it over to us.  So we

would object to allowing them to rehabilitate her at this point.

THE COURT:  Okay.  And so you think we should not put

before the jury at all that in fact the message was not

deleted and it was on her phone, and I take it her explanation

might be that when she was screenshotting, she made a mistake.

You, of course, would then ask her whether she intentionally

didn't include that message and ask the jury to draw that

inference from the omission.  Is that right?

MS. ABE:  The jury can draw that inference based on the

record we have now.  I mean, we -- I mean, my recollection of

the testimony, Your Honor, and I mean, I don't have the

transcript in front of me, but Agent Bates repeatedly

1    insisted, even after -- I mean I did not ask her -- many times

2    she insisted herself she did not delete the message.  Those

3    were her words, not mine, on cross-examination.  So I think

4    now it's the government's bed and they have to lie in it.

5              THE COURT:  I'm going to look at the testimony.

6        Mr. Wolf, do you have a response to Ms. Abe's argument?

7    Because I agree that the defense has been prejudiced by the

8    fact that they got these at 7:30 a.m. this morning.  And as I

9    said before we broke, had this been given to them last week,

10   you guys would have gotten together, you would have noticed a

11   text was missing when you looked at the Residovic texts.  You

12   would have gone back to Agent Bates.

13       We could have resolved this, and we would not have spent a

14   ton of time during trial dealing with it, and the defense

15   would not have been caught flat-footed on cross.  Having to

16   deal with this, cross-examining this witness, and now letting

17   you come back to say, actually, the message is there, hurts

18   them and makes Ms. Abe's cross-examination look a little silly

19   if at the end of it you're here revealing that the text

20   message was there all along.  How has this whole sequence of

21   events not prejudiced the defense?

22             MR. WOLF:  I would agree that the late disclosure of

23   the text messages is prejudicial to the defendant.  However, I

24   would also note that I think just the sheer -- like the

25   confusion on this issue also doesn't reflect well on the

1    government in the jury's eyes.  And so I think Ms. Abe has

2    scored points, I think, on this issue.  And so I know they

3    can -- I know they believe that this can be prejudice, but I

4    think, actually, just in terms of the perception of this, I

5    don't think this really weighs in the government's favor in

6    the way this has transpired.

7        But I think it's important just to establish what actually

8    happened so the jury can make a proper conclusion as to

9    whether Agent Bates was or was not intentionally omitting that

10   text message.

11       THE COURT:  Yeah, but I'm not sure sitting here how to

12   do that in a way that doesn't further prejudice them, because

13   you would agree with me that Ms. Abe, having to figure this

14   out in the middle of her cross, and then present this to this

15   witness and question about whether it was deleted, or not,

16   sort of falls a little flat if what you're going to come do

17   now is say "actually, it wasn't deleted, here it is."

18       I mean, that whole line of cross prejudices them and makes

19   everything that she just did look sort of silly, and that's

20   the government's fault.  So tell me how you propose correcting

21   the record as you would like to do without further prejudicing

22   the defense and making her cross-examination look sort of

23   silly to the jury.  Because I'm not sure how to do that.  I

24   don't know how to accomplish both of those things because I'm

25   not going to let you do something that will further prejudice

1    them.

2          MR. WOLF:  Your Honor, I think Agent Bates -- I mean,

3    based on just the screenshots, she could admit that she in

4    fact did not include that text message.  That is an admission

5    that I think weighs in favor of the defense, whether it's

6    because she intentionally or unintentionally did it --

7          THE COURT:  Are you going to -- sorry.  Are you going

8    to ask her -- I mean, not starting with today, are you going

9    to say, on August 1, I emailed you asking you for this and you

10   didn't provide it to me.  On August 7, I met with you and

11   asked you for this.  You didn't provide it to me.  On August

12   10 you didn't.  Then you sent it to me last night, and last

13   night when you sent it to me, we got it this morning.  You

14   agree it was missing a text message based on what you've seen.

15   Now you realize you had the text message, but you didn't send

16   it?  Because that's the complete picture.

17         MR. WOLF:  I was not intending on eliciting --

18         THE COURT:  I didn't think so, but they were left

19   unable to cross your witness about really what happened

20   because they didn't have anything to impeach her with.  I

21   assume you don't want to stipulate for the jury that you in

22   fact asked your witness for this on the 1st, asked for it on

23   the 7th, asked for it on the 10th, and she didn't give it to

24   you until the morning of trial, which is when they got it.

25         You want to rehabilitate this witness, but you want to do

1    that in a way that doesn't present the whole picture.  And

2    they've already been caught flat-footed throughout this trial

3    in a way that they can't properly impeach your witness, and I

4    don't think you should be permitted to do that in a way that

5    further hurts the defense.

6        MR. WOLF:  Your Honor, I have a proposal.  I think it

7    would be fair to ask -- and defense, for what it's worth, did

8    elicit this -- about whether the government had previously

9    inquired on these dates and these dates --

10        THE COURT:  Yeah, but your witness was incredibly

11    evasive, and she did not answer very clearly in a way that

12    made a record of what you're representing to me happened.

13    Like, that didn't come out.  But what you've told me you've

14    asked for -- and it's because they didn't have something to

15    say, look at this message from AUSA Wolf, he asked you for all

16    information relevant to the substance of this case, did you

17    receive that.  They couldn't do an inquiry in that way because

18    those requests were made at your in-person meeting and during

19    a phone call.  But let me hear your proposal.

20        MR. WOLF:  I mean, what we could ask is did the

21    government ask for any Jencks materials.  Essentially, yes.

22    Were these text messages with Agent Residovic, were those

23    provided when we requested those Jencks materials.  I would

24    presume the answer would be no, because they weren't.

25        THE COURT:  I assume she'll say what she said before,

1    which is, no, because I don't think this was Jencks, or no, I

2    thought he meant everything relevant to the assault, which is

3    what she's been saying, and this isn't about the assault, this

4    is about me talking about it after.  But you would agree with

5    me that what you asked for was broader than that.

6         MR. WOLF:  Yes, Your Honor.

7         THE COURT:  So just -- I mean, I'm trying to figure

8    this out just like all of you, and if you want a chance to

9    rehabilitate this witness, I want to do that in a way that

10   doesn't further prejudice the defense, because I think they

11   have already been prejudiced by, as you admitted, your late

12   disclosure.  So tell me what that option is.

13        MR. WOLF:  I mean, I could ask --

14        THE COURT:  I think Mr. Facci has an idea.  Let's hear

15   it.

16      (Government conferring.)

17        MR. WOLF:  So I think what we could do is basically

18   establish that we asked her previously, in August and in

19   October, for Jencks materials, and that these were not

20   provided.  And it only took like a question regarding

21   specifically Agent Residovic's text messages for her to

22   provide that, and that when she did provide it, this is what

23   she provided, and then go through what she did provide and

24   discuss what happened when she did provide it.

25        THE COURT:  But what you asked for is broader than

Jencks, right?  You told me that on the 7th and on the 10th,

you said to provide all information relevant to the substance

of the case -- I may not be using the right words, but that's

what you told me.  Right?

MR. WOLF:  Yes.

THE COURT:  So would you be saying to your witness, on

October 7th, I asked you to provide all information relevant

to the substance of the case, and she would either say yes or

no or I don't remember, and then -- it's not just Jencks.  I

mean what you asked for is broader, which is what is troubling

me here.

MR. WOLF:  And we can ask that question, and I guess

she would then provide her answer as to what she did and did

not do.  And I would ask just basically -- and if the court

would allow me to lead so the agent wouldn't necessarily

provide an explanation, we could say basically, yes or no,

when we asked for all information related to the substance of

the case, did you provide all information, including these

text messages, and I think the answer to that would be no.

THE COURT:  And then at the end of that, you would say,

and you provided these this morning.

MR. WOLF:  Yes.

THE COURT:  And they were missing a text message, and

you just realized they were missing a text message, what

happened, and she, you assume, is going to say I made a

1     mistake in screenshotting them?

2          MR. WOLF:  I'm not going to assume what -- well, I

3     anticipate that's probably what happened.  But when we all met

4     together, we didn't ask her questions about that.

5          THE COURT:  I would be alarmed if that's what happened.

6     So your proposal, just so we're clear -- and I can hear from

7     the defense on it -- you would go sequentially, October 1,

8     October 7, the dates, and you would be leading because, I

9     mean, I won't say she's a hostile witness at this point, but

10    trying to get out of her -- based on what I've seen earlier,

11    trying to get out of her what happened is not going to be

12    easy, but you're going to say to her, for each of these dates,

13    I asked for X, yes or no, and then follow up with you did not

14    produce these text messages in response to that, and then that

15    she did produce them this morning and they were missing a

16    message, and then ask her why.  Is that the proposal at this

17    point?

18          MR. WOLF:  Yes, Your Honor.

19          THE COURT:  Okay.  Can I hear from the defense?

20          MS. ABE:  Your Honor, we of course maintain our

21    objection to -- I mean, this is still a level of

22    rehabilitation that puts the government in a better position

23    before our cross-examination, and I think the jury can't

24    unhear or unsee everything that has occurred.  And I would

25    just emphasize --

1          THE COURT:  But can I just interject?  Now that the

2     jury, who sat here and watched Ms. Bates go get her phone,

3     right, in response to Mr. Wolf's request before we let them

4     out, who is wondering what's going on with this phone, I think

5     the timeline that I proposed that the government elicit from

6     this witness is helpful and helps clarify some of what was

7     missing in your testimony because you were a little hamstrung

8     in being able to make the point that these things were

9     requested on these dates and she didn't provide them.  He

10     would do that.

11        The message -- it would then be clear that this message

12     does exist, she didn't delete them, but you could ask

13     questions to have the jury draw an inference that she didn't

14     accidentally screenshot this.  I mean, look at the one she

15     chose to exclude.  You could make that argument, and then they

16     have a complete picture.

17        But just moving on at this point with them wondering what's

18     going on with the phone is not, I think, helpful to you either

19     at this point.  Again, I have been clear what's happened is

20     the defense has been prejudiced, I am trying to find a way to

21     make this make sense to the jury in a way that doesn't

22     prejudice you.

23        So if you have an alternate proposal, let me know, or if

24     your proposal is just we move on, Mr. Wolf moves on to another

25     topic on redirect, and we never talk about these text messages

1    again -- I mean, you also then in closing can't say that she

2    deleted these text messages, because we now know that to be

3    false.  And so what are you going to say about the text

4    messages, right?

5          MR. OHM:  I think there is a way that we can not leave

6    the jury hanging, and that would be an instruction from the

7    court saying, right before the break, the government tried to

8    do a demonstration; the government did not have the court's

9    permission in doing that.  I'm finding that that was improper

10    and not for your consideration.

11    And we tell jurors to not consider things that they've

12    heard all of the time.  If they hear it from Your Honor, then

13    we have to presume that they'll follow that instruction, and

14    then we can just move on.  But I think that would be the only

15    way that we see that we would not be prejudiced by all of

16    this.

17          THE COURT:  Okay.  And you wouldn't, in your closing,

18    make any reference to her deleting text messages, because we

19    now know that to be untrue as to this text message.

20          MR. OHM:  I think what would be -- I don't think that

21    we could say that there's evidence -- that you can infer from

22    the evidence that she deleted the text messages, but I think

23    we can say that when the government presented this

24    information, they presented the screenshots that she produced

25    that morning, this text message wasn't there, and you can draw

1    your -- we could make inferences based just upon that fact.

2    But we can't say that she deleted them, and we can't say that

3    they don't exist.  So I think that would be the state of the

4    evidence and the place where we can make those assertions.

5         THE COURT:  Okay.  Mr. Wolf, any last thoughts?

6         MR. WOLF:  No, Your Honor.

7         THE COURT:  Okay.  I agree with Mr. Ohm.  I am going to

8    instruct the jury when they come back that at the end of --

9    not the end.  As Mr. Wolf was conducting his redirect

10   examination, the agent was instructed to get her phone.  I'm

11   just going to say that the jury should disregard that.  I'm

12   not going to say it was improper for them to ask her to do

13   that; I'm just going to say the jury should disregard that and

14   we're going to pick up with the redirect.

15        And if you have other lines of questioning on redirect

16   other than this text message, you can do that.  And I'm not

17   going to let you inquire any further about the text messages.

18   I think the defense is right that, and as you admit, they have

19   been prejudiced to date, and I do not want to do anything

20   further that risks prejudicing the defense further, and I

21   don't think you want me to do that, and I don't think the

22   solution that you have proposed fixes that problem, and I

23   haven't heard a proposal that doesn't result in prejudice to

24   the defense.

25        Before we bring the jury back in, on the Liang grand jury

1    transcript, I am going to let that in.  As I said earlier, I

2    don't think it's hearsay.  It's not being admitted for the

3    truth, and I wasn't quite sure what the defense theory was

4    about why it's relevant.  Now that Mr. Ohm has articulated

5    one, if that is in fact the defense theory -- and, Mr. Ohm, I

6    would ask you to confirm that that is in fact the defense

7    theory, that's what you're going to argue in your closing and

8    submit as the defense theory of the case, then I think it's

9    fair game to let that in if it's in furtherance of the defense

10   theory.

11       So I think your proposal was to put that in in your case as

12   an exhibit as opposed to trying to introduce that through

13   Bates, where I don't think you have foundation to do that.  Is

14   that right?

15            MR. OHM:  That's fine, Your Honor.

16            THE COURT:  Okay.  And I will note for the record the

17   government's objection to that coming in, of course.  Okay.

18   Anything else?

19       So we're going to get the jury.  You'll finish your

20   redirect.  I don't think we're going to have re-cross at this

21   point since I am not allowing the government to inquire about

22   the text messages.  Then you can put in your stipulations, and

23   I assume at that point the government will rest.

24       Is that right?

25            MR. WOLF:  Yes, Your Honor.

1          THE COURT:  Okay.  And Ms. Abe, Mr. Ohm, your plan is

2     still to call those two witnesses?

3          MS. ABE:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. WOLF:  I'm sorry, Your Honor.  Can I get just a

6     very brief clarification?  I just wanted to make sure I'm

7     complying completely with the court's orders.  Am I allowed to

8     ask why this text message was not provided, or is that

9     something that you're not going to allow?

10          THE COURT:  No, I think we're done with the text message.

11          MR. WOLF:  Understood.  Thank you, Your Honor.

12       (Jury in at 1:55 p.m.)

13       (Witness resumes the stand.)

14          THE COURT:  Okay.  Good afternoon.  I hope everyone had

15     a good, nice, long lunch break.  We're going to pick up with

16     the government's redirect of Agent Bates.  And before we left,

17     Agent Bates was asked to get her cell phone.  The jury should

18     disregard that request or anything related to her bringing her

19     cell phone to the stand.  And we'll pick up with the redirect

20     examination.

21     BY MR. WOLF:

22     Q.   Good afternoon.

23     A.   Good afternoon.

24     Q.   Agent Bates, back in early August, a prior AUSA asked for

25     BWC, a body-worn camera, and reports relating to this case.

1    Does that sound right?

2    A.   Yes.

3    Q.   In response to that request, you did not provide the text

4    messages that you had with Agent Residovic.  Is that correct?

5    A.   Correct.  I did not.

6    Q.   And sometime in August, a prior AUSA asked for any

7    exculpatory messages essentially downplaying the incident.  Is

8    that correct?

9    A.   Yes.  I asked -- he said provide me any exculpatory

10   evidence, and I asked him specifically what does he mean by

11   that, and then he elaborated, saying anything that downplays

12   the assault.

13   Q.   And in connection with that request, you did not provide

14   the text messages from Agent Residovic at that time.

15   A.   I did not.

16   Q.   Then on or about -- I know the dates kind of blend

17   together, but on or about October 1st or so -- and you were

18   shown this on cross -- you received an email from the

19   government essentially requesting all Jencks materials related

20   to this case.

21   A.   Yes.

22   Q.   And in response to that request, you did not provide the

23   text messages from Agent Residovic.  Is that correct?

24   A.   I did not.  No.

25   Q.   And then we met in person at the U.S. Attorney's Office

1    back on roughly October 6th or so?  Does that sound right?

2    A.   Yes.

3    Q.   And during that meeting, we orally requested essentially

4    any materials related to the substance of this case.  Does

5    that sound right?

6    A.   Yes.

7    Q.   And in connection with that, you did not provide the text

8    messages from Agent Residovic.

9    A.   I did not.

10   Q.   And then on October 10th or about, you and I spoke on the

11   phone.  Does that sound right?

12   A.   Yes, we did.

13   Q.   And during that conversation, I asked you to just check

14   for any materials related to the substance of the case.  Does

15   that sound right?

16   A.   Yes.

17   Q.   And in connection with that request, you did not provide

18   the text message from Agent Residovic.

19   A.   I did not.

20   Q.   All right.  And then last night, though, I reached out to

21   you, defense counsel was on the line -- or actually it was a

22   text message where defense counsel was included in the text

23   message.  Does that sound right?

24   A.   Yes.  That's correct.

25   Q.   And in that request I specifically asked for the text

1    messages from Agent Residovic.  Does that sound right?

2    A.   Yes.

3    Q.   And your response to that request is when you provided

4    the text messages.

5    A.   Yes.  The following day.  I didn't receive the message

6    that night.  I received it the next day.

7    Q.   Understood.

8         MR. WOLF:  Your Honor, one moment.  May I -- on the

9    husher with the court?

10        THE COURT:  Yes, of course.

11       (Bench conference.)

12        MR. WOLF:  Apologies, Your Honor.  Am I permitted to

13   elicit just the process, what happened outside regarding the

14   viewing of the text messages?

15        THE COURT:  No.

16        MR. WOLF:  Okay.

17       (End of bench conference.)

18   BY MR. WOLF:

19   Q.   All right.  So I want to now discuss the actual incident

20   itself, what happened outside of the D.C. jail, so I'm going

21   to bring up Government Exhibit No. 5.

22        MR. WOLF:  May the record reflect I brought up

23   Government Exhibit No. 5, and it's at time stamp 8:35.  I'm

24   going to just play from this point on.  I'm going to connect

25   the sound.  Okay.  Playing from 8:37.

```
 1        (Video played.)

 2    BY MR. WOLF:

 3    Q.   I just paused at 8:42 time stamp.  I'm going to resume

 4    play at 8:42.

 5        (Video played.)

 6        Paused at 8:51.  What was the defendant doing with her

 7    arm at this point in time?

 8    A.   She was flailing her arms while Officer Liang tried to

 9    maintain control of them.

10    Q.   What kind of -- how much force were you using to hold the

11    defendant's arm?

12    A.   I mean, I had to grasp her strong enough to try to

13    maintain control of her arm.

14    Q.   How much force was she exerting with the arm that you

15    were holding?  I mean, it's hard to describe.  What did you

16    feel when you grabbed her arm?

17    A.   I felt resistance from her arm trying to push away from

18    her body.

19    Q.   Resuming play at 8:51.

20        (Video played.)

21        Paused at 8:58.

22        What did you do with your left arm or left hand at this

23    point?

24    A.   I grabbed her upper arm.

25    Q.   Why'd you do that?
```

1    A.    Because I felt her resistance continue.

2    Q.    When you grabbed her upper arm, what if anything happened

3    with her resistance?

4    A.    It felt as if she was kind of more tensing up and pushing

5    back a little bit more on my arm.

6    Q.    Playing at 8:58.

7          (Video played.)

8          I paused at 9 minutes flat.

9          What happened with the defendant's arms during this last

10   two -- I guess I would say the arm that you're holding, what

11   happened the last two seconds?

12   A.    She raised her arm towards her chest.

13   Q.    What kind of -- I guess what were you feeling in terms

14   of, like, her force?

15   A.    Still she was actively resisting and trying to move her

16   arm away from her body.

17          MS. ABE:  Your Honor, objection.

18        (Bench conference.)

19          MS. ABE:  Your Honor, she's testifying that Ms. Reid

20   did -- or was trying to do something specifically -- was

21   trying to move her arm, which is speculative.

22          THE COURT:  Mr. Wolf?

23          MR. WOLF:  Your Honor, the witness is testifying as to

24   what she felt and observed.  It's not that she's testifying as

25   to the defendant intended to move her arm, it's just that she

1    felt the defendant trying to move her arm, which I think is a

2    tactile observation that she can testify to based on her being

3    in contact with the defendant.

4         THE COURT:  Go ahead, Ms. Abe.

5         MS. ABE:  I was just going to say that that's not what

6    her testimony was.  Her testimony was not what she felt.  It

7    was what she thought Ms. Reid was trying to do, which is

8    speculative.

9         THE COURT:  Yeah.  And I think, Mr. Wolf, looking back,

10   your question is what did you feel, but she's not answering

11   your question.  She's answering in a way that is speculating

12   about what she did.  And so you could try to be clearer in

13   your questions.  And if she's not answering your questions by

14   talking about what Ms. Reid did, then we'll have to stop this

15   line of questioning.

16      You didn't ask an incorrect question, but Ms. Abe is right

17   that she's not answering your question about what she felt.

18   So I will let you try again, and we'll see how that goes.  Do

19   you understand the line I'm drawing, Mr. Wolf?

20        MR. WOLF:  Yes, I do.

21        MS. ABE:  And, Your Honor, we would just move to strike

22   Agent Bates's responses as nonresponsive to Mr. Wolf's

23   questions and as speculative.

24        THE COURT:  Let me look.

25      Okay.  So I am going to say to the jury that the government

1    asked:  What did you feel when you grabbed her arm and I'll

2    strike everything after that.  You can try your question

3    again, Mr. Wolf, by making sure that the witness answers your

4    question.

5              MR. WOLF:  Yes, Your Honor.

6              THE COURT:  Okay.

7          (End of bench conference.)

8              THE COURT:  Okay.  So the government asked the witness,

9    "What did you feel when you grabbed her arm?"  I'm going to

10   instruct you to ignore everything that was answered in

11   response to that.  I'm going to strike that from the record,

12   and Mr. Wolf is going to try to ask that question again.  The

13   witness's response was not responsive.

14   BY MR. WOLF:

15   Q.   Agent Bates, so talking just about what you felt, not

16   about what the person was trying to do, what did you feel the

17   defendant's arm doing during this last two-second clip?  What

18   was her arm doing?

19   A.   Her arm moved up towards the center of her chest.

20   Q.   And how much force, if any, was being exerted during that

21   process?

22   A.   By me?

23   Q.   By her.

24   A.   I would say moderate --

25             THE COURT:  Mr. Wolf, can we please get on the phone?

1          (Bench conference.)

2              THE COURT:  You can ask her how much force she is

3     feeling, but not how much force was being exerted by the

4     defendant.  That's the line I drew previously.

5              MR. WOLF:  I apologize.  I'll rephrase, Your Honor.

6              THE COURT:  Okay.

7          (End of bench conference.)

8              THE COURT:  I'm again going to strike the witness's

9     response and the prior question.  The jury is to disregard it,

10    and Mr. Wolf will ask the question again.

11    BY MR. WOLF:

12    Q.   How much force did you feel during this process?

13    A.   I felt a moderate amount of force.

14    Q.   Okay.  Resuming play at 9 minutes.

15         (Video played.)

16         Paused at 9:04.  During this clip in this last four

17    seconds or so, what were you doing with your feet, if you

18    recall?

19    A.   From what I remember, I was bracing my feet to push her

20    against the wall because she was trying to break free, or she

21    was trying to push away from us.  So I was leaning towards

22    her --

23             MS. ABE:  Your Honor, objection.

24    BY MR. WOLF:

25    Q.   If I may, if you can confine the answer to just what I

1    was asking.  So what were you doing with your feet?

2    A.   Bracing my feet.

3    Q.   How far were your feet away from the defendant, if you

4    know?

5    A.   I don't know.

6    Q.   Okay.  And I resume play at 9:04.

7         (Video played.)

8         I've paused at 9:13.  What happened in this clip that we

9    just watched?

10   A.   She kicked up at my groin.

11   Q.   And how close did -- and you say she kicked up.  Which

12   leg was that with?

13   A.   Her right leg.

14   Q.   And when you say she kicked up, what body part did she

15   kick up with?

16   A.   Her knee.  Her leg and her knee.

17   Q.   How close did her leg and her knee get to your groin?

18   A.   Very close, without touching.

19   Q.   In this clip, do you remember or do you know what you

20   were doing with your feet during this last couple seconds?

21   A.   I don't remember specifically, but I remember my feet

22   were braced on the ground, pushing her up against the wall.

23   Q.   All right.  And I'm going to pause sharing as to

24   Government Exhibit 5.  Thank you.

25        All right.  And as the incident happened that you just

 1    described, what was going on around you as this was happening?

 2    A.   The second arrest was being made by the second arrest

 3    team.

 4    Q.   And I'm going to publish to the jury what's been

 5    previously admitted as Government Exhibit 6a at time stamp

 6    1:40.  Does everyone see that?  All right.  Thank you.

 7         Playing from 1:40.

 8         (Video played.)

 9         Paused at 1:51.  Was that what transpired surrounding you

10    as the incident happened between you and the defendant?

11    A.   Yes.  I couldn't see behind me, but that is what occurred.

12    Q.   When you say you couldn't see behind you, how do you know

13    that this was going on?

14    A.   I saw them coming down out of the corner of my eye when

15    they initially started moving the arrested individual.

16         MR. WOLF:  Nothing further.

17         THE COURT:  Thank you.

18      Thank you, Agent Bates.  You can step down.

19      (Witness steps down.)

20         THE COURT:  Does the government have stipulations it

21    wants to read into the record?

22         MR. WOLF:  Yes, Your Honor.  Can the government be

23    heard on the phone for a second?

24         THE COURT:  Sure.

25         (Bench conference.)

1           MR. WOLF:  Your Honor, the government has two

2    stipulations printed out and signed.  The parties have reached

3    a third stipulation which is not printed or signed yet, but

4    that could be done this afternoon at some point.  But I guess

5    we can read it into the record at this point.  I would defer

6    to the court how we should handle that third stipulation.

7           THE COURT:  Mr. Ohm, Ms. Abe, do you agree they've

8    reached an agreement such that we can just read all three of

9    them in now?

10          MR. OHM:  We do, Your Honor.  Actually, it's probably

11   more appropriate to be in our case because it's the completed

12   impeachment -- a stipulation as to Mr. Dernbach's --

13          THE COURT:  That's the third?

14          MR. OHM:  Yes.

15          THE COURT:  Okay.  So why don't we do your two now, and

16   Mr. Ohm can read the third when the defense puts their case on.

17          MR. WOLF:  Okay.  That's fine, Your Honor.  Thank you.

18          THE COURT:  Thank you.

19       (End of bench conference.)

20          THE COURT:  Okay.  For the jury, the government is

21   about to read stipulations into the record.  A stipulation is

22   an agreement between the parties as to certain facts.  So you

23   should consider any stipulation as a fact to be undisputed

24   evidence in the case.

25          MR. WOLF:  Good afternoon.  The parties have reached

1    the following stipulations.  Reading from what will be marked

2    as Government's Exhibit 24.  The top of the document has the

3    case caption United States v. Sydney Reid.  The title of the

4    document says "Government and Defendant Stipulation Regarding

5    Officer Parodi's Pointing of OC Spray," and the stipulation

6    reads as follows:

7        Had Agent Jason Jankovitz testified, he would have

8    testified that he observed one of the agents, believed to be

9    Officer John Parodi, approach the defendant as she was

10    interacting with Officer Liang and point an OC spray canister,

11    also known as pepper spray, in the direction of the defendant.

12    Agent Jankovitz did not see what prompted Officer Parodi to

13    point the OC spray at the defendant.  Agent Jankovitz would

14    have further testified that the pointing of the OC spray was

15    captured in the below included screenshot from his body-worn

16    camera.

17        And the stipulation has the actual screenshot.

18        Further, had Officer Vincent Liang testified, he would have

19    testified that he did not see those actions because Officer

20    Parodi was behind and to the side of him while he was

21    interacting with the defendant.

22        And it's signed by counsel for the defendant and counsel

23    for the government.  That is Government Exhibit 24.

24        As to Government Exhibit 25, once again, this is a document

25    with the case caption United States v. Sydney Reid, and the

title of the document says "Government's and Defendant's

Stipulation Regarding Body Worn Camera Evidence."

The parties in this case, United States of America, and the

defendant, Sydney Reid, hereby agree and stipulate as follows:

Agents and officers from the FBI and ICE were on the scene

when Sydney Reid was arrested on July 22, 2025.

Agents Vincent Liang and Dinko Residovic are members of

ICE.  They did not wear a body-worn camera on July 22, 2025,

in violation of ICE directives.  ICE Directive 19010.2

requires ICE officers to use body-worn cameras when executing

and attempting to execute criminal and administrative arrest

warrants and in-person issuance of subpoenas.  That is ICE

Directive 19010.2 at 2.  The directive is attached to this

exhibit.

Additionally, Agent Parodi is a member of ICE.  Though he

brought his body-worn camera to the scene, his battery ran out

and he did not create a recording.

Agent Harter wore his body-worn camera on July 22, 2025.

He states that he attempted to activate it but did not do so

properly.  There is thus no footage from Agent Harter.

That is the government's and defendant's stipulations.

THE COURT:  Thank you, Mr. Wolf.  Does the government

have any further witnesses?

MR. WOLF:  No, Your Honor.

THE COURT:  The government rests its case?

1          MR. WOLF:  Yes, Your Honor.

2          THE COURT:  Mr. Ohm, Ms. Abe, are you ready to proceed?

3       (Bench conference.)

4          MR. OHM:  Your Honor, at this point we have to move for

5    judgment of acquittal, on at least the portion of the count

6    that involves Officer Liang, although we have arguments for

7    everything in general, but we'll submit on the record on those

8    unless the court wants to hear more.  But in terms of Officer

9    Liang, there hasn't been any evidence of any assault against

10   Officer Liang.  So we would ask the court to dismiss or enter

11   judgment of acquittal on that portion of the information.

12         THE COURT:  Okay.  Let me have the jury go out, and I

13   will hear from both sides on this.

14         MR. OHM:  Okay.

15      (End of bench conference.)

16         THE COURT:  Okay.  Ladies and gentlemen of the jury,

17   the government has now rested its case.  We're going to take a

18   short break, and I will talk to the lawyers and then we'll

19   come back after that.

20      (Jury out at 2:18 p.m.)

21         THE COURT:  Okay.  Mr. Ohm.

22         MR. OHM:  Thank you, Your Honor.  So we're moving for

23   judgment of acquittal as to the portion of the information

24   that relates to Officer Liang.  The standard is whether any

25   reasonable juror can -- or whether the government has proved

1    to any reasonable juror beyond a reasonable doubt with all

2    inferences in favor of the government that -- I'm sorry --

3    that any reasonable juror could convict.  The government

4    hasn't presented any evidence about an assault against Officer

5    Liang --

6         COURT REPORTER:  You gotta slow down, man.

7         MR. OHM:  Sorry.

8         THE COURT:  Can you repeat that?

9         MR. OHM:  They shifted away from that theory.  They

10   opened on it a little bit, but then shifted away from it.  And

11   then in terms of the evidence that was presented, they did not

12   present really any evidence about any assault against Officer

13   Liang.  The testimony that came in in terms of any sort of

14   physical touching between Officer Liang and Ms. Reid was that

15   Ms. Reid approached Officer Liang or, as the court noted, the

16   video shows that Officer Liang grabbed Ms. Reid by the wrist

17   and essentially held her by the wrist against the wall

18   throughout the entire incident.

19       There's no -- there's one kneeing motion that the

20   government has relied upon as an assaultive conduct.  And the

21   only testimony about that is that it was directed -- well, it

22   didn't touch anybody but it was directed at Special Agent

23   Bates.  So given the complete lack of any evidence that the

24   government has presented of any assault toward Officer Liang,

25   we would ask the court to enter a judgment of acquittal as to

1    that portion of the information.

2    　　　　THE COURT:  Okay.  Mr. Wolf, I have always -- can you

3    come to the podium.

4    　　　　MR. WOLF:  Sorry.  AUSA Facci is going to take this.

5    　　　　THE COURT:  Okay.  You're off the hook.

6    　　　　MR. FACCI:  Hello, Your Honor.

7    　　　　THE COURT:  Hello, Mr. Facci.  So I actually have

8    always understood your case to have the assault element,

9    simple assault element be met with the kicking motion.  And it

10   seems like that's how you argued it in your opening as well.

11   Is that right, or do you think there's something else that

12   meets the simple assault requirement?

13   　　　　MR. FACCI:  That's the theory that we're proceeding on,

14   Your Honor.

15   　　　　THE COURT:  That it's the knee?

16   　　　　MR. FACCI:  Yes.

17   　　　　THE COURT:  And so the knee in your theory was always

18   directed at Agent Bates.  Is that right?

19   　　　　MR. FACCI:  Yes.

20   　　　　THE COURT:  So are you contesting the defense's motion?

21   　　　　MR. FACCI:  No.

22   　　　　THE COURT:  Okay.  Is that a first for you, Mr. Ohm?

23   　　　　MR. OHM:  You can always dismiss.

24   　　　　MR. FACCI:  To be clear, we're going to be proceeding

25   and arguing that there was an assault that occurred on Agent

1    Bates.  Yes.

2              THE COURT:  Okay.  And so at this point do you want me

3    to instruct the jury that -- hang on.  Are you dismissing the

4    information as to Officer Liang?

5              MR. FACCI:  I don't think that's necessary, Your Honor.

6    I think simply we can change the jury instruction, just remove

7    Officer Liang's name from the elements of the offense.  As I

8    mentioned at the beginning of jury selection, the way we

9    allege our informations would be to just put the defense on

10   notice of what our theories are, but that the jury is to be

11   instructed in the disjunctive here that an assault could have

12   occurred on either one.  I think we could just simply remove

13   Officer Liang from the elements.

14             THE COURT:  Okay.  And so am I to now instruct the jury

15   that at the conclusion of the government's case, the parties

16   agree that there is no violation of the statute as to Officer

17   Liang?  Because we did start off talking about both Officer

18   Liang and Agent Bates.  So we need to explain that to the jury

19   somehow.  How do you propose doing that?

20        Because in my preliminary instructions, I did talk about

21   both of them because that's what was charged, and you hadn't

22   told me previously that you were no longer relying on any

23   assault on Officer Liang.

24        So, Mr. Ohm, do you have a proposal?  Should we leave this

25   to the final instructions?  How do you both propose resolving

1     this?

2          MR. OHM:  I think the court could say that given that

3     the government did not present any evidence of an assault

4     against Officer Liang, I am entering a judgment of acquittal

5     for that portion of the information.

6          THE COURT:  Mr. Facci?

7          MR. FACCI:  Court's indulgence.

8          THE COURT:  Yeah, of course.

9     (Government conferring.)

10         MR. FACCI:  Your Honor, we don't believe that the

11    defense's proposal is necessary here.  Our reading of the

12    statute requires that the defendant forcibly assault, resist,

13    interfere, and that that constitutes simple assault.  The

14    statute does not specify that the simple assault that occurs

15    needs to be directed to -- that if the defendant was resisting

16    or interfering, that the person that the defendant was

17    resisting and interfering needs to also be the person that was

18    assaulted here.  Our reading of the statute is that it has to

19    constitute a simple assault.

20         THE COURT:  You think you can mix and match?  That you

21    would say that the defendant forcibly assaulted someone and

22    then the simple assault requirement be with respect to a

23    different officer?

24         MR. FACCI:  Our understanding of the statute, Your

25    Honor, is that there can be a whole sequence of events where a

1    person is interfering and resisting, and if at some point

2    during that resisting and interference a simple assault

3    occurs, then that person is in violation of the statute.

4         THE COURT:  Okay.  But what we have here is you

5    agreeing that you have not put on evidence as to Officer

6    Liang, and you have told me that you are no longer pressing a

7    theory that the statute was violated as to Officer Liang.

8    Right?  You said you were conceding their motion.

9       So how do I communicate that to the jury since at the

10   beginning of the case we referenced both officers, including

11   your information that included both officers?  I mean why is

12   what Mr. Ohm proposing not sensible?

13        MR. FACCI:  I think, Your Honor, that the jury is fully

14   capable of looking at the elements and --

15        THE COURT:  You want me to still ask the jury to decide

16   whether the statute is violated with respect to an assault on

17   Officer Liang even though you've just told me that that didn't

18   happen, you've presented no evidence about that, and you're no

19   longer relying on that theory?

20        MR. FACCI:  I'm saying, Your Honor --

21        THE COURT:  Yes or no?

22        MR. FACCI:  I'm sorry.  Can you repeat your question?

23        THE COURT:  Okay.  You said to me the jury is fully

24   capable of looking at the elements and figuring this out.

25   You've just told me that you concede the Rule 29 motion that

1    there's been no evidence presented with respect to this

2    statute being violated as to Officer Liang, and you

3    nonetheless want me to leave that in the hands of the jury to

4    figure out if there's enough evidence to meet the elements as

5    to Officer Liang?

6         MR. FACCI:  Yes, Your Honor.  I think that the jury

7    can -- will understand that no evidence was presented of

8    assault --

9         THE COURT:  Mr. Facci.  I'm going to give you one

10    minute to just think about what you just said to me.

11         MR. FACCI:  Okay.

12         THE COURT:  Which is that you've conceded a Rule 29

13    motion from the defense, and you nonetheless want me to put

14    that question to the jury because they're capable of figuring

15    that out.  I'm just going to give you a minute to think about

16    that and go talk to your colleague and then come back and tell

17    me if that's actually your position.

18         MR. FACCI:  Will do.

19      (Government conferring.)

20         AUSA HORNOK:  Your Honor, may I approach these

21    gentlemen?

22         THE COURT:  Sure.

23      (Government conferring with supervisor.)

24         MR. FACCI:  Thank you for indulging me, Your Honor.

25         THE COURT:  Of course.

1          MR. FACCI:  The government believes that the

2     appropriate remedy here is to simply remove Officer Liang from

3     the jury instructions from the elements of the crime.  We

4     don't think that it's appropriate to say that there's some

5     type of acquittal here with respect to Officer Liang; that the

6     jury will understand that we have not presented any evidence

7     that there was an assault to Officer Liang.

8        We did not -- it was not required here.  The way that the

9     information was written was that we could -- that we alleged

10    an assault that occurred on one of these two people, that's

11    the way it's supposed to be read, that's the way it's supposed

12    to be instructed to the jury, and the jury is capable of

13    understanding that there was no evidence here presented with

14    respect to an assault on Officer Liang.

15       So our recommendation to the court here is just to simply

16    remove Officer Liang from the elements.  When they see that it

17    will be clear to them what needs to be proven in order to

18    reach a guilty verdict or not guilty verdict in this case.

19          THE COURT:  Okay.  Just to be clear, the defense has

20    moved under Rule 29 to dismiss the portions of this

21    information related to Officer Liang, which I am granting as

22    conceded because you told me that you did not oppose it

23    because you presented no evidence with respect to Officer

24    Liang, who did not even testify in court today.  So that's

25    done.

1          The next question of what I tell the jury is a different

2     question.  In my preliminary instructions, which you did not

3     object to, I said the information alleges that on or about

4     July 22, 2025, within the District of Columbia, Sydney Lori

5     Reid did forcibly assault, resist, oppose, impede, intimidate

6     and interfere with an officer and employee of the United

7     States, Special Agent Eugenia Bates, and Officer Vincent

8     Liang, while such person was engaged in and on account of the

9     performance of official duties.

10         So you're proposing that in the final instructions I just

11    drop Officer Liang and never explain to the jury what

12    happened.  Because you didn't object to that, and that's what

13    I told them at the beginning, that this is what your

14    information charged.  And I'm going to have to instruct them

15    at the end, and I do think there needs to be some explanation

16    about why Officer Liang has just disappeared.

17         I will let you continue to think about that.  I don't think

18    I need to address it right now.  But for the record, I am

19    granting the motion as conceded because you told me you were

20    conceding it because you had presented no evidence with

21    respect to Officer Liang.

22         And just to be clear, all along your theory has been that

23    the knee is the thing that caused the assault.  You superseded

24    last week and still left Officer Liang in that information

25    even though you knew that you didn't have a basis to meet the

1    simple assault requirement with respect to Officer Liang.  And

2    so I'm very confused about what has happened here.  I mean,

3    you chose to supersede and then didn't remove him even

4    though -- I don't think you've had a theory that he was

5    assaulted at all.

6        But for the moment, we're going to bring the jury in.  When

7    we come back for our charging conference, you can propose

8    something to me that's different than let's just remove him

9    entirely, because I think that risks confusion to the jury.  I

10   instructed them at the beginning based on your own

11   information, which is not weeks or months old.  You did it

12   last week.  And you didn't object to this instruction, and I

13   have now granted the Rule 29 motion as conceded.

14       So you can continue to confer with your colleagues about

15   how we should handle that in the final instructions.

16            MR. FACCI:  Okay.  Thank you.

17            THE COURT:  I just continue to be baffled by the

18   government's choices and conduct in this case.

19       Okay.  Mr. Ohm, Ms. Abe, are you ready to proceed with your

20   case?

21            MS. ABE:  Yes, Your Honor.

22            THE COURT:  Okay.  And is the plan to put on these two

23   witnesses, read in your stipulation, and then enter the Liang

24   grand jury transcripts?

25            MS. ABE:  Yes, Your Honor.

1          THE COURT:  Okay.  After we do that, are you all

2     prepared to do the charging conference?  I'm trying to map out

3     whether I'm going to charge the jury today.  Do you think

4     there are going to be things that will take us a long time?

5     And if that's the case, we'll finish the defense's case, then

6     I will let the jury go home, we will do our charging

7     conference, and then I will charge them in the morning and

8     you'll do your closings.  I don't want them waiting for a long

9     time if you think there are things that will take a long time

10    at the charging conference.

11         MR. OHM:  Your Honor, I don't think there's anything

12    controversial for the charging conference.  The only thing we

13    were going to propose was a self-defense instruction, and then

14    I think there was going to be some conversation about our

15    theory of the defense instruction, which hopefully I'll be

16    able to get to the government in the next 10 minutes.

17         THE COURT:  Do you want me to give a defense theory

18    instruction?

19         MR. OHM:  Yes.

20         THE COURT:  So you have a self-defense instruction and

21    a defense theory instruction?

22         MR. OHM:  Right.  And we're just asking for the red

23    book for the self-defense instruction so nothing

24    controversial.

25         THE COURT:  Do you have your defense theory instruction

1    written?

2         MR. OHM:  I have it written.  Ms. Abe usually looks

3    over everything I do --

4         THE COURT:  That seems like a good idea, Mr. Ohm.

5      So maybe we can charge the jury today and get them

6    deliberating unless you're going to tell me you have huge

7    issues to resolve on the instructions, which I've given you

8    many times, including last week.

9         MR. WOLF:  Your Honor, so defense did initially flag

10   it's possible that a self-defense instruction would be

11   applied.  I think there are significant issues that need to be

12   resolved to determine whether that self-defense is actually

13   applicable here.  And so I think giving the parties an

14   opportunity to provide the applicable case law based on the

15   facts of the case and the defense's arguments, I think would

16   be helpful for us to decide whether a self-defense instruction

17   applies, because the government's position is that it would

18   not apply based on the facts of this case.

19        THE COURT:  Okay.  You need to be prepared to do that

20   this afternoon.  To be clear, I'm not -- we're not doing the

21   defense case and then all going home.  This case has been

22   going for some time.  I think you have been aware that that is

23   an instruction they would request.  I believe they mentioned

24   that at an earlier conference that they may request that.

25      So I can hear argument from you and receive your

1     authorities an hour from now when presumably we'll be done

2     with Mr. Ohm's witnesses. So that would put us -- I mean, are

3     you prepared to make those arguments today? Because I'm not

4     going to give you overnight to do that. This is not new.

5          MR. WOLF: Yes, Your Honor. We'll be prepared --

6          THE COURT: Okay. So you're going to be prepared to do

7     that in an hour.

8          MR. WOLF: Yes, Your Honor.

9          THE COURT: Mr. Ohm, how much time do you think you'll

10    need? If I'm going to send the jury home, I want to let them

11    know that. So I'm trying to figure out timing for the next

12    two and a half hours.

13         MR. OHM: I don't think our case is going to last more

14    than 30 minutes. And just so we're clear, because the court

15    said something about deliberating. The court's proposal right

16    now would be that we do our charging conference, and then

17    instruct the jury and then do closings in the morning.

18    Correct?

19         THE COURT: Correct. But if we're going to have fights

20    about the jury instructions, then I'd rather just send them

21    home at the end of your case, we'll do our charging

22    conference, and then I'll instruct them first thing in the

23    morning, you'll do your closings, and then they'll start to

24    deliberate.

25         MR. OHM: I don't see there being too much controversy.

1    The standard for a self-defense instruction is a scintilla of

2    evidence and whether any reasonable juror could reach a

3    conclusion, so I --

4        THE COURT:  I know.  This is also a 111(a) misdemeanor

5    case, and the number of times we've had to break to resolve

6    issues is astounding to me.  So this case would be already

7    finished across the street.

8        MR. OHM:  Certainly.  Well, we -- Ms. Abe's closing.  I

9    defer to the court.  Whatever the court wants to do.

10       THE COURT:  We're going to have you put your case on.

11   I will then dismiss the jury and ask them to come back at

12   9:30, because I do not want them -- they have already been

13   waiting around a lot while we have had to resolve issues.  So

14   I don't want them sitting around for an hour then to be told

15   they can go home.

16     So I will dismiss them, we will come back and do our

17   charging conference, and then break for the day.  First thing

18   tomorrow I'll instruct the jury, you'll do your closings and

19   then they can deliberate.

20     Anything else before we bring them in?

21       MS. ABE:  Nothing for the defense.  Thank you.

22       THE COURT:  Okay.

23     (Jury in at 2:42 p.m. )

24       THE COURT:  Okay.  Thank you for your patience, ladies

25   and gentlemen of the jury.  Mr. Ohm, Ms. Abe?

1          MS. ABE:  Yes, Your Honor.  The defense calls Jessica

2     Mason.

3              JESSICA MASON, WITNESS FOR THE DEFENSE, SWORN

4                          DIRECT EXAMINATION

5     BY MS. ABE:

6     Q.   Good afternoon, Ms. Mason.

7     A.   Hello.

8     Q.   So just while you're testifying, please just remember to

9     speak into the microphone and speak clearly for the court

10    reporter.

11    A.   Okay.

12    Q.   So could you please state your name and spell it for the

13    record?

14    A.   Jessica Mason.  J-E-S-S-I-C-A, M-A-S-O-N.

15    Q.   And how are you employed?

16    A.   I work at Friendship Hospital For Animals.

17    Q.   And what do you do there?

18    A.   I'm an oncology vet tech.  I give chemo to animals.

19    Q.   Do you know the defendant in this case, Sydney Reid?

20    A.   Yes.

21    Q.   How do you know her?

22    A.   We worked together for some years.

23    Q.   Where did you work together?

24    A.   Lou's City Bar, then we worked at another bar, couple of

25    other bars, and now we both work at Friendship.

1    Q.    How long have you known Ms. Reid?

2    A.    10 years?

3    Q.    Okay.  How often do you see each other?

4    A.    Well, now we work at the same job, but our schedules are

5    opposite so kind of like just in passing.

6    Q.    Do you have like an estimate of, is it daily, weekly?

7    A.    I see her daily in passing.

8    Q.    So do you know why we're here today?

9    A.    Kind of.  Yes.

10    Q.    So I'm going to show you a series of photos that have

11    already been labeled as Defense Exhibits 9, 10, 11, and 12.

12    If we may publish to Ms. Mason but not the jury.

13              MR. FACCI:  Objection.

14              THE COURT:  You have an objection to her publishing to

15    the witness?

16        (Bench conference.)

17              MR. FACCI:  Just as to the foundation, Your Honor.  No

18    foundation has been laid to start showing the witness any

19    documents, and she hasn't been asked any questions giving any

20    context of what she's going to be shown.

21              THE COURT:  I think she's about to do that.  Is that

22    right, Ms. Abe?

23              MS. ABE:  Yes, Your Honor.  I was going to --

24              THE COURT:  Please proceed.

25        (End of bench conference.)

1           MS. ABE:  You may publish the photos to the witness.

2      BY MS. ABE:

3      Q.   Ms. Mason, do you recognize this first photo?

4      A.   Yes.

5      Q.   Without telling the jury exactly what the picture

6      contains, how do you know what this photo is?

7      A.   Because I took it.

8      Q.   And what is it -- not the -- well, it's a screenshot, is

9      it not?

10     A.   Yes.

11     Q.   Okay.  What is it a screenshot of?  Again, not the actual

12     picture but the --

13     A.   It's a screenshot of a picture that I emailed to Syd.

14     Q.   Okay.  Thank you.  Can we move to Exhibit 10.

15          Do you recognize this photo?

16     A.   Yes.

17     Q.   Why do you recognize this photo?

18     A.   Because I also took it.

19     Q.   Could we please move to Exhibit 11.

20          And this photo?

21     A.   I took that too.

22     Q.   And Exhibit 12, please.

23          And this photo.

24     A.   I also took that one.

25     Q.   Okay, great.  And so what are these photos of, generally?

1    A.    Bruises.

2    Q.    And is there a body part or something in this photo?

3    A.    On the arm.

4    Q.    And whose arm is it?

5    A.    Sydney.

6         MS. ABE:  We would move to admit Defense Exhibits 9,

7    10, 11, and 12 into evidence and have them published to the

8    jury.

9         MR. FACCI:  No objection.

10         THE COURT:  Admitted.

11                        (Defendant Exhibit Nos. 9-12

12                          received into evidence.)

13   BY MS. ABE:

14   Q.   So, Ms. Mason, just going back to Exhibit 9, do you see

15   the date in the middle, or on the right side of this photo?

16   A.   Yes.

17   Q.   What is that date?

18   A.   July 25.

19   Q.   Okay.  Do you know -- do you know what date you took the

20   photos on?

21   A.   I assume that date.

22   Q.   Is that -- would that be your recollection?

23   A.   Yeah.  The 25th.

24   Q.   So what's your understanding of how Ms. Reid got these

25   injuries?

```
1    A.   She was arrested.

2              MR. FACCI:  Objection, Your Honor.

3              THE COURT:  Basis?

4         (Bench conference.)

5              MR. FACCI:  Your Honor, this calls for hearsay.

6    Whatever the witness is about to say is going to be clearly

7    based on hearsay and not personal observations.

8              THE COURT:  Ms. Abe?

9              MS. ABE:  Your Honor, I just wanted to know what her

10   understanding of where the injuries came from, and then I was

11   going to move on.  And I was not going to elicit any testimony

12   about who she thought did anything -- who she thought injured

13   Ms. Reid or --

14             THE COURT:  But you asked her what's your understanding

15   of how Ms. Reid got these injuries, which I assume, to the

16   extent she's familiar with the incident, is going to say she

17   got them from the officers on the scene.

18             MS. ABE:  I guess, Your Honor, to be clear, I was not

19   going to ask Ms. Mason who she believed gave Ms. Reid the

20   injuries.

21             THE COURT:  But you asked her what's your understanding

22   of how Ms. Reid got these injuries.  So what do you anticipate

23   she's going to say?  She said she was arrested and -- again,

24   Ms. Reid isn't testifying.  What are you trying to get from

25   this witness?
```

1          MS. ABE:  Your Honor, we're trying to get the bruises

2     into evidence, and then of course this is about why Ms. Mason

3     took these photos and I think its, you know, effect on the

4     listener.  It's not for the fact that Ms. Reid herself -- I

5     apologize.  It's not the fact that Ms. Mason herself believed

6     that the -- or it's not to show that the agents themselves

7     created the injuries but to show why Ms. Mason took the

8     injuries.

9          THE COURT:  To show why she took the photos?

10          MS. ABE:  I apologize.  To show why she took the

11     photos, so its effect on the listener.

12          THE COURT:  What do you expect that she's going to say?

13     I assume she's going to say she -- this happened with the

14     incident with the officers.  Correct?

15          MS. ABE:  Your Honor, I think I'm a little confused.  I

16     was not planning on asking -- I was not planning on asking

17     Ms. Mason, like, what she thought happened or what she thought

18     caused the injuries.  And I guess I'd be more than happy to

19     rephrase, but what I was trying to get at was just the fact

20     that Ms. Reid and Ms. Mason see each other at work, they cross

21     days and she hadn't seen her in a period, and then

22     Ms. Mason -- Ms. Reid comes back with bruises and Ms. Mason is

23     taking the photos, and then of course we would argue that the

24     inference the jury could make is that these photos came from

25     that incident.

 1           THE COURT:  You can make that argument and ask the jury

 2     to make that inference, but you can't ask her what's her

 3     understanding of how she got them, which is what you did ask

 4     her.

 5           MS. ABE:  Oh, okay, Your Honor.  I see.  Okay.

 6        (End of bench conference.)

 7     BY MS. ABE:

 8     Q.   So after -- well, I'll move on.  You said that you had

 9     worked with Ms. Reid in the past.  Is that right?

10     A.   Yes.

11     Q.   Are you aware of her character for violence or

12     nonviolence?

13     A.   Am I aware?

14     Q.   Yes.

15     A.   I don't think she's a violent person.

16     Q.   Well, okay.  So you don't have any opinions about whether

17     she's a violent person.  Are you aware of her reputation in

18     the community with respect to being violent or nonviolent?

19     A.   Nonviolent.

20           MS. ABE:  If I may, Your Honor, just one moment.

21           THE COURT:  Yeah.  Go ahead.

22        (Defense conferring.)

23     BY MS. ABE:

24     Q.   So just to go back before you had -- to the day you had

25     taken these photos, July 25, when was the last time you had

1       seen Ms. Reid before you took those photos?

2       A.    I don't know the exact date, but it had been some days.

3       Q.    Okay.  Was she supposed to be at work?

4       A.    Yes.

5       Q.    Okay.  Were you worried about her?

6       A.    I just realized, oh, I hadn't seen Syd in a couple days.

7       Like, wonder where she is.  I didn't think like too deep into

8       it.  Just like, I haven't seen her.  Like I say, our schedules

9       are opposite, so we see each other, like, when I'm leaving

10      out, she's usually coming in for the day.  So it was like, I

11      haven't seen her.

12      Q.    Did you know where she was, without specifically saying?

13      A.    Not at the time.

14      Q.    All right.  And so just going back, are you aware of

15      Ms. Reid's reputation in the community for being a violent or

16      nonviolent person?

17      A.    No, nonviolent.

18      Q.    So --

19      A.    Sorry.

20      Q.    Well, first are you aware of her reputation in the

21      community?

22      A.    Yes.

23      Q.    And would you say she is a violent or nonviolent person?

24      A.    Nonviolent.

25      Q.    And could you kind of expand on that, what you mean by

1    the fact that that's what you believe her reputation is?

2    A.    In like the 10 years I've known her and all the jobs

3    we've worked, I've never seen her get violent with anybody.

4    If anything, Syd is the one who deescalates the situations and

5    handles -- like, she was like my manager, so whenever someone

6    got rowdy in the bar, something like that, Syd is the one that

7    comes in and calms the situation down.  I've never seen her

8    get violent with anybody.

9         MS. ABE:  No further questions for Ms. Mason.  Thank

10   you.

11        THE COURT:  Any cross-examination from the government?

12        MR. FACCI:  Very briefly, Your Honor.

13        THE COURT:  Go ahead.

14                    CROSS-EXAMINATION

15   BY MR. FACCI:

16   Q.    Good afternoon, Ms. Mason.

17   A.    Hello.

18   Q.    You were shown some pictures on direct of some bruises.

19   You didn't see how Ms. Reid got those bruises.  Correct?

20   A.    No.  I wasn't there.

21   Q.    And you primarily work with Ms. Reid.  Right?

22   A.    Yes.

23   Q.    Is your relationship with her basically inside the

24   workplace?

25   A.    I mean, we're friends.

1    Q.   Do you see each other outside of work often?

2    A.   Not really.

3    Q.   So you have not had many opportunities to see how

4    Ms. Reid is out in the community.

5    A.   Back in the day I did, but I have kids now, so I don't

6    hang out anymore.

7    Q.   Back in the day as in like --

8    A.   Like when we worked at the bar together, we hung out

9    outside the bar, but right now we don't hang out outside of

10   work really.  The last couple years we haven't because I have

11   kids.  Our schedules are just opposite, our lives are

12   different.

13            MR. FACCI:  Understood.  No further questions.

14            THE COURT:  Thank you.  Any redirect?

15            MS. ABE:  Nothing from the defense.  Thank you.

16            THE COURT:  Thank you, you're excused.

17            THE WITNESS:  Thank you.

18        (Witness steps down.)

19            THE COURT:  Does the defense have another witness?

20            MS. ABE:  Yes, Your Honor.  The defense calls Katie

21   Campbell-Morrison.

22   CATHERINE CAMPBELL-MORRISON, WITNESS FOR THE DEFENSE, SWORN

23                        DIRECT EXAMINATION

24   BY MS. ABE:

25   Q.   Good afternoon, Ms. Campbell-Morrison.  Could you please

```
 1    state your name and spell it for the record.
 2    A.    Catherine Campbell-Morrison.  C-A-T-H-E-R-I-N-E,
 3    Campbell, C-A-M-P-B-E-L-L - M-O-R-R-I-S-O-N.  And I more
 4    commonly go by Katie, K-A-T-I-E.
 5    Q.    Thank you.  And just to table set, when you're speaking,
 6    please just remember to speak into the microphone and then
 7    speak slowly for the court reporter.
 8          So how are you employed, Ms. Campbell Morrison?
 9    A.    I'm the assistant general manager at Jane Jane, and I
10    also work in social justice ministries at National City
11    Christian Church.
12    Q.    And do you know the defendant in this case, Sydney Reid?
13    A.    Yes.
14    Q.    How do you know Ms. Reid?
15    A.    We worked together at Walters Sports Bar in Navy Yard.
16    Q.    How long have you known Ms. Reid?
17    A.    About five years.
18    Q.    And how often would you say now that you interact or see
19    her?
20    A.    Every couple weeks.  We talk more frequently via text,
21    and she works at a bar near my house and helps walk my dog, so
22    I see her once every few weeks.
23    Q.    And would you say that you and Ms. Reid are part of the
24    same community?
25    A.    Absolutely.
```

```
1    Q.    Can you talk a little bit about that?

2    A.    Syd was vital in my reintegration into D.C.  I've been in

3    D.C. since '09 and I moved back in 2021, and Syd was a mentor

4    for me at Walters Sports Bar.  She took me under her wing,

5    helped guide me to pursue things outside of bartending and

6    helped encourage me to flourish into my pastoral skills as

7    well.  She also has been instrumental in helping me train my

8    dog.

9    Q.    And so you said that -- well, are you aware of Ms. Reid's

10   character for violence or nonviolence within the community?

11   A.    She has a character of nonviolence.

12   Q.    Can you elaborate on that?

13   A.    I have seen Syd be a defender of those in her community.

14   For instance, at Walters, often female staff would face sexual

15   harassment, and Syd would protect us by informing the --

16   professionally and politely informing the patrons that were

17   perpetuating sexual harassment that they were not permitted to

18   do that.  And she also made it feel like a safe environment in

19   what could be sometimes a toxic environment.  And I believe

20   she is a woman of moral character who always stands on the

21   side of justice.

22   Q.    You said that she makes it feel -- she made it feel like

23   a safe environment.  Can you just explain what you meant by

24   that?

25   A.    Firmly and professionally saying you are not allowed to
```

1    sexually harass my staff.

2              MS. ABE:  If I may just have one moment, Your Honor.

3         No further questions.

4              THE COURT:  Okay.  Any cross from the government?

5              MR. WOLF:  Yes, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. WOLF:

8    Q.   Good afternoon.

9    A.   Afternoon.

10   Q.   So you met Ms. Reid when you were working at a bar.

11   Correct?

12   A.   Correct.

13   Q.   And you started working at this bar about five years ago?

14   A.   Correct.

15   Q.   And you still work there or no?

16   A.   No.

17   Q.   When did you stop working there?

18   A.   2021.  '22.  Somewhere around there.

19   Q.   And Ms. Reid worked with you at that bar?

20   A.   Correct.

21   Q.   So presumably since you stopped working at that bar in

22   2022 you stopped seeing Ms. Reid at that bar back in 2022.  Is

23   that correct?

24   A.   Yes.

25   Q.   And so you then pursued other vocations, other avenues.

1    Is that right?

2    A.    Correct.

3    Q.    Sought other employment, excuse me?

4    A.    Correct.

5    Q.    And after you sought other employment, you did not see

6    Ms. Reid as frequently as you saw her, say, when you worked

7    with her back at the bar.  Is that correct?

8    A.    Yes.

9    Q.    That was at this point three years ago now, right?

10    A.    Yes.

11    Q.    And you testified that Ms. Reid was friendly and

12    professional even regarding addressing sexual harassment

13    issues at the bar.  Would you consider using profanities

14    towards strangers to be friendly and professional behavior?

15    A.    I think you can have a professional and firmly placed

16    cuss word if someone -- but I do think that -- it honestly

17    depends on the tone of voice.

18    Q.    So you think using profanities towards, let's say a

19    stranger, could be friendly and professional behavior?

20    A.    I think it depends on the context.

21    Q.    Sorry.  It's a yes or no.  So a stranger, you think it

22    could sometimes be -- it's proper and friendly and

23    professional to use profanities towards them?  You think

24    that's the case?

25    A.    It can be.

1    Q.   And then you talked about her character in the community.

2    So since you left the job, you said you see her once every few

3    weeks.  Is that correct?

4    A.   Correct.

5    Q.   Is that relating to kind of walking your dog?  Is that

6    what you testified to?  Or some other context?

7    A.   Socially and in context of dog training.

8    Q.   Got it.  And so socially, is that like meeting up for,

9    like, dinner or something like that?

10   A.   Yes.

11   Q.   But between those times when you meet up, you don't see

12   Ms. Reid.  Is that right?

13   A.   Correct.

14   Q.   You don't see what she does on a daily basis.

15   A.   Correct.

16   Q.   Are you aware of any of the conduct alleged in this case?

17   A.   What I've seen in the newspaper.

18        MR. WOLF:  One moment, Your Honor.

19      Nothing further.  Thank you.

20        THE COURT:  Any redirect, Ms. Abe?

21        MS. ABE:  No, Your Honor.  Thank you.

22        THE COURT:  Thank you very much.  You're excused.

23      (Witness steps down.)

24        MR. OHM:  Your Honor, may I just confer with counsel

25    real quick?

1           THE COURT:  Yes, of course.

2        (Parties conferring.)

3           MR. OHM:  May I proceed, Your Honor?

4           THE COURT:  Please.

5           MR. OHM:  Your Honor, the defense is going to move the

6     following exhibits into evidence.  So, ladies and gentlemen,

7     the defense moves in Defense Exhibit 5.

8           MR. WOLF:  Your Honor, I apologize.  I just want to

9     lodge the government's further objection to this.  May we be

10    heard?

11          THE COURT:  You want to add something?

12          MR. WOLF:  Yes, Your Honor.

13          THE COURT:  Sure.

14       (Bench conference.)

15          THE COURT:  Go ahead, Mr. Wolf.

16          MR. WOLF:  Your Honor, if I understand the court's

17    ruling, just seeing the way this is being admitted, it's sort

18    of a proffer by the attorney, there's no authentication,

19    there's no foundation for it --

20          THE COURT:  This is a grand jury transcript.  What

21    authentication do you want?

22          MR. WOLF:  I think this goes back to our previous

23    objection, that Officer Liang --

24          THE COURT:  You think they need to authenticate the

25    grand jury transcript?

1          MR. WOLF:  Yes, Your Honor.  As being a fair and

2     accurate recording of what Officer Liang said.  And that would

3     require Officer Liang being here.

4          THE COURT:  Okay.  I heard extensive argument on this,

5     Mr. Wolf, throughout today, and I ruled previously that this

6     is not hearsay, that it is relevant to the defense's theory,

7     and I am not going to impede the defense from laying out its

8     theory of the case.  And so I'm going to permit this for that

9     reason and for the other reasons we've talked about.

10        You have objected on the record and we've discussed this

11     extensively.

12          DEPUTY CLERK:  I just want to say Exhibit 5 is already

13     in as text messages from Agent Bates.

14          THE COURT:  Am I missing some further discussion?

15     What's happening?

16          MR. OHM:  I have to label it 15 I think is what

17     Ms. Bell is telling us.

18          THE COURT:  You have to label it.  Got it.  Okay.

19        (End of bench conference.)

20          THE COURT:  Okay.

21          MR. OHM:  Okay.  So try this again.  So this is Exhibit

22     15, which is a grand jury statement from -- okay.  So can

23     anybody see this?

24        The back row can't see it.

25          DEPUTY CLERK:  I have it as down but it's stuck on

1    their screens.

2         THE COURT:  Okay.  So now we can put it up and see if

3    it gets to everyone's screen.

4         MR. OHM:  Okay.  Exhibit 15 is the grand jury

5    transcript in the United States of America versus Sydney Reid.

6    The testimony of Vincent Liang from August 12, 2025.  Page 2,

7    you can see "Vincent Liang was called as a witness and after

8    first being duly sworn by the foreperson of the grand jury was

9    examined and testified as follows."

10        You see "Examination, Mr. Dernbach."

11        And then page 3 of the exhibit, which is page 15 of the

12    transcript.

13        "Question:  Did you have your official badge with you, on

14    you that day?

15        "Answer:  Yes, I have a badge here.  I had this outside on

16    my neck, but displayed on my chest.

17        "Question:  On July 22nd, 2025, the badge that you were

18    wearing, what does it say?

19        "Answer:  It says ICE on it."

20        Moving down to line 19.

21        "Question:  Was your ICE badge visible?

22        "Answer:  Yes, it was."

23        The defense is also moving in Exhibit 16, which is the

24    grand jury transcript in the United States versus Sydney Reid

25    from Wednesday, August 13, 2025.  Testimony of Vincent Liang.

1    Page 2 of the exhibit.  Well, it's page 2 of the exhibit but

2    page 3 on the transcript.

3        "Vincent Liang was called as a witness and after first

4    being duly sworn by the foreperson of the grand jury was

5    examined and testified as follows:"

6        Moving on to page 26 of the transcript, page 3 of the

7    exhibit.

8        "Question:  Let's go back to the moment Ms. Reid starts

9    going up the staircase and you kind of prevent her from going

10    forward.  In your own words, explain kind of the interaction

11    between you and Ms. Reid.

12        "Answer:  So when she was coming up the staircase, I

13    basically did the same thing, where I hold up my hands and" --

14    moving on to the next page, 26 -- I'm sorry.

15        Moving on to page 27, "and say, this is about as far as you

16    can go, and she kind of pushed my hands away."

17             THE COURT:  Are you not seeing?

18             DEPUTY CLERK:  Okay.  I'm going to shut all the way

19    down and see...

20             MR. OHM:  Okay.  So I'm going to go back.  I'm just

21    going to go back to the answer on page 26.

22        "Answer:  So when she was coming up the staircase, I

23    basically did the same thing where I hold up my hands and say

24    this is about as far as you can go.  And she kind of pushed my

25    hands away."

1        Moving down to line 18, "She kind of tried to slap my hands

2    away."

3        Moving on to Exhibit 7b.  This is a photograph which is a

4    screenshot from Ms. Reid's phone which is 7b.  It's the other

5    side, other angle of what you saw --

6            DEPUTY CLERK:  I took it down.  Is 7b in?

7            MR. OHM:  Yes.  I'm moving all these in.

8            DEPUTY CLERK:  You're moving them in --

9            THE COURT:  They're all admitted.

10           DEPUTY CLERK:  Thank you.

11           MR. OHM:  So 7b is the opposite side of what you could

12   see in 7a, which was a stipulation regarding Officer Parodi.

13   7b is from Ms. Reid's phone.

14       We've also moved in Exhibit 15, which is a stipulation.

15   This is the unsigned version that you see but I have a signed

16   version --

17           THE COURT:  Mr. Ohm, we already have a 15.

18           MR. OHM:  Oh, that's right.  17.  I'm just going to

19   have to do that.  Well, it's unfortunately -- or fortunately

20   just on the PowerPoint but not written on the exhibit itself.

21   But that is a copy of what I have in my hand, which is a

22   signed version of the stipulation, and it's government's and

23   defendant's stipulation regarding A, Assistant United States

24   Attorney Joseph Dernbach:  The parties in this case, the

25   United States of America and the defendant Sydney Reid, hereby

1    agree and stipulate as follows:

2        "Had Special Assistant United States Attorney Joseph

3    Dernbach testified, he would have testified to the following:

4    That he spoke with Agent Eugenia Bates in the complaint

5    drafting process.  He did not recall Agent Eugenia Bates

6    telling him about the allegation that the defendant raised a

7    knee at Agent Bates's groin.  He did not recall telling Agent

8    Bates that he could not add the kneeing allegation to the

9    complaint because the complaint had already been drafted."

10       Court's brief indulgence, Your Honor.

11       (Defense conferring.)

12           MR. OHM:  With that, the defense rests.

13           THE COURT:  Okay.  Thank you.

14       Ladies and gentlemen of the jury, I am going to dismiss you

15    for the day a little early so that we can spend the rest of

16    the day clearing up some business.  Can I ask you to come back

17    tomorrow morning ready to start at 9:30 a.m.

18       As always, please don't discuss the case even with each

19    other.  And thank you again for all of your patience today.

20       (Jury out at 3:20 p.m.)

21           THE COURT:  Okay.  Ms. Reid, can you please come to the

22    podium?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Your attorneys have told me that they

25    aren't calling any further witnesses, which means you've

1    decided not to testify.  Is that correct?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  Okay.  And I want to make sure you

4    understand that you have an absolute right to testify if you

5    want to.  Do you understand that?

6              THE DEFENDANT:  I do, Your Honor.

7              THE COURT:  And of course, it is your attorneys' jobs

8    to give you advice about the pros and cons of testifying and

9    not testifying, but at the end of the day, it is your

10   decision.  Do you understand that even if your lawyers tell

11   you it's not a good idea, that you can testify if you would

12   like to?

13             THE DEFENDANT:  I do, Your Honor.

14             THE COURT:  Okay.  And so understanding all of that, do

15   you want to testify?

16             THE DEFENDANT:  No, I do not, Your Honor.

17             THE COURT:  Okay.  Thank you.

18        All right.  Anything else from the parties before we move

19   to our charging conference?

20             MR. WOLF:  No, Your Honor.  The government would ask

21   for just a couple minutes to confer with Ms. Macey about the

22   government's position regarding self-defense in this case.

23             THE COURT:  Yeah.  Go ahead.  Why don't we break for 10

24   minutes and we'll come back at 3:35.

25        (Recess from 3:22 p.m. to 3:42 p.m.)

1          THE COURT:  Okay.  So let's start with the earlier

2     issue on Rule 29.  And I have tweaked what I had previously

3     sent to you, which I'm going to read to the parties and you

4     can tell me if you have any objections.

5          So instruction 22 would now say "the defendant is charged

6     with assaulting, resisting, or impeding certain officers or

7     employees."  Actually I should change that to track the

8     information which uses all of those verbs.  Oh, no.  That's

9     the heading of the statute.  Sorry.

10         So it would say, "The defendant is charged with assaulting,

11    resisting, or impeding certain officers or employees, which is

12    a violation of federal law.  At the beginning of this case I

13    instructed you that the defendant had been charged with

14    violating the statute as to both Officer Liang and Agent

15    Bates.  At this point in the case, you should focus only on

16    the allegation of criminal conduct with respect to Agent

17    Bates.  In doing so, please focus on the elements of the

18    offense as I am about to lay them out.  To find the defendant

19    guilty of assaulting, resisting, or impeding certain officers

20    or employees, you must find the following elements beyond a

21    reasonable doubt:  First, Ms. Bates was an officer or employee

22    of the United States; second, Ms. Reid forcibly assaulted,

23    resisted, opposed, impeded, intimidated or interfered with

24    Ms. Bates; third, that act constituted simple assault as I

25    will define that term for you; fourth, Ms. Reid so acted while

1    Ms. Bates was engaged in or on account of her performance of

2    official duties; fifth, Ms. Reid acted with what the law calls

3    general intent."  And everything that follows is the same.

4        I'm going to hear from the government first if you have any

5    objection.

6        MR. FACCI:  Your Honor, the government has no objection

7    to that instruction.

8        THE COURT:  Okay.  The defense?

9        MS. ABE:  The defense has no objection, Your Honor.

10       THE COURT:  Okay.  And then the only other change I

11   made since the last version I circulated to you is in the

12   definitions.  I think it had previously said the term

13   "assault."  I changed that to "simple assault" to match the

14   instruction.

15       MR. OHM:  Your Honor, could our witness remain for the

16   remainder of the proceedings?  She's obviously an interested

17   party.

18       THE COURT:  I don't have an issue.  Does the government

19   have an objection?

20       MR. WOLF:  No, Your Honor.

21       THE COURT:  Okay.  So as I was saying, the only other

22   change I made was to change the term in the definition to

23   "simple assault" to track what's in the elements of the

24   offense.

25       So otherwise, with respect to what I circulated to you, is

1    there anything we need to talk about, or should we move to the

2    self-defense instruction?

3         MR. FACCI:  Nothing further, Your Honor, from the

4    government.

5         MR. OHM:  It's fine, Your Honor.

6         THE COURT:  Okay.  So let's move to the self-defense

7    instruction.  Mr. Ohm, are you requesting the Red Book

8    instruction?

9         MR. OHM:  Yes, Your Honor.

10        THE COURT:  Okay.  Do you want to be heard on why you

11   think one is warranted?

12        MR. OHM:  Yes, Your Honor.  The standard for getting an

13   instruction of this sort is a very low standard.  There needs

14   to be a scintilla of evidence where any reasonable juror could

15   find that there's evidence of self-defense, which would

16   trigger the giving of the instruction.  I think there's

17   significant evidence of self-defense here.  The first contact

18   made between anybody and Ms. Reid was initiated by Officer

19   Liang.  And then the first contact between -- well, actually,

20   the only contact I think that's been alleged that has been any

21   assaultive conduct is Agent Bates grabbing Ms. Reid, and the

22   kneeing motion occurs afterwards.

23      So there is plenty of evidence of self-defense.  I think it

24   speaks for itself and the court should charge the jury with

25   that instruction.

1          THE COURT:  All right.  Mr. Facci.

2          MR. FACCI:  Your Honor, there is not significant

3     evidence of self-defense in this case.  In fact, there's been

4     no evidence that has been presented that Ms. Reid acted in

5     self-defense.  As we all know, comments made in opening

6     statements are not evidence.  Questions by the defense are not

7     evidence.  So we would object to a self-defense instruction

8     here because there simply is no basis for that instruction to

9     be given.

10          THE COURT:  So the video where Officer Liang is the

11     first person to make contact -- despite what he said to the

12     grand jury, he makes contact and grabs Ms. Reid first.  And

13     then as you watch the video, you also see him moving his leg

14     into Ms. Reid, which your witness acknowledged on

15     cross-examination, that then resulted in Ms. Reid's knee being

16     moved up.  You don't think any of that warrants a self-defense

17     instruction?

18          MR. FACCI:  No, Your Honor.  And there is case law on

19     this.  There's recent case law from the D.C. Circuit where --

20     it's a 2025 case, *United States v. Celentano*, and the citation

21     is 126 F.4th, 680 to 687, D.C. Circuit case.  In that case a

22     self-defense instruction was given where the defendant

23     believed that the officer involved engaged in excessive force.

24     There's been absolutely no evidence here that any officer

25     engaged in excessive force or that Ms. Reid believed the

1   officer was engaging in excessive force.

2       So absent her testimony, there just simply isn't a basis to

3   instruct on this.

4           THE COURT:  Okay.  Tell me what this case says.  You

5   gave me the case but you didn't tell me, what are the facts

6   there and what did the D.C. Circuit hold?

7           MR. FACCI:  Your Honor, I haven't gotten a chance to

8   get through all of the facts in this case.  I do have the

9   instruction that they --

10          THE COURT:  You're giving me a case and you don't know

11  what it says?

12          MR. FACCI:  Well, I know what the holding was and what

13  the self-defense --

14          THE COURT:  What's the holding?

15          MR. FACCI:  Well, the court here provided what --

16  basically five factors --

17          THE COURT:  Have you read the case?

18          MR. FACCI:  I've just read a summary of the case, Your

19  Honor.  We only had about 10 minutes.

20          THE COURT:  Okay.  Go ahead.

21          MR. FACCI:  Well, in that case -- court's indulgence.

22      So in that case the court held that for the defendant to

23  succeed on a self-defense or defense of another involving a

24  law enforcement officer, then the jury must find that the

25  defendant actually and reasonably believed that the officer

1    was using excessive force.  And it cites to the case *Waldman*,

2    835 F.3d at 755.  "How much force a reasonable law enforcement

3    officer is entitled to use to achieve the needed restraint of

4    a third party will depend on the particular circumstances."

5    And the court went on to give a self-defense instruction.  I'm

6    happy to read that instruction.  There are five steps.

7           THE COURT:  Let me just clarify.  So is it your

8    position that a self-defense instruction is only warranted

9    when an officer has used excessive force?

10          MR. FACCI:  In the context of a 111(a) charge, yes.

11   And when there's evidence that the defendant actually believes

12   that the officer involved engaged in excessive force.

13          THE COURT:  Okay.  So you think in a 111(a) case there

14   are only two scenarios where I can give a self-defense

15   instruction, one where there's testimony from the defendant

16   that she believes it was self-defense, or 2, where the law

17   enforcement officer has used excessive force.

18          MR. FACCI:  That's the government's reading of the

19   *Celentano* case, Your Honor.  I'd like to point out just two

20   other issues as well.  Seeing that the defense's theory here

21   was not that Ms. Reid engaged in any type of self-defense but

22   that she had some kind of involuntary reaction, so I think the

23   government's a little puzzled as to, you know, what they are

24   trying to argue here, and they're trying to have it both ways

25   it seems like.

1      The other point that I want to raise is that we're alleging

2  here that an assault occurred on Ms. Bates, and it seems like

3  the facts that are being presented to form the basis of the

4  self-defense argument are Officer Liang's conduct.  And that

5  would make more sense if we were trying to say she had a

6  self-defense claim with respect to Officer Liang.

7      THE COURT:  But it's all one incident happening, right?

8  I think you would agree that if Officer Liang, according to

9  your theory here, were using excessive force, Agent Bates

10  walks up and Officer Liang is using excessive force, the

11  defendant responds, and that response is what you're alleging

12  is the assault as to a different officer would still be

13  self-defense.  It doesn't matter that a different officer is

14  the officer that engaged in excessive force, assuming that's

15  what had happened.  Is that right?

16      This defendant didn't walk away from Officer Liang and then

17  do something to Agent Bates.  It was all happening at the same

18  time.  Agent Bates was holding her, Officer Liang was holding

19  her.  Officer Liang was moving towards her.  The knee moved,

20  either involuntarily, instinctively or intentionally to knee

21  Agent Bates.

22      So I'm not sure -- I mean, I will do some research and look

23  at your case law on your first point, but I'm not persuaded by

24  your second point that I should disregard everything just

25  because you're no longer pressing your Officer Liang theory.

1          MR. FACCI:  And, Your Honor, I would just respectfully

2     disagree.  I mean, just --

3          THE COURT:  So just -- both of you do this a lot.

4     Answer my question.  So if Officer Liang had engaged in

5     excessive force, you would agree that a self-defense

6     instruction is warranted?

7          MR. FACCI:  If the defendant believed that he engaged

8     in excessive force.

9          THE COURT:  So say -- assume that to be true, right?

10    Say Officer Liang engaged in excessive force, the defendant

11    believed Officer Liang was engaging in excessive force in her

12    interactions with her, and then she responds with the knee,

13    that you say was directed at Agent Bates, you think a

14    self-defense instruction is not warranted because the

15    excessive force happened from Liang and not Bates?

16         MR. FACCI:  I think so, and I can explain why.

17         THE COURT:  Please do.

18         MR. FACCI:  If I can just give a hypothetical

19    situation.

20         THE COURT:  No, just explain why on these facts.  Then

21    you can give your hypothetical after.

22         MR. FACCI:  Because assuming one officer was engaging

23    in excessive force with a defendant, and then another officer

24    walks up, that doesn't give the defendant a claim to then

25    assault and punch an officer that wasn't involved in that

force.

THE COURT:  But Mr. Facci, this is one incident.  Agent Bates isn't standing on the other side of the street.  She's also holding the defendant, Officer Liang is holding the defendant.  You say she moved her knee up.  Agent Bates happened to be standing there, but they're -- all three of them are very close together.  And so that doesn't make sense to me.  I hear your first argument but I don't understand your second.

This is not a case where, say, Officer Liang is engaged in excessive force and the defendant walks up to another officer and, according to you, assaults that officer.  This is a case where all three of them are in -- very close.  Bates walks up right next to Liang, they're both very close to the defendant, and the defendant does something that you say was directed at one officer and you want me to disregard what the other officer did.  That does not make sense.

MR. FACCI:  Your Honor, I view this as two separate interactions.  First was the interaction that was just between Officer Liang and the defendant when they were walking to the wall when he grabs onto her arm.  The second interaction would be when Agent Bates assisted and they were on the wall.

THE COURT:  Okay.  Even assuming they're two incidents, in that second interaction is when Officer Liang moves his leg into the defendant's crotch area, as your witness acknowledged

1    from looking at the video that you entered into evidence.  So

2    why is that not relevant?  Or you think I shouldn't consider

3    Officer Liang's conduct in that interaction either?

4              MR. FACCI:  No, I'm not saying that.

5              THE COURT:  So what are you saying?

6              MR. FACCI:  Well, I'm saying --

7              THE COURT:  You told me categorically this is not about

8    Liang anymore, nothing about Liang can be considered when I

9    decide whether to give a self-defense instruction because you

10   don't have any allegation against Liang anymore.  Is that

11   still true or no?

12             MR. FACCI:  Your Honor, I would still argue that if

13   the --

14             THE COURT:  Let me ask this a different way because

15   again you're not answering.  Do you think it is improper for

16   me to consider anything that Officer Liang did because you're

17   no longer relying on Liang as a basis to convict the

18   defendant?  That's what you said to me earlier, so I just want

19   to make sure that's still your position, that this is about

20   Bates, not Liang, and I can't consider what Liang did.  Is

21   that right?  Do you want a minute to confer with everyone

22   here, or...

23             MR. FACCI:  I'll confer with my co-counsel and see if

24   he --

25             THE COURT:  Okay.

1          (Government conferring.)

2          MR. FACCI:  Your Honor, if it's the court's position

3     that this was all one continuous conduct, then yes, then

4     Officer Liang's conduct should be taken into consideration

5     here.  But we still maintain that the defendant needed to have

6     believed that at least Officer Liang was engaging in excessive

7     force when he did that.

8          THE COURT:  Okay.  Mr. Ohm, do you have any response to

9     that account of the law and what I'm permitted to do?

10         MR. OHM:  As relates to the excessive force?

11         THE COURT:  Yeah.  So the government says -- there are

12    two scenarios.  The defendant has to believe that she is

13    engaging in self-defense and there needs to be some finding of

14    excessive force or some belief from the defendant that the

15    officer is engaging in excessive force.

16         MR. OHM:  I agree with that.

17         THE COURT:  Okay.  So tell me what evidence you think

18    we have in the record that the defendant believed that the

19    officer was engaged in excessive force.

20         MR. OHM:  So there's -- I sort of see that -- two

21    questions there.  So if I could answer the excessive force

22    question first.  Any force under these circumstances was

23    excessive because the officers had no -- they had no basis to

24    use force under the circumstances.

25         THE COURT:  But what evidence is in about her belief

1     about the use of excessive force, given that she didn't

2     testify?

3          MR. OHM:  So her statements while she's being

4     restrained by Officer Liang is obviously protesting about the

5     force that was being used upon her, and saying she hasn't

6     moved anywhere closer.  So that is a statement that

7     essentially is saying, or a jury certainly can reasonably

8     infer that she is saying that the force you're using against

9     me is inappropriate because I'm not doing anything.  That's

10    the meaning of "What are you doing?  F off.  I haven't moved

11    any closer than I was before when you weren't touching me."

12    That's the import of what her statement meant.

13        So when she's saying that, she's saying why are you using

14    force against me -- she's also saying F off, but why are you

15    using force against me when I haven't done anything

16    differently than when you weren't using force against me.

17    That statement is a statement of her actually believing and

18    reasonably believing that there's force being used against her

19    that's excessive given the circumstances.  And so even under

20    *Celentano* we get the instruction.

21         THE COURT:  And what authority do you have, what's your

22    best case to support an argument like that?  I mean, I don't

23    have the defendant saying that.  I have the defendant

24    saying -- and I'll go back and look at the video, but I have

25    the defendant saying things like "I'm as close as I was

1    before."  I mean, she's not saying, hey...

2        MR. OHM:  So I -- this case, I wouldn't call it

3    directly on point, Your Honor, because the issue was a

4    defendant objecting under a plain error review to the

5    self-defense instruction that was given, and that's *United*

6    *States v. Purvis*, 706 F.3d 520.  But in that case the

7    self-defense instruction was given without the testimony of

8    the defendant when the complainant in the shooting said -- the

9    complainant claims that he -- I'm sorry -- that the defendant

10   pulled a gun, he started running away, the complainant pulled

11   his own gun and started firing back.  And the D.C. Circuit

12   accepted that a self-defense instruction was appropriate but

13   ruled that because there was no objection to the self-defense

14   instruction that was given, that there wasn't plain error --

15   that the instruction that was actually given wasn't plain

16   error.

17       So I think the government is trying to argue this notion

18   that you need testimony from a defendant to get a self-defense

19   instruction.  There's a gazillion cases out there where that

20   hasn't been required.  The actual reasonable belief can come

21   from somewhere other than the defendant testifying about it.

22   And again, because you have such a low standard, a scintilla

23   of evidence standard, where a juror can reasonably believe

24   that self-defense occurred, the bar is just really low.

25       THE COURT:  Okay.  Mr. Facci, do you have anything you

 1    would like to add?

 2        MR. FACCI:  Just briefly, Your Honor.  I think there is

 3    a difference here between her belief in the officer using

 4    force versus excessive force.  I don't think there's evidence

 5    here at all that the defendant believed that this officer was

 6    engaging in excessive force.  Sure, he was engaging in force,

 7    no more force than was reasonably necessary under the

 8    circumstances.  And we're not saying --

 9        THE COURT:  So you agree that, based on what she said

10    on the video, that the defendant believed that force was being

11    used; you just don't think that's enough to show that she

12    believed that excessive force was being used?

13        MR. FACCI:  Yes.  I think that's correct.

14        THE COURT:  And I think Mr. Ohm said in this scenario

15    any force is excessive force given that she wasn't doing

16    anything.  What's your response to that?

17        MR. FACCI:  That's not what the definition of excessive

18    force is, at least under the *Celentano* case.  It's force that

19    is no greater than reasonably necessary to perform a lawful

20    action or a detention.  There's no basis to believe that what

21    we see in this video here, that any reasonable person could

22    find that that was excessive.

23       And particularly, it's not even a reasonable person

24    standard.  It's what the defendant believed.  And again, we're

25    not saying that the defendant needs to testify in order to

1    show that there was a reasonable belief, but I don't know how

2    else that evidence would come in to show that the defendant

3    did reasonably believe this officer was engaged in excessive

4    force.

5        THE COURT:  Okay.  And you think a defendant can't show

6    that through other evidence; they need to testify?

7        MR. FACCI:  I don't know what other evidence that the

8    defense could put on to show that.  But I just know that it

9    hasn't been shown in this case.

10        THE COURT:  Okay.  I'm going to give both sides until

11    eight o'clock to file whatever you want to file alerting me to

12    any authorities that would support a self-defense instruction

13    in this case, and at the same time, assuming I give one, I

14    want you to try to come to an agreement on one and tell me

15    what that is.  And then I will get that at 8:00 and decide

16    whether I'm giving one, and if you've agreed on one --

17    hopefully you don't have a dispute about what that says,

18    especially if we're sticking to the Red Book, which would be

19    my preference.  And then I'll let you know whether I'm giving

20    one or not.

21        MR. OHM:  Just one thing.  So Your Honor, the reason

22    that the *Celentano* and the other cases add this sort of

23    excessive force component is because obviously when an officer

24    is putting someone under arrest, there's force being used.

25    They're talking about force within that context.  The

1    excessive force here, not only was there no evidence that

2    Ms. Reid was doing anything other than videoing when the

3    assault that the police officer actually conducted first

4    began, but you also have her reacting, and then you also have

5    her taking pictures or her friend taking pictures of the

6    bruises because of what she perceived as excessive because she

7    had injuries based upon the force that was used by Agent

8    Bates.

9        So if the court feels they need that extra little nudge,

10   which it's our position that you don't, you have that other

11   piece of evidence that reflects Ms. Reid's state of mind.  And

12   again, a reasonable juror could find this.  There's more than

13   a scintilla of evidence.  But we understand the court's

14   invitation and we'll take you up on it.

15            THE COURT:  Okay.  What's next?  Do you want me to

16   instruct on a defense theory, Mr. Ohm?

17            MR. OHM:  Yes, Your Honor.  It hopefully came by email

18   to chambers within the last 15 minutes?

19            THE COURT:  Here, let me check.  Yes, I see it.  And

20   you've gotten this, Mr. Wolf and Mr. Facci?

21            MR. WOLF:  Yes, Your Honor.

22            THE COURT:  Okay.  What else?

23            MR. WOLF:  Your Honor, may we be heard just briefly as

24   to the defense theory?

25        Your Honor, the Red Book instruction on this issue,

1    instruction 9.100, discusses I guess many cases in which this

2    has come up, but the instruction says that if there is any

3    evidence fairly tending to bear upon the issue, however weak,

4    then the court may not enter the province of the jury which

5    may find credibility testimony the judge may consider -- I'm

6    sorry.  And they may completely -- may find credibility

7    testimony that the judge may consider completely overborne

8    by --

9        Let me start from the beginning.  An accused is entitled to

10    an instruction if there is any evidence fairly tending to bear

11    upon the issue, however weak.

12        So I'll leave it there.  The government has concerns about

13    the second paragraph of the proposed defense theory in that I

14    think it goes far beyond the evidence in this case about what

15    happened in this interaction at the wall, and goes into sort

16    of the concerns that the government expressed at the beginning

17    of this case, discussing about the posture and how the case

18    has been indicted or not indicted.  And there's just been no

19    evidence elicited in this case about, like, what led the

20    government to initiate this case.

21        So I think it's far beyond the bounds of what's actually

22    before the jury.  And it confuses the issues and goes to the

23    concerns that the government expressed regarding the admission

24    of this grand jury testimony.  And so we would object to the

25    second paragraph of this instruction.

1          THE COURT:  Okay.  Mr. Ohm?

2          MR. OHM:  Your Honor, so it's a fair inference from the

3     evidence and from the prosecution.  I mean, when the defense

4     is in closing arguments, the defense is entitled to argue

5     things that aren't specifically mentioned in evidence, for

6     example, a lack of evidence, or for example, the government's

7     bias.  You know, we don't have to call Jeanine Pirro and put

8     her on the stand and elicit testimony that she's biased to say

9     that based upon the evidence and the way the government

10    presented its case and the way the government prosecuted this

11    person that the government appears to be biased against the

12    defendant.  That's a fair inference just from the manner in

13    which a person is prosecuted.

14       So what we're limited to is -- theory of the defense

15    instruction is in order if there is sufficient evidence from

16    which a reasonable jury could find for the defendant on his

17    theory.

18       So the factual basis for our theory we acknowledge is the

19    first paragraph.  The second paragraph is a legitimate

20    argument that we can make, and it's an argument we can make in

21    closing.  Frankly, if the court -- if the government doesn't

22    want this in the theory of the defense instruction, just wants

23    us to argue it, I don't know that that's something that we

24    would spend a lot of time arguing about.  But I guess I'll

25    just leave it at that.

1          THE COURT:  Okay.  So you are fine leaving paragraph 2

2     to your closing?

3          MR. OHM:  Yes.

4          THE COURT:  Okay.  Mr. Wolf, do you have any objection

5     to the first paragraph?  I mean, obviously, it will depend on

6     whether or not I allow a self-defense instruction.

7          MR. WOLF:  No, Your Honor.

8          THE COURT:  Okay.  Mr. Ohm, I will also take this under

9     advisement and then let you know whether I'm going to read the

10    second paragraph or whether you can just argue that in your

11    closing.

12         MR. OHM:  Understood.  Oh, because I'm getting mentally

13    elbowed aloud here by my co-counsel, I didn't officially renew

14    the Rule 29 motion even though we did discuss it at the end of

15    the evidence.  So I just want to make sure that the record is

16    clear that we are renewing our Rule 29 motion.

17         THE COURT:  With respect to Officer Liang?

18         MR. OHM:  Just all -- the entire count.

19         THE COURT:  Okay.  I only understood you to be making a

20    Rule 29 motion as to Officer Liang, which I granted.  So

21    you're now making one generally.

22         MR. OHM:  Yes.  I think I said I was submitting on the

23    record, I wasn't going to take the court's time in argument,

24    but we wanted to preserve the issue, and we're doing the same

25    now.

1          THE COURT:  Understood.  So you're making a Rule 29

2     motion generally.

3          MR. OHM:  Yes.

4          THE COURT:  Okay.  I will reserve decision on that.  Do

5     you want to be heard?

6          MR. WOLF:  No, not on that, Your Honor.  Just there's

7     one issue just to kind of close a loop on.  Ms. Macey provided

8     information to the court.  I think there was some additional

9     follow-up that Ms. Macey wanted to represent to the court.

10          THE COURT:  Sure.  You can come up.

11          AUSA MACEY:  Thank you, Your Honor.  I didn't find

12     anything specific to the court's inquiry, but I did just want

13     to close the loop given that I did find one item that I wanted

14     to mention.

15      I searched my emails today, and I found one email where I

16     was cc'd -- or actually I was not cc'd on the initial email.

17     There was an email from Special Agent Bates to Mr. Dernbach.

18     This was back on August 12.  And in the core body of the email

19     Agent Bates just wrote:  See attached for your requested

20     messages.  She did not specify any more detail about the

21     request itself.

22      And then when that was shared with me, Mr. Dernbach

23     mentioned -- wrote:  Here are the text messages regarding

24     Special Agent Bates's comments about the case and her injury.

25      So that was the only information I could find.

1          THE COURT:  Okay.  Thank you for updating me.

2          AUSA MACEY:  And if I could just add one other thing.

3     I believe when I mentioned this morning, it was my

4     recollection about us making an inquiry based on a derogatory

5     comment about Ms. Bates.  It may have been, after seeing this

6     email, it may have been that we knew she had made a comment

7     about the assaultive component.  I just don't remember at this

8     point what exactly we had heard, but I know that we were

9     reaching out to make sure we had obtained that message and

10    complied with our obligations.

11         THE COURT:  Okay.  Thank you.

12         AUSA MACEY:  Thank you.

13         THE COURT:  Mr. Ohm, you also moved for a mistrial

14    earlier based on prosecutorial misconduct.  Do you want to

15    make any arguments in support of that?  And then I'll hear

16    from the government.

17         MR. OHM:  Your Honor, we would actually -- at this

18    point we would ask the court to hold that motion in abeyance

19    until after a verdict, and then we can ask permission to brief

20    that in writing.

21         THE COURT:  Okay.

22       Okay.  Anything else?

23         MR. WOLF:  Nothing from the government.

24         MR. OHM:  No, Your Honor.

25         THE COURT:  Does anyone plan to use exhibits or

1    demonstratives in closings?

2         MR. FACCI:  I do, Your Honor.  Yes, Your Honor.  I plan

3    on showing a PowerPoint presentation that has mostly clips of

4    the BWC that's already been entered here.  Just to flag for

5    the court, I would like to play the video of the knee raise

6    more than once, a few times, since it happened so quickly, and

7    kind of argue that to the jury.  So just want to flag that for

8    the court, that I will be playing that multiple times.

9         THE COURT:  Okay.  I do not want objections during

10   closings.  So Mr. Ohm, Ms. Abe, do you have any objection to

11   that?  I assume you mean from Government 5 and the Bates

12   body-worn camera footage?

13        MR. FACCI:  Yes, Your Honor.

14        MS. ABE:  I don't believe that we have any objections

15   to the government playing anything that has been admitted.  We

16   would respectfully ask that the government, at a time

17   reasonably ahead of closings, share their PowerPoint, and we

18   would do the same, just in the event that there are objections

19   to any slides in closing.  Sometimes the parties use things

20   that have not necessarily been entered I would say, like other

21   demonstratives.

22        THE COURT:  Okay.  Does the government have any issue

23   with both sides exchanging their PowerPoints so we can clear

24   up any objections before you're in front of the jury?

25        MR. FACCI:  No objection.

1          THE COURT:  Okay.  When are you going to do that?

2          MS. ABE:  We will do it in the morning, and we would

3    give the government -- I think we would venture to give the

4    government at least an hour notice before we began, or before

5    the court begins instructing the jury.  So by 8 a.m.

6          THE COURT:  8 a.m.  And you guys will be back here at 9

7    and actually at 9 so we can clear up any objections and I can

8    resolve them because at 9:30, once the jury comes back, I'm

9    going to instruct them, we'll go directly into closings, I'll

10    then do the rest of my instructions, and then they'll go back

11    for deliberations.

12          MR. OHM:  Yes, Your Honor.

13          THE COURT:  Is that acceptable to the government?  8

14    a.m. you will exchange your PowerPoints, and then you will let

15    me know at 9 if there are any issues?

16          MR. FACCI:  That's acceptable.

17          THE COURT:  Okay.  And you might also get here and test

18    the technology to make sure everything is working before you

19    start your closings.

20       Okay.  Anything else?

21          MS. ABE:  Not from the defense, Your Honor.

22          THE COURT:  Okay.  So I assume then you're planning to

23    use PowerPoint, a PowerPoint presentation?

24          MS. ABE:  Yes, Your Honor.  That's correct.

25          THE COURT:  And also play videos?  Or are you not sure

1          yet?

2               MR. OHM:  Your Honor, I'm just going to ask if we could

3          sort of modify our position.  We're happy to provide all the

4          exhibits and demonstratives by eight o'clock a.m. tomorrow.

5          But to the extent there are any sort of arguments within the

6          slides, the PowerPoints are often a preview of our arguments,

7          and I guess what I'm worried about is next time I'm in trial

8          before Your Honor, Your Honor being like last time you were in

9          trial you turned them over and my practice is generally that

10         if the government wants to see it to show them --

11              THE COURT:  It was your co-counsel's proposal, Mr. Ohm.

12              MR. OHM:  That's why I've been glaring at her.

13              THE COURT:  Here's what I would like to avoid.  I do

14         not want objections during closings.  I do not want to be

15         resolving objections during closings.  You should both confer

16         this evening and figure out what you need to exchange to

17         prevent that.  Obviously, no one's objecting to arguments that

18         you're going to be making, but if that means flagging the

19         exhibits, whatever you need to do to make sure no one asks me

20         to get on this phone during closings, you should do that

21         tonight.  Otherwise I'm going to leave that up to the four of

22         you to figure out.

23              MR. OHM:  Thank you very much.

24              THE COURT:  Okay.  Anything else?

25              MR. WOLF:  No, Your Honor.

1          THE COURT:  Okay.  So just to summarize where we are.

2     If either side wants to submit anything to me in support or

3     against the self-defense instruction, you should do that by

4     filing something on the docket, do not email me, by 8 p.m.

5     tonight so that's on the record.

6          Also by 8 p.m. you should submit a joint proposed

7     self-defense instruction, assuming I am going to give one, to

8     the extent you can agree on one.  If you can't agree on one,

9     you should submit something with both of your versions and

10     what your objections are so that I can then after eight

11     o'clock tonight resolve that and figure out whether and how

12     I'm going to be instructing the jury on self-defense.

13          I will also let you know, Mr. Ohm, whether on the defense

14     theory I'm going to instruct on both paragraphs or whether I

15     will leave it to you to handle the second paragraph in closing

16     as the government has requested.

17          We come back here tomorrow at 9 a.m. so we can resolve any

18     issues.  At 9:30 we'll get the jury in here.  I'll instruct

19     them, you'll do your closings, I'll do the rest of my

20     instructions after your closings, which are the last couple on

21     exhibits, etc.  And then the jury will begin deliberations.

22          Anything else?  Okay.  I will hear from you later tonight

23     and I will see you all tomorrow at 9:00.

24          (Proceedings adjourned at 4:24 p.m.)

25

\*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne